

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
12/22/2020

|  |  |
|---|---|
| In re:<br><br>EBONY MEDIA OPERATIONS, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-33665 (DRJ)<br><br>(Jointly Administered)<br><br>(Docket No. 48) |

**ORDER (I) APPROVING AND AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES,
(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
<u>AND (III) GRANTING RELATED RELIEF</u>**

Upon consideration of the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors

in possession (the "<u>Debtors</u>"), pursuant to sections 105(a), 363, 365, and 503 of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006,

9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and

Rules 2002-1 and 6004-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court

for the Southern District of Texas, effective May 29, 2020 (the "<u>Local Rules</u>"), for the entry of

an order (this "<u>Sale Order</u>") authorizing and approving (i) the sale (the "<u>Sale</u>") pursuant to that

certain Asset Purchase Agreement attached hereto as <u>Exhibit 1</u> (including all exhibits and

schedules related thereto) (as may be amended, supplemented, or otherwise modified in

accordance with the terms thereof, the "<u>APA</u>"),[2] by and between the Debtors, as sellers, and

Bridgeman Sports and Media LLC, as purchaser (the "<u>Purchaser</u>"), free and clear of all liens,

---

[1]    The Debtors in these jointly administered cases are Ebony Media Operations, LLC and Ebony Media Holdings, LLC.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to such terms in the APA, or to the extent not defined therein, the Bidding Procedures Order (as defined herein).

claims, interests, and encumbrances (except any permitted liens and encumbrances), (ii) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code in connection with the Sale, and (iii) granting related relief; and the Court having entered on October 9, 2020 that certain *Order Granting Debtors' Motion to (A)Approve Letter of Intent and Entry Into Stalking Horse Asset Purchase Agreement, (B) Approve Bidding Procedures for the Sale of Debtors Assets, (C) Approve Stalking Horse Bid Protections, (D) Approve Assumption and Assignment Procedures, (E) Schedule Auction for, and Hearing to Approve, the Sale of Debtors' Assets, (F) Approve Form and Manner of Notice Thereof, (G) Approve the Sale of Assets Free and Clear of Liens, Claims and Encumbrances and Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Approve Related Relief* [Docket No. 110] (the "Bidding Procedures Order"); and the Debtors, after an extensive marketing and sale process, and acting in accordance with the bidding procedures approved pursuant to the Bidding Procedures Order, having determined that the highest or otherwise best offer for the Purchased Assets was made by the Purchaser pursuant to the APA; and the Court having conducted a hearing on December 22, 2020 (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sale, to consider the approval of the Sale pursuant to the terms and conditions of the APA; and the Court having considered (i) the Motion and any objections thereto, (ii) the Sale, (iii) the arguments of counsel made, and evidence adduced, related thereto, and (iv) the full record in these chapter 11 cases, including the record related to the hearing to consider the Bidding Procedures Order and the Sale Hearing held before the Court; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA, the Sale and the transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their bankruptcy

2

estates, their creditors, and other parties in interest in these chapter 11 cases; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.

B.     To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     The Court has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Court may enter a final order with respect to the Motion, the Sale, the transactions contemplated thereby, and all related relief, in each case, consistent with Article III of the United States Constitution.

D.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale Order and directs entry of judgment as set forth herein.

E.     The Purchased Assets constitute property of the Debtors' bankruptcy estates and title thereto is vested in the Debtors' bankruptcy estates within the meaning of section 541(a) of the Bankruptcy Code.

3

F.      The statutory bases for the relief requested in the Motion and provided for herein are sections 105, 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, and 9014, and Local Rules 2002-1 and 6004-1.

G.      On July 23, 2020 (the "Petition Date"), involuntary petitions were filed against each of the Debtors.

H.      On September 3, 2020, the Court entered an *Agreed Order for Relief* with respect to each of the Debtors [Docket No. 45].

I.      This Court previously entered the Bidding Procedures Order, among other things: (i) establishing certain bidding and auction procedures; (ii) scheduling the Auction (if necessary) and the Sale Hearing to consider the sale of the Purchased Assets; (iii) establishing certain procedures for noticing and determining cure amounts related to the Debtors' executory contracts and unexpired leases; (iv) approving the form and manner of notice of certain procedures, dates, and deadlines in connection with the Bidding Procedures and the Sale; and (v) granting certain related relief [Docket No. 110].

J.      As evidenced by the affidavits of service and publication previously filed with the Court [including Docket Nos. 49, 53, 121 and 126], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Auction, the Sale, and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Purchaser at Closing or thereafter pursuant to this Sale Order and the APA (collectively, the "Assigned Contracts") has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9014, and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, without limitation, to the following parties or, in lieu thereof, to

4

their counsel if known:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) Parkview Capital Credit, Inc. ("Parkview"); (c) Unity National Bank of Houston, N.A. (the "DIP Lender"); (d) all persons known or reasonably believed to have asserted an interest in the Purchased Assets; (e) the Attorneys General in the State(s) where the Purchased Assets are located; (f) all state and local taxing authorities in the State(s) where the Purchased Assets are located; (g) the Internal Revenue Service; (h) all parties that have asserted liens against the Purchased Assets; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice once in the *Houston Chronicle* and the *Houston Business Journal*, as evidenced by the *Notice of Compliance With Order* of service filed by the Debtors at Docket No. 121 in these chapter 11 cases, was, and is deemed, sufficient, and reasonably calculated under the circumstances to reach such entities.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale, and the Sale Hearing is, or shall be, required.

K.     In accordance with the provisions of the Bidding Procedures Order, the Debtors have served notices (the "Cure Notices") upon the counterparties to the Assigned Contracts (collectively, the "Non-Debtor Counterparties"): (i) that the Debtors seek to assume and assign to the Purchaser the Assigned Contracts on the closing of the Sale (as such closing date may be modified pursuant to the terms of the APA, the "Closing Date"); and (ii) of the relevant cure amounts as stated in the Cure Notice or as otherwise agreed by the Debtors, the Purchaser, and the applicable Non-Debtor Counterparty, (each, a "Cure Amount" and collectively, the "Cure Amounts").  The service of such notices was good, proper, timely, reasonable, adequate, sufficient,

5

and appropriate under the circumstances, and no other or further notice need be given in respect of establishing a Cure Amount for the Assigned Contracts. Each of the Non-Debtor Counterparties has had a reasonable opportunity to object to the Cure Amounts set forth in the applicable notice and to the assumption and assignment to the Purchaser of the applicable Assigned Contract.

L.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion as it pertains to the Sale and provided for herein.

M.      The disclosures made by the Debtors in the Motion, the Sale Notice, and related documents filed with the Court concerning the APA, the Auction, the Sale, and the Sale Hearing were good, complete, and adequate.

N.      A reasonable opportunity to object and to appear and be heard with respect to the Sale, the Motion, and the relief requested therein, including but not limited to, the assumption and assignment of the Assigned Contracts and the Cure Amounts, has been afforded to all interested parties, including the Notice Parties.

O.      The deadline to file a Cure Amount/Assignment Objection has expired. To the extent that any party timely filed a Cure Amount/Assignment Objection or Post-Auction Objection, all such Cure Amount/Assignment Objections or Post-Auction Objections have been resolved, withdrawn, overruled, or adjourned to a later hearing by agreement of the parties. To the extent that any such party did not timely file a Cure Amount/Assignment Objection or a Post-Auction Objection, such party shall be deemed to have consented to (i) the assumption and assignment of the Assigned Contract to the Purchaser, and (ii) the proposed Cure Amount set forth on the Potential Assumption and Assignment Notice.

P.      The Bidding Procedures set forth in the Bidding Procedures Order are non-collusive, proposed and executed in good faith as a result of arms'-length negotiations,

6

designed to maximize the value of the Purchased Assets, and substantively and procedurally fair to all parties.

Q.      The Debtors conducted the process with respect to the Sale in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Auction was duly noticed, and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Purchased Assets.  The Purchaser is the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order.

R.      The terms contained in the APA constitute the highest or otherwise best offer for the Purchased Assets and will provide a greater recovery for the Debtors' bankruptcy estates for the Purchased Assets than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

S.      The APA and the Sale contemplated thereby represent a fair and reasonable offer to purchase the Purchased Assets.  No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Purchased Assets for greater economic value to the Debtors' bankruptcy estates than the Purchaser.

T.      Approval of the Motion and the APA and the consummation of the Sale contemplated thereby is in the best interests of the Debtors, their bankruptcy estates, their creditors and other parties in interest in these chapter 11 cases.

U.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Purchased Assets because, among

other reasons, (i) the APA constitutes the highest or otherwise best offer for the Purchased Assets, (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets, and (iii) any other transaction would not have yielded as favorable an economic result.  The Purchaser is purchasing the Purchased Assets in good faith, is a good-faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is not an "insider" (as defined under section 101(31) of the Bankruptcy Code) of the Debtors, and therefore is entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code, and otherwise has proceeded in good faith in all respects in connection with the Sale in that:  (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Purchaser complied with the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the APA, including the Sale contemplated thereby, were at arms'-length and in good faith.

V.      The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  The Debtors, the Purchaser, and their respective agents, representatives, and affiliates have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

W.      The consideration provided by the Purchaser pursuant to the APA:  (i) is fair and adequate, and constitutes reasonably equivalent value and fair consideration and value, under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Fraudulent Transfer Act); and (ii) will provide a greater recovery for the Debtors' bankruptcy estates and creditors than would be provided by any other reasonably practicable available alternative.

X.       By consummating the Sale, the Purchaser is not a mere continuation of the Debtors or their bankruptcy estates, and there is no continuity, no common identity, and no continuity of enterprise between the Debtors and the Purchaser.  The Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Purchaser is not a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser and the Debtors.  Neither the Purchaser nor any of its agents, representatives, or affiliates shall assume or in any way be responsible for any obligation, liability or claim of the Debtors and their bankruptcy estates except as expressly provided in this Sale Order or the APA.  None of the transactions contemplated by the APA, including, without limitation, the Sale or the assumption and assignment of any Assigned Contracts, is being undertaken for the purpose of hindering, delaying, or defrauding any creditors under the Bankruptcy Code, under the laws of the United States, or under the laws of any state, territory, possession, or the District of Columbia.  Neither the Debtors nor the Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

Y.       The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a plan of reorganization of the Debtors.  The Sale does not constitute a *sub rosa* plan.

Z.      The Debtors, acting by and through their agents, representatives, and officers, have (i) full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and (ii) taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  Each member of each Debtor shall be deemed to have authorized and approved the APA and the consummation of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the APA, are required for the Debtors to consummate the Sale, execute the APA, or consummate the transactions contemplated thereby.

AA.      The transfer of each of the Purchased Assets to the Purchaser will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Purchaser with all right, title, and interest to the Purchased Assets free and clear of any and all Encumbrances (as defined below).

BB.      Not transferring the Purchased Assets free and clear of all Encumbrances (other than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA) of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities and/or applicable state, federal, or foreign law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets other than pursuant to a transfer that is free and clear of all Encumbrances (other than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

CC.      The Debtors may sell the Purchased Assets free and clear of any and all Encumbrances against the Debtors, their bankruptcy estates, or any of the Purchased Assets (other

10

than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances against the Debtors, their bankruptcy estates, or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Encumbrances who may have been able to object fall within one or more of the other subsections of section 363(f) and are adequately protected in this Sale Order by having their Encumbrances, if any, in each instance against the Debtors, their bankruptcy estates, or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an Encumbrance, in the same order of priority, with the same validity, force, and effect that such creditor had prior to the Sale, subject to any claims and defenses that the Debtors and their bankruptcy estates may possess with respect thereto. All other holders of Encumbrances could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim or interest, or otherwise fall within section 363(f) of the Bankruptcy Code. Except as set forth in ¶21, p. 23, of the *Final Order Authorizing the Debtors to Obtain Debtor-In-Possession Financing and to Use Cash Collateral, and Granting Related Relief* [Doc. 230] (the "Final DIP Order") [Doc. No. 230], the Debtors shall not use Parkview's cash collateral except (i) upon the terms and conditions set forth in a cash collateral order to be negotiated by the Debtors and Parkview within ten (10) days after the Closing Date; (ii) upon Parkview's prior written consent (which consent may be provided or withheld in Parkview's sole discretion); or (iii) as otherwise approved by this Court. Notwithstanding anything contained herein to the contrary, disbursements shall only be made to professionals on account of allowed professional fees and expenses.

11

DD.    If the Sale were not free and clear of all Encumbrances (other than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA), or if the Purchaser would, or in the future could, be liable for any Encumbrances (other than Assumed Liabilities, or unless otherwise assumed in, or permitted by, the APA), the Purchaser would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors, their bankruptcy estates, and their creditors.

EE.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser pursuant to the terms of this Sale Order and the APA, in each case in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their bankruptcy estates and creditors and other parties in interest.  The Assigned Contracts being assigned to the Purchaser under the APA are an integral part of the APA and the Sale, and accordingly such assumptions and assignments are reasonable and enhance the value of the Debtor's bankruptcy estate.  Any Non-Debtor Counterparty to any Assigned Contract that has not actually filed with the Court an objection to such assumption as of the date hereof is deemed to have consented to such assumption and assignment.

FF.    The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Assigned Contracts to the extent provided under this Sale Order and the APA and have:  (i) cured any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to

12

such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance with respect to the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. The Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary.

GG.     Except as expressly assumed by the Purchaser under the APA, the transfer of the Purchased Assets to the Purchaser and the assignment to the Purchaser of the Assigned Contracts will not subject the Purchaser to any liability whatsoever which may become due or owing under the Assigned Contracts prior to the Closing Date (other than Cure Amounts), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities

HH.     The APA and Sale must be approved and the Closing must occur promptly to preserve the value of the Purchased Assets and the Debtors' bankruptcy estates.

II.     Given the adequacy and fair value of the consideration provided by the Purchaser under the APA, the Sale constitutes a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their bankruptcy estates, and their creditors and other parties in interest in these chapter 11 cases, and should be approved.

JJ.     The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale.

KK.     To maximize the value of the Purchased Assets and preserve the viability of the businesses to which they relate, it is essential that the Sale occur within the time constraints set forth in the APA.  Time is of the essence in consummating the Sale.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price under the APA, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.  Accordingly, cause exists to waive the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a), 6004(h), and 6006(d) to permit the immediate effectiveness of this Sale Order.

## NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.      The relief requested in the Motion is **GRANTED** as set forth herein and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

2.      All objections to, reservations of rights regarding, or other responses to the Motion or the relief requested therein, the APA, all other Ancillary Agreements, the Sale, the entry of this Sale Order, or the relief granted herein, including, without limitation, any objections to Cure Amounts or relating to the cure of any defaults under any of the Assigned Contracts or to the assumption and assignment of any of the Assigned Contracts to the Purchaser by the Debtors, that have not been withdrawn, waived, adjourned, or settled by announcement to this Court during the Sale Hearing or by stipulation filed with this Court or otherwise been resolved pursuant to the terms thereof, including, without limitation, any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or withdrew their objections to the Motion or the entry of this Sale Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are

14

deemed to have consented to the relief granted herein for all purposes, including without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law constitute findings of fact, they are adopted as such.

4.      Notice of the Motion, the Auction, the Sale Hearing, the Sale, and the assumption and assignment of the Assigned Contracts was fair and equitable under the circumstances, and complied in all respects with the Bidding Procedures Order, section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the Local Rules.

### Approval of the Sale of the Purchased Assets

5.      The APA, including all other Ancillary Agreements, and all of the terms and conditions thereof, and the Sale of the Purchased Assets to the Purchaser as provided in the APA, are hereby approved in all respects.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their agents, representatives, and officers, are authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of this Sale Order and the APA; (b) transfer and assign all rights, title, and interest to all property, licenses, and rights to be conveyed in accordance with the terms and conditions of this Sale Order and the APA; and (c) execute and deliver, perform under, consummate, and implement this Sale Order and the APA and all additional instruments and documents that may be reasonably necessary or desirable to implement this Sale Order, the

15

APA and the Sale, including any other Ancillary Agreements, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by this Sale Order, the APA, and any such other Ancillary Agreements.

7.      This Sale Order shall be binding in all respects upon the Debtors, their bankruptcy estates, all creditors, all parties in interest, all holders of equity interests in the Debtors, all holders of any Encumbrances against the Debtors, any holders of Encumbrances against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser, and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' chapter 11 cases, or other plan fiduciaries, plan administrators, liquidating trustees, or other estate representatives appointed or elected in the Debtors' cases.  The terms and provisions of the APA and this Sale Order shall inure to the benefit of the Debtors, their bankruptcy estates, their creditors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any other affected third parties, including all persons asserting any Encumbrances in the Purchased Assets to be sold to the Purchaser pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

## Sale and Transfer of Purchased Assets

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing Date and pursuant to and except as otherwise set forth in the APA, the

16

Purchased Assets shall be transferred to the Purchaser free and clear of all encumbrances, claims, interests, and liens accruing, arising, or relating thereto any time prior to the Closing Date, including, without limitation, the Excluded Liabilities, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, and other liens (including mechanics', materialman's, and other consensual and non-consensual liens and statutory liens), judgments, litigation, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities related to the Employee Retirement Income Security Act of 1974, liabilities related to the Internal Revenue Code, or any other liability relating to the Debtors' current and former employees, including without limitation any withdrawal liabilities or liabilities under any collective bargaining agreement or labor practice agreement, of the Debtors or any of the Debtors' predecessors or affiliates, claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of

17

successor liability (other than Assumed Liabilities and Permitted Encumbrances) (collectively, the "Encumbrances"), with all such Encumbrances to attach to the cash proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtors and their bankruptcy estates may possess with respect thereto.

9.      On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser pursuant to the terms set forth in this Sale Order and the APA.  For the avoidance of doubt, the Excluded Assets set forth in the APA are not included in the Purchased Assets, and the Excluded Liabilities set forth in the APA are not Assumed Liabilities. Except as set forth in ¶21, p. 23, of the Final DIP Order, the Debtors shall not use Parkview's cash collateral except (i) upon the terms and conditions set forth in a cash collateral order to be negotiated by the Debtors and Parkview within ten (10) days after the Closing Date; (ii) upon Parkview's prior written consent (which consent may be provided or withheld in Parkview's sole discretion); or (iii) as otherwise approved by this Court.  Notwithstanding anything contained herein to the contrary, disbursements shall only be made to professionals on account of allowed professional fees and expenses.

10.     Subject to the terms and conditions of this Sale Order, the transfer of the Purchased Assets to the Purchaser pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in this Sale Order and the APA, constitute a legal, valid, and effective transfer of the Purchased Assets, and shall vest the Purchaser with right, title, and interest in and to the Purchased Assets as

18

set forth in this Sale Order and the APA, as applicable, free and clear of all Encumbrances (except as otherwise assumed in, or permitted by, the APA).

11.     The Sale of the Assets is not subject to avoidance by any person or for any reason whatsoever, including, without limitation, pursuant to section 363(n) of the Bankruptcy Code and the Purchaser shall not be subject to damages, including any costs, fees, or expenses under section 363(n) of the Bankruptcy Code.

12.     The Purchaser, to the extent provided by this Sale Order or the APA, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by this Sale Order and the APA.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit or entity may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

13.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets to be sold, transferred, or conveyed (wherever located) to the Purchaser pursuant to this Sale Order and the APA are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

14.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, litigation, mechanic's liens, *lis pendens*, or other documents or agreements

*ACTIVE 54327459v3*

evidencing Encumbrances against or in the Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Encumbrances that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in, or permitted by, the APA), or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against or in the Purchased Assets of any kind or nature (except as otherwise assumed in, or permitted by, the APA); *provided* that notwithstanding anything in this Sale Order or the APA to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  For the avoidance of doubt, upon consummation of the Sale, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any Encumbrances that are extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

15.     Except to the extent included in Assumed Liabilities or Permitted Encumbrances, or to enforce the APA, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to contracts and leases, customers, employees and former employees, dealers and sale representatives, and trade or other creditors

holding Encumbrances against or in the Debtors and their bankruptcy estates or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the transfer of the Purchased Assets to the Purchaser, or any entities or individuals asserting any interests in the Purchased Assets, hereby are forever barred, estopped, and permanently enjoined from asserting any Encumbrances against the Purchaser, the permitted successors and assigns of the Purchaser, the property of the Purchaser or its permitted successors and assigns, or the Purchased Assets conveyed in accordance with the APA.

16.     As of and after the Closing:  (a) each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release their Encumbrances in the Purchased Assets (if any) as such Encumbrances may have been recorded or may otherwise exist; and (b) any Purchased Asset that may be subject to a statutory lien, mechanic's lien or the like shall be turned over and such liens shall attach to the proceeds of the Sale in the same priority they currently enjoy with respect to the Purchased Assets, and subject to any challenge rights that may exist with respect to such alleged liens.

17.     Except as otherwise provided in the APA, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Purchased Assets, including, but not limited to, any liability for any liabilities whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business, which may become due or owing (a) prior to the Closing Date, or (b) from and after the Closing Date but which arise out of relate to any act, omission, circumstances, breach, default, or other event occurring prior to the Closing Date.

18.     To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, trademark, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

19.     Subject to the terms, conditions, and provisions of this Sale Order, all Entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere (a) with the ability of the Debtors to sell and transfer the Purchased Assets to Purchaser in accordance with the terms of the APA and this Sale Order, and (b) with the ability of the Purchaser to acquire, take possession of, use and operate the Purchased Assets in accordance with the terms of the APA and this Sale Order.

### Designation Right Assets

20.     Purchaser shall have the right, by written notice to the Debtors no later than the Closing, to specify that any Contract and/or asset shall be held by the Debtors (and, to the extent a Contract, not rejected pursuant to section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth on Schedule 2.5(b) to the APA, which Schedule 2.5(b) may be amended by Purchaser at any time no later than the end of the Designation Rights Period, a "Designation Right Asset") for the duration of the Designation Rights Period; *provided*, *however*, that, with respect to any such Designation Right Asset, (i) Purchaser shall promptly reimburse the Debtors on demand, and thereby be solely responsible for, all costs associated with the continuation by, and (to the extent such Designation Right Asset is a Contract) ultimate assumption or rejection by, the Debtors of such Designation Right Asset for the period from the Closing

22

through the end of the Designation Rights Period (such costs, "Continuation Costs"); (ii) all cash collected by the Debtors in respect of such Designation Right Asset shall be promptly delivered to Purchaser; provided, however, that the Debtors shall be entitled to deduct Continuation Costs from any cash collected by the Debtors in respect of the Designation Right Asset giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to the Purchaser of any other Purchased Asset that may be related to such Designation Right Asset.

21.    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Asset, the Debtors shall, subject to the Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Bankruptcy Sale Order or otherwise that are reasonably necessary to seek to assume and assign to the Purchaser pursuant to section 365 of the Bankruptcy Code such Designation Right Asset(s) set forth in an Assumption Notice.

22.    As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) from the Purchaser during the Designation Rights Period requesting rejection of any Designation Right Asset, the Debtors shall take all actions required by this Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to section 365 of the Bankruptcy Code.

23.    Notwithstanding anything in this Sale Order or the APA to the contrary, on the date any Designation Right Asset is assumed and assigned to Purchaser pursuant to Section 2.5 of the APA, such Designation Right Asset shall be deemed a Purchased Asset (and, for the avoidance of doubt, in the event such Designation Right Asset is a Contract, such Designation Right Asset shall be deemed an Assigned Contract) for all purposes under the APA and no further consideration

23

shall be required to be paid for any Designation Right Asset that is assumed and assigned to the Purchaser.

**Contracts to be Assumed and Assigned**

24.     Consideration of unresolved Cure Amount/Assignment Objections and Post-Auction Objections relating to Contract assignment, including with respect to any Contract that is a Designation Right Asset, unless otherwise ordered by the Court or with the consent of the party to any Contract that is subject to a Cure Amount/Assignment Objection or Post-Auction Objection relating to Contract assignment, shall be considered by the Court at a date to be determined and agreed to by the Debtors and the Purchaser; *provided*, *however*, that (i) any Contract that is the subject of a Cure Amount/Assignment Objection with respect solely to the amount of the Cure Amount may be assumed and assigned prior to resolution of such objection, and (ii) such undisputed Cure Amount shall be promptly cured on or after the Closing Date or as otherwise agreed to by the Purchaser and the applicable Non-Debtor Counterparty by the Purchaser's payment of the applicable Cure Amount.

25.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption, on the terms set forth in this Sale Order and the APA, of the Assigned Contracts, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

26.     The Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Purchaser, effective upon the Closing Date, the Assigned Contracts free and clear of all Encumbrances (except as otherwise assumed in,

24

or permitted by, the APA) and execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

27.     The Debtors are hereby authorized in accordance with section 365 of the Bankruptcy Code and the procedures set forth in the APA to assume and assign the Assigned Contracts to the Purchaser free and clear of all liens, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser as provided in the APA; _provided_ that Designation Right Assets shall only be transferred free and clear upon assumption or assumption and assignment of such Designation Right Asset.  The Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assigned Contracts assumed and assigned in accordance with the procedures set forth in the APA.

28.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest in and of each Assigned Contract.

29.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

30.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, with respect to each of the Assigned Contracts assigned to the Purchaser on the Closing Date or during the Designation Rights Period, the Purchaser, upon notice to the Debtors, shall pay promptly after the Closing Date or after entry of order approving assumption and assignment of a Contract designated

25

in accordance with Section 2.5 of the APA all amounts necessary to cure any monetary Default (as distinct from curing all Defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to the Purchaser, which Cure Amounts, including those set forth on the Contracts Schedule, shall reduce the Base Amount on a dollar-for-dollar basis in an amount not to exceed $500,000.00 in the aggregate pursuant to Section 3.1 of the APA.

31.     Except as otherwise agreed in writing between the Debtors and the Non-Debtor Counterparties to the Assigned Contracts or stated on the record of the Sale Hearing, the Cure Amounts to be paid by the Purchaser for the Assigned Contracts are hereby fixed at the amounts set forth at Docket No. 133, and the Non-Debtor Counterparties to such Assigned Contracts are forever bound by such Cure Amounts and, upon payment of such Cure Amounts, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, or the Assets with respect to any claim for cure under any Assigned Contract. Notwithstanding anything to the contrary in this Sale Order or the APA,  Purchaser shall own all of the Debtors' right, title and interest in and shall be subject to and bound by that certain Trademark License Agreement between Johnson Publishing Company, LLC ("JPC") and Ebony Media Operations, LLC dated May 5, 2016 (the "Trademark License Agreement"); provided, however, that Purchaser reserves and preserves all of its rights and remedies with respect to the validity or enforceability of the Trademark License Agreement. Nothing in this Sale Order shall be construed as an extinguishment or modification of the Trademark License Agreement or the rights of Miriam R. Stein, as chapter 7 bankruptcy trustee of JPC, or JPC's rights or JPC's bankruptcy estate's rights

26

thereunder to the extent such rights exist under applicable law. Notwithstanding anything to the contrary in this Sale Order or in the APA, the contract listed by the Debtors in Schedule G at Docket No. 60 as the Archive License Agreement, dated May 5, 2016, is not an Assigned Contract. Nothing in this Sale Order shall relieve the Debtors from performance of their obligations under the APA.

32.     The Purchaser shall have no liability arising or accruing under the Assigned Contracts on or prior to the Closing, except as otherwise expressly provided in the APA or this Sale Order.  Unless as otherwise set forth in this Sale Order or the APA, the Non-Debtor Counterparties to the Assigned Contracts are barred from asserting against the Debtors, their estates, the Purchaser, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Assigned Contracts arising or incurred prior to the Closing, other than the Cure Amounts set forth at Docket No. 133 or such other Cure Amount as agreed to by the Debtors (with the consent of the Purchaser) or as determined by the Court.

33.     The payment of the applicable Cure Amounts (if any) shall effect a cure of all defaults existing as of the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such Non-Debtor Counterparty resulting from such default.

34.     To the extent a Non-Debtor Counterparty to an Assigned Contract failed to timely object to a Cure Amount in accordance with the Bidding Procedures Order, such Cure Amount shall be deemed to be finally determined and any such Non-Debtor Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount

27

at any time, and such Cure Amount, when paid, shall be deemed to resolve any defaults or other breaches with respect to any Assigned Contract to which it relates.

35.     The Purchaser shall have assumed the Assigned Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtors and their bankruptcy estates nor the Purchaser shall have any further liabilities to the Non-Debtor Counterparties to the Assigned Contracts, other than the Purchaser's obligations under the Assigned Contracts that accrue after the date that such Assigned Contracts are assumed.

36.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts have been satisfied.

37.     Any party having the right to consent to the assumption or assignment of any Assigned Contract that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

38.     The Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts, and the Debtors and their bankruptcy estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts. The Purchaser shall have standing to object to the allowance of claims (as such term is

defined in section 101(5) of the Bankruptcy Code) asserted against the Debtors or their estates that constitute obligations assumed by the Purchaser pursuant to the terms of the APA, including, without limitation, any unresolved or disputed Assumed Liabilities, Cure Amounts under the Bidding Procedures Order, or otherwise.  Nothing in this Sale Order shall divest the Debtors, or any liquidating agent or other successor or assign, of their standing or duty under the Bankruptcy Code or otherwise from reconciling claims asserted against the Debtors or their estates and objecting to any such claims that should be reduced, reclassified or otherwise disallowed.  For the avoidance of doubt, the Purchaser does not have standing to object to any claims asserted by Parkview against the Debtors.

39.     The Purchaser has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

40.     There shall be no assignment fees, increases, rent-acceleration, or any other fees charged to the Purchaser or the Debtors and their bankruptcy estates as a result of the assumption and assignment of the Assigned Contracts.

41.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors and their bankruptcy estates or the Purchaser any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed or arising by reason of the Closing.

42.     Neither the Purchaser nor any permitted successor or assign of the Purchaser shall be responsible for or have any Encumbrances or obligations arising out of any of the contracts,

agreements, or understandings that are not Assigned Contracts after the Closing Date (except as specifically provided by the APA).

43.     The amounts shown on the 363 Sale Carve Out Worksheet [Dkt. No. 258] are estimates at the time of entry of this Sale Order and are subject, where applicable, to approval of a final fee application by further order of this Court.  On the date of the Closing, the Debtors shall provide Unity Bank, Parkview, Purchaser, and the U.S. Trustee with an updated 363 Sale Carve Out Worksheet containing the correct Carve-Out amounts as of the Closing date, which shall be subject to Unity's and Parkview's approval. Upon the Closing under the APA and the funding of the Purchase Price, the Debtors shall deposit the sale proceeds into the DIP account located at Unity Bank to repay (i) the DIP Loan, including any applicable fees under the DIP Loan Agreement; (ii) the Carve-Out amounts allocable to Unity Bank; and (iii) the Subrogation Amount in accordance with paragraph 21 of the Final DIP Order [Dkt. No. 230]. The Debtors shall then transfer any remaining sale proceeds into the DIP account at JPMorgan Chase Bank, and upon such transfer, Unity Bank shall be authorized to close the DIP account held at Unity Bank.

### Additional Provisions

44.     The Debtors and the Purchaser hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

45.     Following the Closing, no holder of an Encumbrance in or against the Debtors and their bankruptcy estates or the Purchased Assets shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Encumbrance or any actions that the Debtors and their bankruptcy estates may take in these chapter 11 cases or any successor bankruptcy case.

46.     The Debtors, including their respective officers, employees, and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA and this Sale Order.  The Debtors shall be, and hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Order and the relief granted pursuant to this Sale Order.

47.     The Sale is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts by the Purchaser, if any, and the sale free and clear of all Encumbrances (unless otherwise assumed in, or permitted by, the APA), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Purchaser is a good-faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code, and as such is entitled to the full benefits and protections of such section.

48.     As a good-faith purchaser of the Purchased Assets, the Purchaser has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

49.     This Sale Order and the APA shall be binding in all respects upon all creditors of (whether known or unknown), and holders of equity interests in, any Debtor, any holders of Claims or Liens in, against, or on all or any portion of the Purchased Assets, all successors and assigns of the Purchaser, the Debtors, and their affiliates and subsidiaries, and any subsequent trustees

31

appointed in the Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.

50.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in these chapter 11 cases, any subsequent chapter 7 or chapter 11 cases of the Debtors, or any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the terms of this Sale Order or the APA, and to the extent of any conflict or derogation between this Sale Order or the APA and such future plan or order, the terms of this Sale Order and the APA shall control.

51.     Nothing in this Sale Order or the APA shall constitute finding of fact or a conclusion of law in relation to the allocation of the sale proceeds as consideration for each of the Purchased Assets.

52.     The failure specifically to include any particular provisions of the APA including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the APA and each document, agreement or instrument be authorized and approved in its entirety.

53.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes and matters arising from or related to the APA, the Sale and the implementation, interpretation, and enforcement of this Sale Order.

*ACTIVE 54327459v3*

54.     To the extent the Debtors receive, hold, or otherwise come into possession of any payment or asset that constitutes Purchased Assets after the Closing, the Debtors shall immediately deliver or otherwise turn over each such payment or asset to the Purchaser.

55.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

56.     To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Sale Order shall govern.

57.     To the extent there are any inconsistencies between the terms of this Sale Order and the APA (including all Ancillary Agreements executed in connection therewith), the terms of this Sale Order shall govern.

58.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

59.     The provisions of this Sale Order are nonseverable and mutually dependent.

60.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

61.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith

*ACTIVE 54327459v3*

to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

**Signed:  December 22, 2020.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

34

# **EXHIBIT 1**

Asset Purchase Agreement

EXECUTION VERSION

---

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**EBONY MEDIA HOLDINGS, LLC**

**AND**

**EBONY MEDIA OPERATIONS, LLC,**

**AS SELLERS,**

**AND**

**BRIDGEMAN SPORTS AND MEDIA LLC,**

**AS PURCHASER,**

**DATED AS OF OCTOBER 7, 2020**

---

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS; INTERPRETATION ...................................................................... 2

    1.1    Certain Terms Defined ........................................................................... 2
    1.2    Interpretation .......................................................................................... 2

ARTICLE 2 PURCHASE AND SALE OF THE PURCHASED ASSETS ................................ 3

    2.1    Purchase and Sale of Assets .................................................................. 3
    2.2    Excluded Assets ...................................................................................... 6
    2.3    Assumption of Liabilities ...................................................................... 7
    2.4    Excluded Liabilities .............................................................................. 7
    2.5    Assignment and Assumption of Contracts; Benefit Plans ................... 10
    2.6    Third Party Consents ........................................................................... 11
    2.7    Right to Change Designations ............................................................. 11
    2.8    Cure Amounts ...................................................................................... 11

ARTICLE 3 CONSIDERATION ............................................................................................. 12

    3.1    Purchase Price ...................................................................................... 12
    3.2    Allocation of Purchase Price ............................................................... 14

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 15

    4.1    Organization ......................................................................................... 15
    4.2    Authorization of Agreement ................................................................ 15
    4.3    Conflicts; Consents of Third Parties ................................................... 15
    4.4    Title to Purchased Assets ..................................................................... 16
    4.5    Contracts .............................................................................................. 16
    4.6    Property ................................................................................................ 16
    4.7    Intellectual Property ............................................................................ 17
    4.8    Permits ................................................................................................. 18
    4.9    Employee Benefit Plans; Employees .................................................. 18
    4.10   Labor Relations ................................................................................... 19
    4.11   Environmental Matters ........................................................................ 19
    4.12   Insurance .............................................................................................. 19
    4.13   No Brokers or Finders ......................................................................... 19
    4.14   Litigation; Proceedings ....................................................................... 19
    4.15   Board Approval and Recommendations .............................................. 19
    4.16   Compliance with Laws ........................................................................ 20
    4.17   Affiliate Transactions .......................................................................... 20
    4.18   Customers and Suppliers ..................................................................... 20
    4.19   Taxes ................................................................................................... 20
    4.20   Warranties Are Exclusive .................................................................... 21

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................... 21

**TABLE OF CONTENTS**
**(Continued)**

| | | |
|---|---|---|
| 5.1 | Corporate Organization | 21 |
| 5.2 | Authorization and Validity | 21 |
| 5.3 | No Conflict or Violation | 21 |
| 5.4 | Consents and Approvals | 22 |
| 5.5 | Financing | 22 |
| 5.6 | Litigation | 22 |
| 5.7 | No Other Representations and Warranties | 22 |

ARTICLE 6 COVENANTS AND OTHER AGREEMENTS .................................................. 22

| | | |
|---|---|---|
| 6.1 | Pre-Closing Covenants of Sellers | 22 |
| 6.2 | Pre-Closing Covenants of Purchaser | 26 |
| 6.3 | Other Covenants of Sellers and Purchaser | 26 |
| 6.4 | Employment Covenants and Other Undertakings | 27 |
| 6.5 | Casualty | 28 |
| 6.6 | Confidentiality; Public Announcements; Use of Intellectual Property | 28 |
| 6.7 | Intellectual Property | 29 |
| 6.8 | No Successor Liability | 30 |

ARTICLE 7 TAXES .................................................. 30

| | | |
|---|---|---|
| 7.1 | Taxes Related to Purchase of Purchased Assets | 30 |
| 7.2 | Waiver of Bulk Sales Laws | 31 |

ARTICLE 8 BANKRUPTCY COURT MATTERS .................................................. 31

| | | |
|---|---|---|
| 8.1 | Motions | 31 |
| 8.2 | Contracts | 31 |
| 8.3 | Procedure | 32 |
| 8.4 | Purchaser Protections | 32 |

ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES .......... 32

| | | |
|---|---|---|
| 9.1 | Conditions Precedent to Performance by Sellers | 32 |
| 9.2 | Conditions Precedent to the Performance by Purchaser | 33 |

ARTICLE 10 CLOSING AND DELIVERIES .................................................. 35

| | | |
|---|---|---|
| 10.1 | Closing | 35 |
| 10.2 | Sellers' Deliveries | 35 |
| 10.3 | Purchaser's Deliveries | 37 |

ARTICLE 11 TERMINATION .................................................. 37

| | | |
|---|---|---|
| 11.1 | Termination | 37 |
| 11.2 | Effect of Termination | 39 |
| 11.3 | Break-Up Fee; Expense Reimbursement | 39 |

**TABLE OF CONTENTS**
**(Continued)**

PAGE

11.4    Exclusive Remedies ................................................................................ 40
11.5    Specific Performance ............................................................................. 41

ARTICLE 12 MISCELLANEOUS ........................................................................ 42

12.1    Survival .................................................................................................. 42
12.2    Further Assurances ............................................................................... 42
12.3    Successors and Assigns ........................................................................ 42
12.4    Governing Law; Jurisdiction ................................................................ 42
12.5    Expenses ................................................................................................ 43
12.6    Severability ........................................................................................... 43
12.7    Notices .................................................................................................. 43
12.8    Amendments; Waivers .......................................................................... 44
12.9    Entire Agreement .................................................................................. 45
12.10   Seller Disclosures ................................................................................. 45
12.11   Headings ................................................................................................ 45
12.12   Counterparts .......................................................................................... 45
12.13   Name Change ........................................................................................ 46
12.14   Payments and Revenues ....................................................................... 46
12.15   Waiver of Jury Trial ............................................................................. 46
12.16   General Release .................................................................................... 47
12.17   No Third Party Beneficiaries ............................................................... 47

**EXHIBITS**

EXHIBIT A          Form of Escrow Agreement
EXHIBIT B          Form of Assignment and Assumption Agreement
EXHIBIT C          Form of Bill of Sale
EXHIBIT D          Form of Domain Name Transfer Agreement
EXHIBIT E          Form of Intellectual Property Assignment Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**"), dated as of October 7, 2020 (the "**Execution Date**"), is made by and among Ebony Media Holdings, LLC, a Texas limited liability company ("**Holdings**"), Ebony Media Operations, LLC, a Texas limited liability company (the "**Company**" and together with Holdings, "**Sellers**" and each, a "**Seller**") and Bridgeman Sports and Media LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "**Purchaser**").

## <u>RECITALS</u>

WHEREAS, Sellers are engaged in the Business;

WHEREAS, on July 23, 2020 (the "**Petition Date**"), involuntary petitions were filed against the Company and Holdings in the United States Bankruptcy Court for the Southern District of Texas Houston Division (the "**Bankruptcy Court**");

WHEREAS, on September 2, 2020, the Company and Holdings moved to convert their respective involuntary Chapter 7 cases to voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") pursuant to Section 705 of the Bankruptcy Code;

WHEREAS, on September 3, 2020, Sellers filed a motion in the Bankruptcy Cases in the Bankruptcy Court to (a) approve entry into a letter of intent, (b) approve bidding procedures for sale of Sellers' assets, (c) approve procedures for stalking horse bid protections, (d) approve assumption and assignment procedures, (e) schedule an auction for, and hearing to approve, sale of Sellers' assets, (f) approve form and manner of notice thereof, (g) approve the sale of assets free and clear of liens, claims and encumbrances, and assumption and assignment of executory contracts and unexpired leases and (h) approve related relief;

WHEREAS, promptly following the Execution Date, Sellers shall file a notice in the Bankruptcy Court of this Agreement authorizing Sellers to consummate the transactions contemplated hereby and by other transaction documents;

WHEREAS, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase, take delivery of and assume from Sellers, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below), all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code;

WHEREAS, the board of directors of each Seller has determined that it is advisable and in the best interests of its respective bankruptcy estate and the beneficiaries of such estate to consummate the transactions provided for herein pursuant to the Bidding Procedures Order (as defined below) and the Bankruptcy Sale Order (as defined below) and has approved this Agreement; and

1

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Cases.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser hereby agree as follows:

ARTICLE 1
**DEFINITIONS; INTERPRETATION**

1.1     <u>Certain Terms Defined</u>. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms on **Schedule 1** attached hereto and as set forth elsewhere herein.

1.2     <u>Interpretation</u>.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation" (i.e., by way of example and not by way of limitation).

(b)     The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. A reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule shall also apply to paragraphs and other subdivisions.

(c)     The word "or" is not exclusive and is used in the inclusive sense of "and/or."

(d)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning. Pronouns stated in either the masculine, feminine or neutral gender shall include the masculine, feminine and neuter.

(e)     A reference to any party to this Agreement or any other agreement or document shall include such party's permitted successors and assigns.

(f)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

2

(g)     Any reference in this Agreement to $ shall mean U.S. dollars. Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP.

(h)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE PURCHASED ASSETS

2.1     <u>Purchase and Sale of Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, convey, assign and deliver to Purchaser, all of such Seller's, direct or indirect, right, title and interest in, to and under all of such Seller's tangible and intangible assets (including goodwill), properties and rights as of the Closing Date (as defined below) of whatever kind or nature, whether real, personal or mixed, wherever situated or located and whether now existing or hereafter acquired, other than the Excluded Assets (as defined below), free and clear of any and all Encumbrances (as defined below) other than Permitted Encumbrances (as defined below). All of such assets, properties and rights (other than the Excluded Assets) are collectively referred to in this Agreement as the "**Purchased Assets**." Without limitation of the foregoing, the Purchased Assets shall include each Seller's right, title and interest to the following assets as of the Closing Date, except to the extent that any of the following are also enumerated in <u>Section 2.2</u> as being Excluded Assets:

(a)     all accounts receivable, notes receivable, negotiable instruments, chattel paper (including completed work which has not yet been billed) and other receivables (including in respect of goods shipped, subscriptions or products sold, licenses granted, advertising sold, services rendered or otherwise and all amounts that may be returned or returnable with respect to any letters of credit or similar drawn down prior to the Closing) and including all intercompany receivables, notes, rights and claims payable or in favor of a Seller (collectively "**Accounts Receivable**");

(b)     all Contracts set forth on **Schedule 2.1(b)** (the "**Assigned Contracts**");

(c)     all Inventory and supplies owned, used or held for use in the Business, including all inventory of those titles published under the Business Marks that are set forth on **Schedule 2.1(c)** (the "**Book Inventory**");

(d)     all rights under each lease and any related agreement for the Leased Real Property (as defined below), in each case together with all interests in and to all Improvements (as defined below) and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)  all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies and other tangible personal property (the "**Tangible Personal Property**");

(f)  all Business Software, all Copyrights, all Trademarks (including those set forth on **Schedule 2.1(f)**), all tangible embodiments of such Copyrights and Trademarks, in each case, owned, purported to be owned by, in the possession or in the control of Sellers, including print versions and all historic print and digital and online content (including all writings, photography, artwork and graphics, audio/visual material, interactive features, and other material) first appearing in print publications and/or digital or online services of the Business since November 1945, and all other Intellectual Property;

(g)  all Internet domain names, including those set forth on **Schedule 2.1(g)** (the "**Internet Domain Names**");

(h)  all Social Media Accounts, including those set forth on **Schedule 2.1(h)**;

(i)  all e-mail addresses of the Business, including those using the domains set forth on **Schedule 2.1(i)**, including e-mail address names that are used in the Business, and all e-mail messages associated with such accounts on such domains related to the creation of the magazines, events, social media, and the digital platform and including any messages related to art, photography and any other creative or artistic creation or authorship, other than any Retained Privileged Materials, Deal Communications and communications to the extent solely personal in nature and not related to the aforesaid matters; provided, however, notwithstanding the foregoing, at any time following the Closing, Purchaser shall have rights to any e-mail messages and communications that are reasonably necessary to establish ownership of the Purchased Assets or are otherwise material to the ongoing operation of the Business;

(j)  all documents, Contracts and equipment related to the information technology systems of the Business;

(k)  all Permits, to the extent their transfer is not expressly prohibited by Law, which are held by any Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets;

(l)  all rights to any Proceeding of any nature available to or being pursued by any Seller, to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(m)  all Claims, causes of action, rights of recovery, objections and any rights, Claims or causes of action against creditors (if any) (other than those identified in Sections 2.2(j) and (k)) and all proceeds thereof;

(n)  all prepaid expenses, credits, advance payments, prepayments, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise)) (other than refunds or credits of Taxes of Sellers);

(o)      all rights under or arising out of all insurance policies relating to the Business or any of the Purchased Assets (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies), unless non-assignable as a matter of Law (as defined below);

(p)      all motor vehicles;

(q)      all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction (as defined below));

(r)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(s)      all sales and promotional materials, catalogues and advertising literature;

(t)      all bank accounts (to the extent assignable), checkbooks and cancelled checks;

(u)      (i) all copies and originals of corporate books and records of internal corporate proceedings, and (ii) Tax records and work papers in respect of the Purchased Assets or the Business (other than income Tax Returns, sales and use Tax Returns and payroll Tax Returns), in each case, that Sellers are not required by Law to retain or are not Retained Privileged Materials;

(v)      all (or the benefit of all to the extent not assignable) Tax refunds, rebates, credits and similar items of any Seller, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax return;

(w)      the assets, if any, listed on **Schedule 2.1(w)** (regardless of whether such assets are covered by any of the foregoing);

(x)      all of any Seller's rights under indemnities and all similar rights against third parties to the extent related to any of the Purchased Assets or the Assumed Liabilities;

(y)      all lists, records and other information pertaining to suppliers, all information pertaining to customers and subscribers (including subscriber lists), all lists, records and other information pertaining to accounts, personnel and referral sources, all drawings, plats, specifications, reports, studies, plans, books, ledgers, files, documents, correspondence and business and accounting records of every kind (including all financial, business and marketing plans), all advertising, marketing and promotional materials, and all other printed or written materials, in each case owned, maintained or in the custody or control of any Seller that relate to the Business, the Purchased Assets or the Assumed Liabilities, and in each case whether or not evidenced in writing, electronic data or otherwise (the "**Books and Records**"); and

5

(z)      all other assets (including goodwill) related to, associated with or used in the conduct of the Business or the Purchased Assets, excepting therefrom only the Excluded Assets.

2.2      <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, and as the same may be amended pursuant to <u>Section 2.7</u>, the term "**Excluded Assets**" shall consist of the following items and assets (whether or not such assets are otherwise described in <u>Section 2.1</u>):

(a)      cash and cash equivalents except as set forth in **Schedule 2.2(a)**;

(b)      the original corporate books and records of internal corporate proceedings (excluding Tax records and workpapers described in <u>Section 2.1(u)</u>), only to the extent that Sellers are required by Law to retain such items or are otherwise Retained Privileged Materials; <u>provided</u>, <u>however</u>, copies of the foregoing items shall be provided by Sellers to Purchaser, unless they are Retained Privileged Materials;

(c)      the rights of Sellers under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(d)      all rights and interests in connection with, and assets of, any Employee Benefit Plan (as defined below);

(e)      all shares of capital stock or other equity interests in any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in any Seller;

(f)      the assets, if any, listed on **Schedule 2.2(f)**;

(g)      (i) all rights under or arising out of insurance policies not relating to the Business or the Purchased Assets or that are non-assignable as a matter of Law, and (ii) each Seller's director and officer insurance policies;

(h)      all Contracts rejected pursuant to <u>Section 2.5</u>;

(i)      Permits that are not transferable;

(j)      all Claims (including insurance claims) or causes of action, if any, set forth, in each case, on **Schedule 2.2(j)**;

(k)      all Claims or causes of action pursuable through Chapter 5 of the Bankruptcy Code;

(l)      all receivables (including any accounts receivable) to the extent related to any Excluded Asset or Excluded Liability and the right to recover such receivables; and

(m)     all materials, documents, reports and records of a Seller that constitute attorney-client privileged communications between Sellers and Sellers' legal counsel and the transfer of which to Purchaser would result in the waiver of any such privilege ("**Retained Privileged Materials**"); provided, however, Retained Privileged Materials shall not include communications related to ownership, purported ownership, license rights to or with respect to control or enforcement of Intellectual Property, or opinions relating to the foregoing.

2.3     Assumption of Liabilities. Upon the terms and subject to the conditions of this Agreement, Purchaser shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the liabilities and obligations of Sellers (and only those liabilities and obligations of Sellers) which are enumerated in this Section 2.3 (the "**Assumed Liabilities**"). Except to the extent that any of the following expressly constitute Excluded Liabilities (as defined below), the following liabilities and obligations of Sellers (and only the following liabilities and obligations) shall constitute the Assumed Liabilities:

(a)     all Cure Amounts due and owing under any Assigned Contracts, provided that the Base Amount shall be reduced by Cure Amounts of up to $500,000.00 pursuant to Section 3.1;

(b)     all of Sellers' liabilities and obligations under the Assigned Contracts, but, in each case, only to the extent such liabilities and obligations relate to performance, and benefits to Purchaser accruing thereunder, after the Closing; and

(c)     the prepaid customer service liabilities, as set forth on **Schedule 2.3**, with respect to Sellers' customers who have prepaid for services which have not been provided as of the Closing Date.

2.4     Excluded Liabilities. All claims against, and liabilities and obligations of, (of any nature whatsoever, whether direct or indirect, matured or unmatured, known or unknown, absolute, accrued, contingent or otherwise, whether now existing or hereafter arising) any Seller not specifically assumed by Purchaser pursuant to Section 2.3 (including the liabilities enumerated in this Section 2.4) are collectively referred to herein as the "**Excluded Liabilities**." Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities. Sellers shall take all actions as may be necessary or appropriate to cause Sellers to promptly pay, and discharge when due all of the Excluded Liabilities. For purposes of this Section 2.4, "Seller" shall be deemed to include all Affiliates of each Seller and any predecessors to each Seller and any Person with respect to which each Seller is a successor-in-interest (including by operation of law, merger, liquidation, consolidation, assignment, assumption or otherwise). Notwithstanding Section 2.3 (and without implication that Purchaser is assuming any liability or obligation not expressly excluded by this Section 2.4 and, where applicable, without implication that any of the following would constitute Assumed Liabilities but for the provisions of this Section 2.4), the following claims against, and liabilities of, Sellers (whether of or against a single Seller or of or against more than one Seller together) are Excluded Liabilities and shall not be assumed or discharged by Purchaser:

(a)     any and all liabilities and obligations arising out of, relating to or otherwise in respect of the Purchased Assets or Business arising prior to the Closing, other than the Assumed Liabilities;

(b)     any and all liabilities and obligations of any Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)     any and all liabilities and obligations for (i) any Taxes (as defined below) arising from or with respect to the Purchased Assets or the Business to the extent attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by this Agreement, (ii) any Taxes of the Sellers, (iii) any Taxes for which a Seller (or any predecessor for the foregoing) is held liable under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) by reason of such entity being included in any consolidated, affiliated, combined or unitary group at any time on or before the Closing Date, (iv) any Taxes imposed on or payable by third parties with respect to which a Seller has an obligation to indemnify such third party pursuant to a Contract entered into in connection with a transaction consummated on or prior to the Closing, provided that in the case of any such Contract entered into in connection with a transaction in the Ordinary Course of Business and that does not principally relate to Taxes, limited to Taxes in respect of taxable period (or portion thereof) ending on or before the Closing Date, and (v) any Transaction Taxes;

(d)     any and all liabilities and obligations for indebtedness of Sellers to banks or other financial institutions, in each case with respect to borrowed money;

(e)     any and all liabilities and obligations arising under any Environmental Law (as defined below) or any other Law (including as a result of any action or inaction of Sellers or of any third party) relating to the storage, use or operation of the Purchased Assets;

(f)     any and all liabilities and obligations for any violation of any Law;

(g)     any and all liabilities and obligations for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and the official creditors' committee, the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Cases); and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(h)     drafts or checks outstanding at the Closing;

(i)     any and all liabilities and obligations of any Seller under those Contracts and Permits which constitute Excluded Assets or which are not assigned to Purchaser pursuant to the provisions of this Agreement;

(j)     any and all liabilities and obligations (i) that are the subject of any Claim or Proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, or (iii) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing (including, in each case, all matters noticed or pending and scheduled on **Schedule 4.14** and any such liabilities or obligations that otherwise would be Assumed Liabilities);

(k)     any liabilities or obligations which Purchaser may or could become liable for arising out of or in connection with any "defacto merger" or "successor-in-interest" theories of liability (other than the Assumed Liabilities);

(l)     those specific liabilities and obligations of Sellers identified on **Schedule 2.4** attached hereto;

(m)     any and all liabilities and obligations arising out of or relating to any business or property formerly owned or operated by any Seller, any Affiliate or predecessor thereof, but not presently owned and operated by such Seller;

(n)     any and all liabilities and obligations of any Seller arising and to be performed prior to the Closing Date;

(o)     any and all liabilities and obligations with respect to change or control or similar arrangements with any officer, employee or contractor of any Seller;

(p)     any and all liabilities and obligations of Sellers not in the Ordinary Course of Business arising in the Bankruptcy Cases;

(q)     any and all liabilities and obligations of Sellers under this Agreement;

(r)     any and all liabilities and obligations of Sellers resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(s)     any and all liabilities and obligations related to the WARN Act, to the extent applicable, for any action resulting from employees' separation of employment prior to or on the Closing Date;

(t)     any and all liabilities and obligations of Sellers arising out of or in connection with the classification and treatment of independent contractors;

(u)     any and all liabilities and obligations of Sellers arising out of or in connection with employment matters or employment practices, including wages, benefits, hours, overtime, discrimination, equal opportunity, harassment, immigration and employment eligibility verification, disability, affirmative action, leaves of absence, negligent hiring or retention or affirmative action and the classification and treatment of employees, consultants and independent contractors;

(v)     any and all liabilities and obligations arising under any Employee Benefit Plan; and

(w)     without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of any Seller or arising out of or related to the Purchased Assets or the Business that are not expressly assumed by Purchaser pursuant to the provisions of Section 2.3.

2.5     Assignment and Assumption of Contracts; Benefit Plans.

(a)     No later than the second (2nd) day after the date of this Agreement, Sellers shall provide to Purchaser a schedule setting forth (x) each Contract to which any Seller is a party or by which any Seller is bound and that is used in or related to the Business or any of the Purchased Assets, (y) all Cure Amounts (if any) for each such Contract and (z) a detailed description of each such Contract (such schedule, the "**Contracts Schedule**").

(b)     Purchaser shall have the right, by written notice to Sellers no later than the Closing, to specify that any Contract or asset shall be held by Sellers (and, to the extent a Contract, not rejected pursuant to Section 365 of the Bankruptcy Code) (any such Contract or asset, including those Contracts set forth on **Schedule 2.5(b)** (which may be amended by Purchaser at any time no later than the end of the Designation Rights Period), a "**Designation Right Asset**") for the duration of the Designation Rights Period; provided, however, that, with respect to any such Designation Right Asset, (i) Purchaser shall promptly reimburse Sellers on demand, and thereby be solely responsible for, all costs associated with the continuation by, and (to the extent such Designation Right Asset is a Contract) ultimate assumption or rejection by, Sellers of such Designation Right Asset for the period from the Closing through the end of the Designation Rights Period (such costs, "**Continuation Costs**"); (ii) all cash collected by Sellers in respect of such Designation Right Asset shall be promptly delivered to Purchaser; provided, however, that Sellers shall be entitled to deduct Continuation Costs from any cash collected by Sellers in respect of the Designation Right Asset giving rise to such costs; and (iii) the foregoing shall not affect the validity of the transfer to Purchaser of any other Purchased Asset that may be related to such Designation Right Asset.

(c)     As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, an "**Assumption Notice**") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Asset, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Bankruptcy Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to section 365 of the Bankruptcy Code such Designation Right Asset(s) set forth in an Assumption Notice.

(d)     As to each Designation Right Asset that is a Contract, as soon as practical after receiving further written notice(s) (each, a "**Rejection Notice**") from Purchaser during the Designation Rights Period requesting rejection of any Designation Right Asset, Sellers shall take all actions required by the Bankruptcy Sale Order or otherwise that are

reasonably necessary to reject such contract pursuant to section 365 of the Bankruptcy Code.

(e)     Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 2.5 shall survive the Closing.

(f)     Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Asset is assumed and assigned to Purchaser pursuant to this Section 2.5, such Designation Right Asset shall be deemed a Purchased Asset (and, for the avoidance of doubt, in the event such Designation Right Asset is a Contract, such Designation Right Asset shall be deemed an Assigned Contract) for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Asset that is assumed and assigned to Purchaser.

2.6     Third Party Consents. To the extent that (i) Sellers' rights under any Contract or Permit constituting a Purchased Asset or any other Purchased Asset may not be assigned to Purchaser under Section 363 or 365 of the Bankruptcy Code or (ii) a third party objects to assignment and it is determined by the Bankruptcy Court that Sellers are incapable as a matter of law of assigning that particular Purchased Asset, this Agreement shall not constitute an agreement to assign the same until applicable required consent(s) are obtained; provided, however, that, subject to the satisfaction or waiver of the conditions contained in Article 9, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and Sellers shall continue their reasonable best efforts to obtain any such consents after the Closing. Sellers shall (i) cooperate with Purchaser in any lawful and economically feasible arrangement to provide that Purchaser shall receive the interest of Sellers in the benefits under any such Contract, Permit or other Purchased Asset, provided that Purchaser shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent Purchaser would have been responsible therefor if such consent or approval had been obtained, (ii) use their reasonable best efforts to enforce any rights of Sellers arising from such Contract, Permit or other Purchased Asset against the issuer thereof or the other party or parties thereto (including the right to elect to terminate any such Contract, Permit or other Purchased Asset in accordance with the terms thereof upon the advice of Purchaser), and (iii) continue to hold and operate such Contract, Permit or other Purchased Asset in all material respects in the Ordinary Course of Business and taking into account the transactions contemplated hereby.

2.7     Right to Change Designations. Notwithstanding anything contained in this Agreement to the contrary, Purchaser reserves the right, and shall have the right, at any time during the Designation Rights Period to designate in one or more written notices delivered to Sellers (i) any Purchased Asset as an Excluded Asset and (ii) any Excluded Asset as a Purchased Asset; provided that any change in designation of a Purchased Asset to an Excluded Asset shall not cause or result in a change to the Purchase Price.

2.8     Cure Amounts. With respect to each of the Assigned Contracts assigned to Purchaser on the Closing Date or during the Designation Rights Period, Purchaser shall pay promptly after the Closing Date or after entry of order approving assumption and assignment of a Contract designated in accordance with Section 2.5 all amounts necessary to cure any monetary Default (as distinct from curing all Defaults or failures to comply with provisions thereunder that

may not be cured by the mere payment of money) that are required to be paid pursuant to section 365 of the Bankruptcy Code in order to assume and assign the Assigned Contracts to Purchaser, which Cure Amounts, including those set forth on the Contracts Schedule, shall reduce the Base Amount on a dollar-for-dollar basis in an amount not to exceed $500,000.00 in the aggregate pursuant to Section 3.1 (collectively, the "**Cure Amounts**").

## ARTICLE 3
## CONSIDERATION

3.1     Purchase Price.

(a)     In consideration of the sale of the Business and Purchased Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the purchase price (the "**Purchase Price**") for the Business and Purchased Assets shall be:

(i)     $14,000,000.00 (the "**Base Amount**"), plus

(ii)     assumption of the Assumed Liabilities.

(b)     At the Closing, Purchaser shall (i) pay by wire transfer of immediately available funds the Base Amount minus the Cure Amounts Holdback minus the IP Holdback minus the Deposit as provided in Section 3.1(e), and (ii) direct the Escrow Agent to disburse the Deposit to Sellers.

(c)     At Closing, Purchaser shall retain $500,000.00 (the "**Cure Amounts Holdback**") in respect of any Cure Amounts. Promptly following (i) thirty (30) days following Closing, Purchaser shall pay by wire transfer of immediately available funds an amount equal to $150,000.00 minus any Cure Amounts, and (ii) the expiration of the Designation Rights Period, Purchaser shall pay by wire transfer of immediately available funds an amount equal to the remainder of the Cure Amounts Holdback minus any Cure Amounts to the extent not previously taken into account pursuant to clause (i); provided, however, that, in each case, in no event shall any such payment amount be less than $0.

(d)     At Closing, Purchaser shall retain $150,000.00 (the "**IP Holdback**") in respect of (i) its costs, fees and expenses (including attorneys' fees) in connection with recordation of the transfers to any Seller of any registrations or applications of Intellectual Property with the appropriate Governmental Authority in the United States of America and in any jurisdiction outside the United States of America and process of establishing ownership of any such Intellectual Property with Seller(s) and (ii) disputed or lapsed ownership or recordation of any Intellectual Property with the appropriate Governmental Authority in the United States of America and in any jurisdiction outside the United States of America. In the event that Purchaser or its Affiliates incurs, or determines it could incur, any such costs, fees and expenses (including attorneys' fees) in connection with the recordation of said transfers of any registrations or applications of Intellectual Property or determines any Intellectual Property is disputed or lapsed within two (2) years following Closing, Purchaser shall retain the aggregate amount of such costs, fees and expenses (or a reasonable estimation thereof) and the amount allocated to the disputed or lapsed

Intellectual Property up to the IP Holdback. Promptly following the expiration of such two (2) year period, Purchaser shall pay by wire transfer of immediately available funds an amount equal to $150,000.00 minus the aggregate amount of such costs, fees and expenses and the amount allocated to such Intellectual Property; provided, however, that in no event shall any such payment amount be less than $0. Sellers agree and acknowledge that (i) following Sellers' purchase of intellectual property assets on May 5, 2016, Sellers did not record the transfer of certain of such intellectual property with the appropriate Governmental Authority in the United States of America and in jurisdictions outside the United States of America, and (ii) Purchaser's recordation of such transfers of any registrations or applications of Intellectual Property and establishment of ownership of any Intellectual Property will involve a substantial investment of time and may require a significant investment of financial, legal, and other resources by Purchaser and its Affiliates, and that such investments, in Sellers' reasonable business judgment, would be necessary for the preservation of the value of the Purchased Assets. Sellers further agree and acknowledge that the IP Holdback is reasonable in relation to Purchaser's efforts and investments with respect to recordation, establishment of ownership, and disputed or lapsed ownership or recordation of such Intellectual Property.

(e)     If the Bidding Procedures Order entered by the Bankruptcy Court is acceptable to Purchaser in its sole and exclusive discretion, then within three (3) Business Days following the Bidding Procedures Order Date, Purchaser shall deposit into a segregated account (the "**Escrow**") maintained by Purchaser's escrow agent (the "**Escrow Agent**") cash by wire transfer of immediately available funds in an amount equal to $500,000.00 (the "**Deposit**"). Upon receipt of any portion of the Deposit, the Escrow Agent shall immediately place the Deposit into an escrow account pursuant to an escrow agreement by and among Purchaser and Sellers substantially in the form of **Exhibit A**. The Deposit shall become nonrefundable upon Sellers' valid termination of this Agreement pursuant to Section 11.1(d) (a "**Purchaser Default Termination**"). At the Closing, the Deposit shall be delivered to Sellers and credited toward payment of the Purchase Price. In the event the Deposit becomes non-refundable by reason of a Purchaser Default Termination and each Seller is not then in material breach or default of this Agreement, (i) Escrow Agent shall immediately disburse the Deposit to Sellers to be retained by Sellers for Sellers' own account as liquidated damages in respect of Purchaser's breach, which shall constitute the sole and exclusive remedy of each Seller and its Related Persons in the event of a Purchaser Default Termination in lieu of all other rights and remedies that each Seller and its Related Persons may have against Purchaser or any of its Related Persons at Law and Purchaser and its Related Persons shall have no further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Purchasers and Sellers shall execute any joint instructions reasonably necessary to permit the Escrow Agent to make such disbursement. The parties agree that the Deposit is a reasonable estimate of Sellers' damages in the event of a Purchaser Default Termination. If this Agreement is terminated other than pursuant to Section 11.1(d), Purchaser and Sellers shall within two (2) Business Days execute and deliver a joint instruction to the Escrow Agent instructing the Escrow Agent to release the Deposit to Purchaser. Any disputes regarding the disposition of the Deposit held by the Escrow Agent shall be determined by the Bankruptcy Court.

(f)     Notwithstanding anything in this Agreement to the contrary, Purchaser and any other Person who has any obligation to withhold or deduct from any consideration payable or otherwise deliverable pursuant to this Agreement shall be entitled to withhold and deduct such amounts as Purchaser or such other Person is required to deduct and withhold therefrom under the Code or any provision of state, local or foreign Law. To the extent that amounts are so deducted or withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made. All compensatory amounts subject to payroll reporting and withholding payable pursuant to or as contemplated by this Agreement shall be payable through, as applicable, the applicable company's payroll in accordance with applicable payroll procedures.

3.2     Allocation of Purchase Price.

(a)     Within the one hundred twenty (120) days after the Closing Date, Purchaser shall deliver to Sellers a statement (the "**Allocation Statement**") allocating, for tax purposes, the consideration paid by Purchaser for the Purchased Assets for U.S. federal income tax purposes (which purposes of this Section 3.2 shall include any Assumed Liabilities and other amounts required to be treated as part of the purchase price for U.S. federal income tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder which shall be subject to the approval of Sellers (which approval shall not unreasonably be withheld, conditioned or delayed). Following Purchaser's delivery of the draft Allocation Statement to Sellers, Sellers and Purchaser will use good faith efforts to attempt to agree on the Allocation Statement. If Purchaser and Sellers fail to agree on the Allocation Statement within thirty (30) days of Sellers' receipt of the draft Allocation Statement from Purchaser, then each of Sellers and Purchaser may adopt its own position regarding the allocation of the consideration paid by Purchaser for the Purchased Assets for U.S. federal income tax purposes among the Purchased Assets.

(b)     If Sellers and Purchaser are able to agree on the Allocation Statement, Sellers and Purchaser agree, except as required by applicable Law, to (i) be bound by the agreed Allocation Statement for Tax purposes, (ii) act, and cause their respective Affiliates to act, in accordance with the agreed Allocation Statement in connection with the preparation and filing of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any corresponding other Tax forms), and (iii) take, and cause their respective Affiliates to take, no position inconsistent with the agreed Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative Proceeding); provided, however, that no Person shall be unreasonably impeded in its ability and discretion to negotiate, compromise or settle any Tax audit, claim or similar proceedings in connection with the agreed Allocation Statement. If the Allocation Statement is agreed upon, any adjustments to consideration considered to paid by the

Purchaser for the Purchased Assets for U.S. federal income tax purposes pursuant to this Agreement will be allocated in a manner consistent with the agreed Allocation Statement.

ARTICLE 4
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Sellers hereby represent and warrant to Purchaser:

4.1     Organization.  Each Seller is duly organized, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted. Except as a result of the commencement of the Bankruptcy Cases, each Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Business or otherwise conducts the Business. Except as set forth on **Schedule 4.1**, no Seller holds or owns, directly or indirectly, any capital stock or other voting securities of, or ownership interests in, any Person.

4.2     Authorization of Agreement.  Subject to entry of the Bankruptcy Sale Order and authorization as is required by the Bankruptcy Court:

(a)     each Seller has, or at the time of execution will have, all necessary corporate or limited liability company (as the case may be) power and authority to execute and deliver this Agreement and each Ancillary Agreement (as defined below) to which such Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)     the execution and delivery of this Agreement and each Ancillary Agreement to which a Seller is or will become a party and the performance of each Seller's obligations hereunder and thereunder (including the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary corporate or limited liability company (as the case may be) action on the part of such Seller and no other corporate or limited liability company (as the case may be) proceedings (shareholder, member or otherwise) on the part of Sellers are necessary to authorize such execution, delivery and performance; and

(c)     this Agreement and each Ancillary Agreement to which a Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by such Seller and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each Ancillary Agreement to which a Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of such Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a Proceeding at law or in equity).

4.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on **Schedule 4.3(a)**, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement, the

consummation of the transactions contemplated hereby and thereby, or compliance by each Seller with any of the provisions hereof and thereof do not, or will not at the time of execution, result in the creation of any Lien upon the Purchased Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)     such Seller's certificates of formation, certificates of incorporation and by-laws, limited liability company agreements or comparable organizational documents of such Seller;

(ii)     subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which such Seller is a party or by which any of the Purchased Assets are bound;

(iii)     subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the properties or assets of such Seller as of the date hereof; or

(iv)     subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b)     Subject to entry of the Bankruptcy Sale Order, except as set forth on **Schedule 4.3(b)**, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Purchased Assets.

4.4     Title to Purchased Assets.  Sellers have good and marketable title to the Purchased Assets, including all Intellectual Property, which, subject to any applicable orders of the Bankruptcy Court, is a Purchased Asset, free and clear of all Interests and Encumbrances, other than Permitted Encumbrances, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good and marketable title to the Purchased Assets, including all Intellectual Property which is a Purchased Asset, free and clear of all Claims, Interests and Encumbrances, other than Permitted Encumbrances.

4.5     Contracts.  Both the Contracts Schedule and **Schedule 4.5** sets forth a complete list, as of the date hereof, of all Contracts to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Purchased Assets. Purchaser has received true and complete copies of such Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

4.6     Property.  Sellers do not own any real property. Purchaser has received true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.

16

4.7    Intellectual Property.

(a)    **Schedule 4.7(a)** sets forth a complete list, as of the date hereof, of all Intellectual Property owned by any Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office, the intellectual property office of any foreign jurisdiction or otherwise) and for each item of Intellectual Property, sets forth (i) the registration, patent, serial or application number, if any, and the Governmental Authority or other entity with which any such application has been filed and/or which has issued, reissued or renewed any such patent or registration and (ii) any actions that must be taken within ninety (90) days after the date hereof for the purposes of obtaining, maintaining, preserving or renewing any Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of documents, applications or certificates or any responses to office actions.

(b)    Except as set forth on **Schedule 4.7(a)**, (i) with respect to any Intellectual Property owned by any Seller or which comprises a Purchased Asset (as opposed to Intellectual Property of which any Seller is a licensee), Sellers have all right, title and interest to all Intellectual Property, without any conflict known to any Seller with the rights of others, (ii) no Person other than Sellers has the right to use the Intellectual Property owned by Sellers, (iii) Sellers have the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Sellers' Business that is owned by a party other than Sellers, (iv) there are no pending claims or allegations of infringement or unauthorized use of any third party Intellectual Property against any Seller, (v) all Patents, domain names, registered Trademarks and registered Copyrights and applications to register Trademarks and Copyrights set forth on **Schedule 4.7(a)** are in full force and effect, none have been adjusted invalid or unenforceable in whole or in part, all renewal and other maintenance filings and fees with respect thereto have been made and paid, all other maintenance actions have been taken, and all such Intellectual Property rights are valid and enforceable, (vi) Sellers have delivered to the Purchaser complete and correct copies of each assignment agreement by which any Seller has acquired any Intellectual Property from a third party, (vii) each license agreement granting to any third party any rights relating to any of the Intellectual Property or granting to any Seller the right to use any Intellectual Property (the "**IP License Agreements**"), and (viii) none of the Intellectual Property is subject to any order or settlement restricting any Seller's use, ownership or right to assign.

(c)    No Seller has received any written complaint or notice from any Person regarding any Seller or any of its respective agents, employees or contractors' uses or disclosures of, or security practices or security incidents regarding Personal Information.

(d)    Each Seller is in material compliance with all Data Privacy and Security Requirements in all material respects, and no written notices have been received by, and to each Seller's Knowledge, no claims, charges or complaints have been made against, any Seller alleging a violation of any Privacy and Data Security Requirements, and no Seller has been subject to any investigation or legal proceeding with regard to any Privacy and Data Security Requirements. To each Seller's Knowledge, since June 1, 2016, there have been no breaches involving Personal Information held or collected by or on behalf of any

Seller, or other incident affecting Personal Information for which notification is required under applicable Privacy Laws.

(e)    Except as set forth on **Schedule 4.7(e)**, all Company IT Systems have been maintained by technically competent personnel in accordance with prudent industry standards, to ensure proper operation, monitoring and use. The Company IT Systems operate in all material respects in accordance with their documentation and functional specifications in each case as known to the Sellers and are in working condition to perform effectively all information technology operations necessary to conduct the Business as now conducted. Since the date that is twelve (12) months before the date of this Agreement, the Company IT Systems have not suffered any failures, errors or breakdowns or otherwise malfunctioned or failed resulting in a material disruption of the conduct of the Business. There has not been any breach of security or unauthorized access of the Company IT Systems or the data or information stored on the Company IT Systems.

(f)    To each Seller's Knowledge, no Company IT System: (i) contains any bug, defect or error (including any bug, defect or error relating to or resulting from the display, manipulation, processing, storage, transmission or use of date data) that materially and adversely affects the use, functionality or performance of that Company IT System; or (ii) fails to comply, or would cause any Seller to fail to comply, with any applicable warranty or other contractual commitment relating to any services rendered or products offered by any Seller. To each Seller's Knowledge, no Company IT System contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus" or "worm" (as such terms are commonly understood in the Software industry) or any other code designed or intended to have, or capable of performing, any of the following functions: (x) disrupting, disabling, harming or otherwise impeding in any way the operation of, or providing unauthorized access to, a computer system or network or other device on which the code is stored or installed; or (y) damaging or destroying any data or file without the user's consent.

4.8    _Permits_.    **Schedule 4.8(i)** sets forth a complete list, as of the date hereof, of all Permits issued to Sellers for the operation of the Business (including, without limitation, the Locations). **Schedule 4.8(ii)** sets forth a complete list, as of the date hereof, of all Permits applied for by Sellers or the issuance of which to Sellers is pending. **Schedule 4.8(iii)** sets forth a complete list, as of the date hereof, of all Permits required for the operation of the Business (including, without limitation, the Locations) which have not been issued to Sellers, applied for by Sellers or the issuance of which to Sellers is pending.

4.9    _Employee Benefit Plans; Employees_.    **Schedule 4.9** sets forth a list of each Employee Benefit Plan. No Seller or any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan. All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which Sellers may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service. **Schedule 4.9** sets forth a true, correct and complete list of the names, positions, work

locations, hire dates, total compensation (listing separately applicable salaries and hourly rates) and eligibility and elections with respect to Employee Benefit Plans of all Employees, consultants and independent contractors engaged by each of Sellers, and indicates which of such individuals are on disability leave or any other type of leave of absence, authorized or otherwise.

4.10    <u>Labor Relations</u>.  Except as set forth on **Schedule 4.10**, no Seller is a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization. No Seller has received written notice of any outstanding representation petitions involving any Seller before the National Labor Relations Board or any state labor board, and, to the knowledge of Sellers, no such petition has been threatened, and, to the knowledge of Sellers, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing. No Seller is subject to any material unfair-labor-practice charge.

4.11    <u>Environmental Matters</u>.  The Purchased Assets are in material compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("**Environmental Laws**"). At all times, Sellers have conducted the Business and their respective operations in accordance with all Environmental Laws applicable to Sellers and the Business.

4.12    <u>Insurance</u>. Sellers maintain the insurance policies set forth on **Schedule 4.12(i)**, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect, except as set forth on **Schedule 4.12(ii)**, will continue in full force and effect immediately following the Closing. Sellers have paid all premiums on such policies due and payable prior to the Execution Date. Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.13    <u>No Brokers or Finders</u>.  Except as set forth on **Schedule 4.13**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.14    <u>Litigation; Proceedings</u>.  Except as set forth in **Schedule 4.14**, there is no claim, Proceeding, charge, hearing, grievance pending or, to Sellers' Knowledge, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority. None of the Purchased Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any arbitration award or settlement agreement with any Person.

4.15    <u>Board Approval and Recommendations</u>.  The board of directors of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation

of Alternate Transactions, a sale, assignment and assumption of the Purchased Assets and Assumed Liabilities pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is and are each in the best interests of such Seller.

4.16    Compliance with Laws.  Each Seller (i) except as set forth on **Schedule 4.16(i)** has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits. Except as set forth on **Schedule 4.16(ii)**, no Seller has received any written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit. Each Seller is in material compliance with the terms of the Permits.

4.17    Affiliate Transactions.  **Schedule 4.17** sets forth a true and complete list of all transactions and Contracts to which any Seller is a party with (i) any officer, director, manager, employee or affiliate of any Seller (other than for ordinary course services as employees, officers, directors or managers) and (ii) any corporation, partnership, trust or other Person in which any such officer, director, manager, employee or affiliate has a substantial interest or is an employee, officer, director, trustee or partner.

4.18    Customers and Suppliers.

(a)    **Schedule 4.18(a)** sets forth a list of (i) the top ten (10) customers of the Business, as measured by the dollar amount of purchases thereby, during the fiscal year ended December 31, 2019, showing the approximate total sales by Sellers to each customer for such period and (ii) the top ten (10) suppliers to the Business, showing the approximate total sales by such supplier to Sellers during the fiscal year ended December 31, 2019.

(b)    Except as set forth on **Schedule 4.18(b)**, since December 31, 2018, no customer or supplier listed on Schedule 4.18(a) has terminated its relationship with any Seller or materially reduced or changed the pricing, volume, timing or other terms of its business with any Seller and, except as set forth on **Schedule 4.18(b)**, no such customer or supplier has notified any Seller, and no Seller has otherwise any reason to believe, that it intends to terminate or materially reduce or change the pricing, volume, timing or other terms of its business with any Seller.

4.19    Taxes. All material Tax Returns required to be filed by or on behalf of the Sellers related to the Purchased Assets or the Business have been duly and timely filed with the appropriate Governmental Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects. All material Taxes required to be paid by or on behalf of the Sellers or any of their Subsidiaries related to the Purchased Assets or the Business (whether or not shown on any Tax Return) have been timely paid. To Sellers' Knowledge, no audits, examination, investigation or other administrative proceedings or court proceedings are pending with regard to any Taxes or Tax Returns of any Seller and no Seller has received a written notice of any such audits, examinations, investigations or proceedings.

4.20 <u>Warranties Are Exclusive</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE PURCHASED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED IN THIS AGREEMENT SHALL RELIEVE ANY SELLER OR ITS RELATED PERSONS OF LIABILITY FOR FRAUD BY, ON BEHALF OF OR WITH RESPECT TO ANY SELLER.

ARTICLE 5
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers as follows:

5.1 <u>Corporate Organization</u>. Purchaser is an entity duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own its properties and assets and to conduct its businesses as now conducted.

5.2 <u>Authorization and Validity</u>. Purchaser has, or at the time of execution will have, all necessary limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary action by the board of managers (or similar governing body) of Purchaser, and no other limited liability company proceedings on the part of Purchaser is necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each Ancillary Agreement to which Purchaser is or will become a party constitutes, or will constitute, when executed and delivered, Purchaser's binding obligations, enforceable against it in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3 <u>No Conflict or Violation</u>. The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order,

21

writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject, in each case, other than any violation, conflict, breach, event of default or default that would not reasonably be expected to adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

5.4     <u>Consents and Approvals</u>.  Except with respect to the issuance of the Bankruptcy Sale Order or as otherwise as set forth on **<u>Schedule 5.4</u>**, no consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is or will become a party or the performance by Purchaser of its obligations hereunder or thereunder.

5.5     <u>Financing</u>. Purchaser currently has, and on the Closing Date will have, readily available funds in such amount as is required to consummate the transactions contemplated hereunder on the terms set forth herein and otherwise to perform all of Purchaser's obligations under this Agreement.

5.6     <u>Litigation</u>.  There is no action or claim that is pending or, to Purchaser's knowledge, threatened in any court or by or before any Governmental Authority that would adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

5.7     <u>No Other Representations and Warranties</u>.  Except for the representations and warranties contained in this <u>Article 5</u>, neither Purchaser nor any other Person on behalf of Purchaser makes, and each Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes, any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to any Seller by or on behalf of Purchaser.

ARTICLE 6
**COVENANTS AND OTHER AGREEMENTS**

6.1     <u>Pre-Closing Covenants of Sellers</u>.  Sellers covenant to Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of <u>Article 11</u>:

(a)     <u>Cooperation</u>.  Sellers shall use reasonable best efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Purchased Assets. Sellers shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

22

(b)     Access to Records and Properties. Sellers shall (i) provide Purchaser and its Related Persons (as defined below) reasonable access upon reasonable notice to the facilities, offices and personnel of Sellers and to the books and records of Sellers, related to the Business or the Purchased Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law, including access to perform field examinations and inspections of the Business' or the Purchased Assets' inventories, facilities and equipment; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties, prospects or operations of Sellers as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Sellers; provided, further, that nothing herein shall constitute a waiver of Sellers' rights to seek an order of the Bankruptcy Court authorizing Sellers to abandon, destroy or otherwise dispose of any Excluded Assets in Sellers' bankruptcy estates upon thirty (30) days' prior written notice to Purchaser.

(c)     Conduct of Business Prior to Closing. Except as expressly contemplated by this Agreement or disclosed on **Schedule 6.1(c)**, and except to the extent expressly required under the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court, Sellers shall ensure that, without Purchaser's prior written consent (which consent may be delivered via electronic mail by any senior officer of Purchaser and may be withheld for any reason or no reason at all):

(i)     No Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than the sale of Inventory in the Ordinary Course of Business;

(ii)     No Seller shall, directly or indirectly, permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Interest or Encumbrance other than (i) any Interest or Encumbrance granted in connection with any debtor in possession loan or (ii) any Interest or Encumbrance that would be discharged or released in accordance with the Bankruptcy Sale Order;

(iii)     No Seller shall, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in or constitute a breach of any representation, warranty or covenant made by any Seller in this Agreement;

(iv)     Sellers shall notify Purchaser promptly in writing of the occurrence of any Material Adverse Effect;

(v)     No Seller shall, directly or indirectly, make any promise or representation, oral or written, or otherwise, to (x) increase the annual level of

compensation payable or to become payable by any Seller to any of its directors, managers, members or Employees, (y) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, manager, member or Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) enter into any employment, deferred compensation, severance, consulting, non-competition, non-solicitation or similar agreement (or amend any such current agreement) to which any Seller is a party or involving a director, manager, member or Employee of Sellers, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Execution Date and disclosed on **Schedule 4.9**;

(vi)     Sellers shall comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(vii)     No Seller shall, directly or indirectly, (x) enter into any Contract that is material to such Seller, (y) enter into any Contract if entering into such Contract, when taken together with all other Contracts entered into by all Sellers, would be material in the aggregate to all Sellers (taken as a whole) or (z) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which any Seller is a party or by which it is bound and that is used in or related to the Business or the Purchased Assets (including any Assigned Contract) or take any affirmative action not required by the terms of any such Contract;

(viii)     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any right of any Seller that constitutes a Purchased Asset;

(ix)     No Seller shall, directly or indirectly, enter into any commitment for any capital expenditure other than any amounts set forth in a budget approved by the Bankruptcy Court;

(x)     No Seller shall, directly or indirectly, terminate, amend or modify in any manner any Contract for Leased Property;

(xi)     Sellers shall use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the Ordinary Course of Business, (ii) preserve the existing business organization and management of the Business, (iii) keep available the services of the current Employees, to the extent reasonably feasible, (iv) maintain the existing relations with customers, carriers, call centers, distributors, suppliers, creditors, business partners, Employees and others having business dealings with the Business, to the extent reasonably feasible, and (v) refrain from changing in any material respect any of its product or advertising prices or pricing policies (*e.g.*, discount policies) for any of its products or advertising, except as shall be necessary to meet competition or customer requirements;

24

(xii)    Sellers shall use reasonable best efforts to obtain all consents or approvals set forth on **Schedule 6.1(c)(xii)** prior to the Closing that are required, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Sellers to assume and assign to Purchaser any Assigned Contract or Permit;

(xiii)    Sellers shall use commercially reasonable efforts to assist Purchaser to obtain the Permits set forth on **Schedule 9.2(i)**, including making filings with the Governmental Authorities and issuing powers of attorneys to Purchaser, as necessary; and

(xiv)    No Seller shall, directly or indirectly, take, or agree, commit or offer (in writing or otherwise) to take or omit to take, any action or actions in violation of the foregoing.

(d)    <u>Required Bankruptcy Deliveries</u>. Sellers shall have filed with the Bankruptcy Court, and delivered to Purchaser, all of the Required Bankruptcy Deliveries on or prior to the date of this Agreement.

(e)    <u>Approval of Bidding Procedures Motion; Efforts</u>. The Sellers shall use their reasonable best efforts to seek approval of the Bidding Procedures Motion in form and substance acceptable to Purchaser by the Bankruptcy Court.

(f)    <u>Notice of Certain Events</u>.  Sellers shall promptly notify Purchaser of, and furnish Purchaser any information it may reasonably request with respect to, (i) the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to Purchaser's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled, (B) any material breach or inaccuracy of any representation or warranty of any Seller contained in this Agreement, or (C) directly or indirectly, any Material Adverse Effect on any Seller, or (ii) the receipt of any proposal for an Alternate Transaction and shall deliver all written proposals for an Alternate Transaction to Purchaser. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 6.1(f)</u> shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(g)    <u>Employees</u>.  Sellers shall promptly (but in any event within three (3) days) deliver to Purchaser a revised **Schedule 4.9** if any of the information set forth thereon, or required to be set forth thereon (such as with respect to terminated Employees and new Employees) changes after the date hereof with respect to any Employee, consultant or independent contractor. On the Business Day immediately prior to Closing, Sellers shall deliver to Purchaser a final **Schedule 4.9** which will be accurate and complete as of the Closing Date with respect to all information required to be set forth thereon.

25

6.2     <u>Pre-Closing Covenants of Purchaser</u>. Purchaser covenants to Sellers that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement in accordance with the provisions of <u>Article 11</u>:

(a)     <u>Cooperation</u>. Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things commercially reasonably necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby, provided that the foregoing shall not require Purchaser to participate in the Auction.

(b)     <u>Required Orders</u>. Purchaser shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement, provided that the foregoing shall not require Purchaser to make any expenditure of funds or to incur any other obligation or liability.

(c)     <u>Permits</u>. Purchaser shall use commercially reasonable efforts to cooperate with Sellers to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Purchased Assets under applicable Laws.

6.3     <u>Other Covenants of Sellers and Purchaser</u>.

(a)     <u>Disclosure Schedules and Supplements</u>. From time to time prior to the Closing Date, Sellers, on the one hand, with respect to disclosure schedules relating to Sellers, shall notify Purchaser of, and Purchaser on the other hand, with respect to disclosure schedules relating to Purchaser, shall notify Sellers of, and shall supplement or amend the disclosure schedules (the "**Schedules**") to this Agreement with respect to, any matter that arises after the Execution Date and that, (i) if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation or warranty of Sellers or Purchaser, as applicable, that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made by Sellers to the Schedules prepared by Sellers or Purchaser to the Schedules prepared by Purchaser, as applicable, no later than two (2) Business Days after discovery thereof by Sellers or Purchaser, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties thereto, then promptly after discovery thereof by Sellers or Purchaser, as applicable. Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Purchaser under <u>Section 9.2(a)</u> or <u>Section 11.1(c)(iv)</u> as if the Schedules were not supplemented or amended pursuant to this <u>Section 6.3(a)</u> and (ii) no such supplement or amendment to the Schedules shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(b)     <u>Personally Identifiable Information</u>. Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Sellers provided to Purchaser and in effect on the Petition Date prohibiting the transfer of

personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

    (c)    Access to Records after Closing.

        (i)    From and after the Closing Date, each party hereto shall provide the other parties hereto with such non-privileged information in its possession as may be reasonably requested by such other party to enable such other party to prepare Tax Returns and other financial reports and otherwise in connection with furthering the disposition of the Bankruptcy Cases.

        (ii)    Without limiting Section 6.3(c), from and after the Closing Date, the Sellers shall not and shall cause their Related Persons not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors, managers, advisors and employees of Purchaser or its Affiliates or use or otherwise exploit for its own benefit or for the benefit of anyone other than Purchaser or its Affiliates, any Confidential Information or trade secret. The Sellers and their Related Persons shall not have any obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by applicable Law. To the extent practical and legally permissible, the applicable Person shall notify Purchaser of its intention to make such disclosure and provide a list of the Confidential Information that such Person intends to disclose prior to making such disclosure. Sellers agree to cooperate with Purchaser so that Purchaser may seek, at its sole cost and expense, an appropriate protective order.

6.4    Employment Covenants and Other Undertakings.

    (a)    Employees. Purchaser shall have the right, but not the obligation, to employ or engage as contractors or employees any or all of the Employees as Purchaser determines in its sole and absolute discretion. The terms of engagement or employment offered to any Employees shall be determined by Purchaser in its sole and absolute discretion. Any Employees actually employed by Purchaser are referred to herein as "**Transferred Employees**." Purchaser shall deliver a list of the Employees it intends to hire no later than three (3) days prior to the hearing to approve the Bankruptcy Sale Order. Sellers shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such Employees as Sellers certify in writing are exempt from such requirement).

    (b)    Sellers' Employee Benefit Plans. Sellers shall retain (i) all liabilities and obligations in respect of their past, present and future employees under applicable Laws and (ii) all liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(c)     Other Obligations. Except as otherwise required by Law or otherwise agreed in writing by Purchaser or its Affiliates, neither Purchaser nor any of its Affiliates shall be obligated to provide any severance, separation pay or other payments or benefits, including any key employee retention payments, to any Employees on account of any termination of such Employee's employment on or before the Closing Date, and all such severance, separation pay and other payments and benefits (if any) shall remain obligations of Sellers. For the avoidance of doubt, Sellers shall be responsible for and pay to each Employee employed as of the Closing Date an amount equal to such Employee's accrued wages and other remuneration with respect to their services as Employees through the Closing Date and such Employee's accrued paid time off as of the Closing Date. In addition, Sellers shall be responsible for, and Purchaser shall not be liable for, failure by Purchaser or Sellers to provide notice under the WARN Act or other similar Law.

(d)     Employee Communications. Prior to making any written or oral communications to the Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Sellers shall provide Purchaser with a copy of the intended communication.

(e)     No Right to Employment. Nothing herein shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with Purchaser or any of its Affiliates. Nothing in this Section 6.4 or any other provision of this Agreement: (i) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (ii) shall limit the ability of Purchaser or any of their Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (iii) shall be construed to create any third-party beneficiary right in any employee or other Person other than the Parties to this Agreement.

6.5     Casualty.  If, between the date of this Agreement and the Closing, any of the Purchased Assets shall be destroyed or damaged in whole or in part by fire, earthquake, hurricane, flood, other casualty or any other cause (each a "**Casualty**"), then Purchaser shall have the option to: (a) acquire such Purchased Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.6     Confidentiality; Public Announcements; Use of Intellectual Property.

(a)     As of the Closing, assuming Purchaser is the successful bidder, Purchaser's obligations under the Confidentiality Agreement related to non-use, non-disclosure and return or destruction of Evaluation Material (as defined in the Confidentiality Agreement) related to the Business, the Purchased Assets and the Assumed Liabilities shall terminate. All other provisions of the Confidentiality Agreement shall remain in full force and effect in accordance with their terms.

(b)     From and after the Closing, each Seller shall, and shall cause its Related Persons to, hold in confidence all Evaluation Material (as defined in the Confidentiality

Agreement as if such party were the Recipient under the Confidentiality Agreement) and any and all other information, whether written or oral, concerning the Business or provided to or retained by them in connection with this Agreement (the "**Business Confidential Information**"). If Sellers or any of their Related Persons are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Sellers shall promptly notify Purchaser in writing so that Purchaser may seek at its own cost and expense an appropriate protective order and Sellers shall disclose only that portion of such information which Sellers are advised by its counsel in writing is legally required to be disclosed and to such Persons to whom disclosure is required; provided, however, that Sellers shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information and fully cooperate with Purchaser's efforts to obtain such protective order or such other reasonable assurances. Sellers shall be responsible for any breach by any of its Related Persons of this Section 6.6 expressly applicable to its Related Persons. Notwithstanding anything in this Section 6.6 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business shall be maintained by Sellers and their Related Persons for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business.

(c)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, Sellers and their Related Persons shall not issue any press release, make any public announcement or disclose (directly or indirectly) any information relating to the existence or subject matter of this Agreement or Purchaser without the prior written approval of Purchaser, unless a press release or public announcement is required by applicable Law or an Order of the Bankruptcy Court or if the Board of Directors of each Seller determines in good faith, after consultation with the Sellers' outside legal counsel, that the failure to make any disclosure would be inconsistent with its fiduciary duties under applicable Law. The parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court and shall make any applicable disclosures regarding this Agreement (i) to the Bankruptcy Court and (ii) as contemplated by the Bidding Procedures Order.

(d)     Notwithstanding anything to the contrary in this Agreement, after the Closing, Purchaser and its Related Persons shall have the right to issue any press releases and make any public announcements concerning the Business and the Purchased Assets in its and their sole and absolute discretion.

(e)     Sellers shall cease to make use of any Intellectual Property related to the Purchased Assets after the Closing Date.

6.7     Intellectual Property. Without limiting any other provision of this Agreement, prior to, on and after the Closing Date, each Seller hereto shall cooperate with each other party, without any further consideration, (i) to obtain, execute and deliver, or use best efforts to obtain, execute and deliver to Purchaser, or cause to be executed and delivered, all instruments, including any instruments of conveyance, assignment and transfer as such party may request to be executed and delivered by the other party, (ii) to make, or cause to be made, all filings with, and to obtain, or cause to be obtained, all consents of any Governmental Authority or any other Person under any

Permit, license, agreement, indenture or other instrument, and (iii) to take, or cause to be taken, all such other actions Purchaser may reasonably request from time to time in order to effectuate the provisions and purposes of this Agreement and any and all transfers of Intellectual Property pursuant to this Agreement and the Ancillary Agreements. In the event the Purchaser (or its designee) is unable for any reason, after reasonable effort, to secure Sellers' signature on any document needed in connection with the actions specified in this paragraph, Sellers' hereby irrevocably designate and appoint the Purchaser and its duly authorized officers and agents as Sellers' agent and attorney in fact, which appointment is coupled with an interest, to act for and in Sellers' behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by Sellers.

6.8     No Successor Liability. The parties hereto intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (a) be the successor of any Seller or any Subsidiary, (b) have, de facto, or otherwise, merged with or into any Seller or any Subsidiary, (c) be a mere continuation or substantial continuation of any Seller, any Subsidiary or its enterprise(s) or (d) be liable for any acts or omissions of any Seller or any Subsidiary in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties hereto intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of any Seller's predecessors or Related Persons, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Sellers or any Subsidiary arising prior to the Closing Date. The parties hereto agree that the provisions substantially in the form of this Section 6.8 shall be reflected in the Bankruptcy Sale Order.

ARTICLE 7
**TAXES**

7.1     Taxes Related to Purchase of Purchased Assets.

(a)     All Taxes, including all sales and transfer taxes, deed taxes, conveyance fees, recording charges, filing fees and similar taxes, fees and charges (including penalties and interest) (collectively, "**Transaction Taxes**"), that are imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets shall be borne by Sellers. Purchaser and Sellers shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b)     On or prior to the Closing Date, Sellers shall pay all Taxes, which are then due and owing with respect to the Purchased Assets and the Business and attributable to Tax periods or portions thereof commencing on or after the Petition Date and ending on

the Closing Date. All sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Purchased Assets that accrue during, or attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date shall be paid by Sellers.

(c)     Each of Sellers, on the one hand, and Purchaser, on the other hand, will, and will cause each of its Affiliates to, use commercially reasonable efforts to provide the other with such assistance, cooperation and information as may reasonably be requested by any of them in connection with the preparation and filing of any Tax Return, determining or contesting a liability for Taxes or a right to a refund of Taxes, or any audit, examination or other proceeding in respect of Taxes with respect to the Purchased Assets, in each case, as it relates to any taxable period (or portion thereof) ending on or before the Closing Date.

7.2     <u>Waiver of Bulk Sales Laws</u>.  To the greatest extent permitted by applicable Law, Purchaser and Sellers hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Sellers shall cause the Bankruptcy Sale Order to exempt Sellers and Purchaser from compliance with any such Laws.

ARTICLE 8
**BANKRUPTCY COURT MATTERS**

8.1     <u>Motions</u>.

(a)     Subject to the Bankruptcy Court's calendar, the hearing on the Bidding Procedures Motion shall occur not earlier than October 5, 2020 and, if possible, not later than October 12, 2020 (but in any event as soon after October 5, 2020 as possible) (the date of such hearing, the "<u>Bidding Procedures Hearing Date</u>") and may be adjourned or continued by the Bankruptcy Court if agreed by Purchaser (provided that in no event shall the hearing occur earlier than October 5, 2020) and the Bankruptcy Court shall enter the Bid Procedures Order not later than one (1) business day following the conclusion of the Bid Procedures Hearing (such date of entry, the "<u>Bidding Procedures Order Date</u>").

(b)     Sellers shall file a true and complete copy of this Agreement with the Bankruptcy Court not later than October 7, 2020.

(c)     Not later than sixty (60) days after the Bidding Procedures Order Date, should the Sellers receive a Qualified Bid for the Purchased Assets (in accordance with the Bidding Procedures Order entered by the Bankruptcy Court), the Sellers shall hold an Auction for the Purchased Assets on a date and time to be announced.

(d)     Not later than sixty-two (62) days after the Bidding Procedures Order Date, subject to the Bankruptcy Court's calendar, the Sale Hearing shall occur.

8.2     <u>Contracts</u>. Sellers shall serve on all non-debtor counterparties to all of the Contracts on the Contracts Schedule a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-debtor counterparties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than three (3)

31

Business Days prior to the Sale Hearing. In cases in which Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The motions contemplated by Section 8.1 shall reflect Purchaser's promise to perform from and after the Closing under all Assigned Contracts, which shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of the Assigned Contracts.

8.3     Procedure. To the extent practicable under the circumstances, Sellers shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall to the extent that such comments relate to the Purchased Assets cooperate with Purchaser to make reasonable changes. Sellers agree to diligently prosecute the entry of the Bankruptcy Sale Order. In the event the entry of the Bankruptcy Sale Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting changes to this Agreement or the Ancillary Agreements or any resulting material changes to the Orders shall be subject to Purchaser's approval in its sole and exclusive discretion, and any resulting non-material changes to the Orders shall be subject to Purchaser's approval in its reasonable discretion.

8.4     Purchaser Protections. Subject to Bankruptcy Court approval, Sellers shall pay to Purchaser the Break-Up Fee and Expense Reimbursement (each as defined herein) pursuant to the terms and conditions set forth in Section 11.3 hereof.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1     Conditions Precedent to Performance by Sellers. The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(d)) may be waived by Sellers, in their sole discretion:

(a)     Representations and Warranties of Purchaser. Each and every representation and warranty of Purchaser made in this Agreement that is qualified by a materiality standard, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Purchaser made in this Agreement that is not qualified by a materiality standard, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date.

(b)     Performance of the Obligations of Purchaser. All material obligations of Purchaser to be performed hereunder through, and including on, the Closing Date (including all obligations which Purchaser would be required to perform at the Closing if the transaction contemplated hereby was consummated) shall have been fully performed.

(c)     Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

(d)    No Violation of Orders.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)    Bidding Procedures Order.  The Bidding Procedures Order shall have been entered in the Bankruptcy Cases.

(f)    Assumption, Sale and Assignment of Contracts. Subject to Section 2.6, the Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assigned Contracts.

For avoidance of doubt, there shall be no conditions precedent to Sellers' obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

9.2    Conditions Precedent to the Performance by Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c) and Section 9.2(d), except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a)    Representations and Warranties of Sellers. Each and every representation and warranty of each Seller made in this Agreement that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of each Seller made in this Agreement that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date (disregarding for all purposes of this Section 9.2(a) any supplement or amendment to any of the Schedules pursuant to Section 6.3(a)).

(b)    Performance of the Obligations of Sellers. All material obligations of the Sellers to be performed hereunder through, and including on, the Closing Date (including all obligations which the Sellers would be required to perform at the Closing if transaction contemplated hereby was consummated) shall have been fully performed.

(c)    Bankruptcy Court Approval.  The Bankruptcy Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement, and the Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(d)    No Violation of Orders.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

33

(e) <u>Bidding Procedures Motion</u>. The Bidding Procedures Motion shall have been filed in the Bankruptcy Cases.

(f) <u>Bidding Procedures Order</u>. The Bidding Procedures Order shall have been entered in the Bankruptcy Cases in form and substance acceptable to Purchaser in Purchaser's sole and exclusive discretion.

(g) <u>Bankruptcy Sale Order</u>. The Bankruptcy Sale Order shall exempt all Sellers and Purchaser from compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement and shall have been entered by the Bankruptcy Court in form and substance acceptable to Purchaser in Purchaser's sole and exclusive discretion.

(h) <u>Assumption, Sale and Assignment of Contracts</u>. Subject to <u>Section 2.6</u>, the Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assigned Contracts to Purchaser on terms satisfactory to Purchaser.

(i) <u>No Claims</u>. No Claim shall have been brought by any Person against any of Purchaser or its Related Persons, and, to the extent applicable, all periods in which any Claim could be brought against any of the foregoing by any Person shall have expired.

(j) <u>Corporate Documents</u>. Sellers shall have delivered to Purchaser copies of the resolutions of Sellers' boards of directors or similar governing bodies, as applicable, evidencing the approval of this Agreement, the Bankruptcy Cases and the transactions contemplated hereby.

(k) <u>Ordinary Course Operations</u>. From and after September 3, 2020, Sellers shall have continued to operate the Business in the Ordinary Course of Business in accordance with the terms of this Agreement.

(l) <u>Delivery of Purchased Assets</u>. Each of the deliveries required to be made to Purchaser pursuant to Section 10.2 shall have been so delivered and at Closing, Sellers shall deliver possession of all Purchased Assets to Purchaser.

(m) <u>Release of Liens</u>. Purchaser shall have received such documents or instruments as may be required, in Purchaser's discretion, to demonstrate that, effective as of the Closing Date, the Purchased Assets are released from any and all Liens.

(n) <u>Permits</u>. Purchaser shall have obtained Permits in replacement of the Permits that are not transferable by Sellers to Purchaser, which are set forth on **Schedule 9.2(n)**, and that are necessary for Purchaser to take title to all of the Purchased Assets at Closing and thereafter to operate all aspects of the Business.

(o) <u>Contract Defaults</u>. There shall be no defaults, violations or breaches of, or under, any Contracts to which any Seller is a party (including, without limitation, any of the Physician Services Agreements (as defined below)).

(p)     Material Adverse Effect. No Material Adverse Effect shall have occurred since August 31, 2020.

(q)     Violations of Law. There shall be no violations of Law (when either taken individually or in the aggregate) that, in the opinion of Purchaser in its sole discretion, could adversely affect in any manner Purchaser's operation of the Business.

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.2. Upon the non-fulfillment of any condition set forth in this Section 9.2, this Agreement may, at Purchaser's option, be terminated pursuant to, in accordance with and with the effect set forth in Article 11.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1     Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 a.m. Houston time remotely via the exchange of documents and signatures on a date mutually acceptable to the parties, which shall be no later than two (2) Business Days after the date on which all conditions set forth in Article 9 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions) shall have been satisfied or waived (in writing), or at such other place, time or date as Purchaser and Sellers mutually agree, but in any event no later than fifteen (15) days after the date of the Sale Hearing (the "**Outside Date**"). The date on which the Closing is occurs is herein referred to as the "**Closing Date**." All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. Upon consummation of the Closing, the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (Houston time) on the Closing Date.

10.2     Sellers' Deliveries.  At the Closing:

(a)     the sale, transfer, assignment, conveyance and delivery by Sellers of the Purchased Assets to Purchaser shall be effected by the execution and delivery by Sellers of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Intellectual Property Assignment Agreement and Domain Name Transfer Agreement, and (iv) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably requested by Purchaser and satisfactory in form and substance to Purchaser;

(b)     Sellers shall deliver originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Purchaser through Sellers' datasite;

(c) Sellers shall obtain and deliver originals of each assignment of Intellectual Property from Johnson Publishing Company, LLC to any Seller, including that certain Intellectual Property Assignment, dated as of May 5, 2016, by and between Ebony Media Operations, LLC and Johnson Publishing Company, LLC and that certain Trademark License Agreement, dated as of May 5, 2016, by and between Johnson Publishing Company, LLC and Ebony Media Operations, LLC, in the quantity, form and substance satisfactory to Purchaser to enable Purchaser's submission of same to Government Authorities in jurisdictions outside of the United States of America that require such documentation to record said assignments;

(d) Sellers shall deliver proof of ownership of each Internet Domain Name, in form and substance satisfactory to Purchaser;

(e) Sellers shall deliver a copy of the Bankruptcy Sale Order entered by the Bankruptcy Court;

(f) Sellers shall deliver joint instructions to the Escrow Agent to deliver the Deposit to Sellers;

(g) Sellers shall deliver all keys to any locations that are included in the Purchased Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein;

(h) Sellers shall have executed and delivered to Purchaser, to the extent required by Purchaser, as applicable, any other Ancillary Agreement;

(i) Sellers shall deliver an officer's certificate, duly executed by a senior officer of Sellers, certifying the matters set forth in Section 9.2(a), Section 9.2(b) and Section 9.2(d), in form and substance satisfactory to Purchaser;

(j) each Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code, reasonably satisfactory to Purchaser;

(k) each Seller shall deliver a duly executed IRS Form W-9 with respect to each Seller (or, in the case of any disregarded entity, the regarded parent entity of such Seller);

(l) Sellers shall deliver possession of the Purchased Assets and the Business;

(m) Sellers shall deliver all other instruments of transfer, assumption, filings, or documents, reasonably requested by Purchaser in form and substance reasonably satisfactory to Purchaser, as may reasonably be required to give effect to this Agreement;

(n) each Seller shall deliver duly and properly authorized and executed documents (in form and substance satisfactory to Purchaser) as to the amendment of the organizational documents of each Seller and any Subsidiary of any Seller (collectively for all Sellers and Subsidiaries of Sellers, the "**Organizational Amendments**") changing such

Seller's or Subsidiary's name to another name which does not include any of the following words: "Ebony" or "Jet"; and

(o)     Sellers shall deliver a duly executed Copyright License Agreement between Ebony Media Operations, LLC and each owner of any Archive Images (as defined therein) that are the subject of the Archive License Agreement, dated May 5, 2016.

10.3    Purchaser's Deliveries.  At the Closing:

(a)     Purchaser shall pay the Purchase Price payable pursuant to and in accordance with Section 3.1; and

(b)     Purchaser shall execute and deliver to Sellers the Assignment and Assumption Agreement and any other Ancillary Agreement to which Purchaser is a party.

ARTICLE 11
**TERMINATION**

11.1    Termination. This Agreement may be terminated only in accordance with this Section 11.1. This Agreement may be, or as applicable, shall be, terminated at any time before the Closing as follows:

(a)     (i)     by mutual written consent of Sellers and Purchaser; or

(ii)     by Purchaser or Sellers, if the transactions contemplated hereby shall not have been consummated on or prior to the Outside Date (which may be extended by fifteen (15) days by the Purchaser or Sellers); provided, however, that such right to terminate this Agreement shall not be available to any party whose failure to fulfill any of its covenants or obligations under this Agreement has been the cause of, or resulted in, the failure of the transactions contemplated hereby to be consummated on or before such date.

(b)     automatically and without any action or notice by Sellers to Purchaser, or Purchaser to Sellers, immediately upon:

(i)     the issuance of a final and non-appealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Purchased Assets contemplated hereby;

(ii)     closing of an Alternate Transaction; or

(iii)     Purchaser is not declared the winning and successful bidder or the alternate bidder upon completion of the Auction.

(c)     by Purchaser:

(i)     if the Bidding Procedures Order shall not have been entered within three (3) days after the conclusion of the Bidding Procedures Hearing, as adjourned

37

and/or continued by the Court if agreed by Purchaser, or the Bidding Procedures Order is not in form and substance acceptable to Purchaser in Purchaser's sole and exclusive discretion, or if (A) such Bidding Procedures Order has been entered by such date but has been amended, supplemented or otherwise modified in any manner adverse to Purchaser without the prior written consent of Purchaser, (B) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bidding Procedures Order, or (C) following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of Purchaser;

(ii)    if the Auction has not concluded within sixty-one (61) days after the Bidding Procedures Order Date;

(iii)    if the Bankruptcy Court has not entered the Bankruptcy Sale Order within sixty-three (63) days after the Bidding Procedures Order Date (or such later date as Sellers and Purchaser may have agreed in writing), or the Bankruptcy Sale Order is not in form and substance acceptable to Purchaser in Purchaser's sole and exclusive discretion, or if (A) such Bankruptcy Sale Order has been entered by such date but is stayed or stayed pending appeal or has been reversed or vacated, (B) such Bankruptcy Sale Order has been entered by such date but has been amended, supplemented or otherwise modified in a manner adverse to Purchaser and without the prior written consent of Purchaser, or (C) such Bankruptcy Sale Order has been entered by such date but any Seller or any other Person takes any Action seeking to void or modify such Bankruptcy Sale Order;

(iv)    if there has been a material violation or breach by any Seller of any representation, warranty, agreement or covenant contained in this Agreement (disregarding any supplement or amendment to any of the Schedules pursuant to Section 6.3(a)) which (x) has rendered the satisfaction of any condition to the obligations of Purchaser set forth in Section 9.2 impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Sellers of written notice of such violation or breach from Purchaser, and (y) has not been waived by Purchaser;

(v)    if, prior to the Closing, any Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vi)    if there shall be excluded from the Purchased Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the reasonable opinion of Purchaser, prevent it from effectively operating the Business;

(vii)    if Purchaser so elects in writing pursuant to Section 6.5 hereof;

(viii) if there exists any default, violation or breach of or under any Contract to which any Seller is a party and such default, violation or breach has not been cured within five (5) days following receipt by Sellers of written notice of such default, violation or breach from Purchaser;

(ix) if the Bankruptcy Court enters any order inconsistent with the Bidding Procedures Order or the Bankruptcy Sale Order;

(x) if a Material Adverse Effect occurs;

(xi) an order, decree, ruling, injunction, stay or similar has been issued, or any Proceeding is pending, by a Governmental Authority to restrain, enjoin or otherwise prohibit the transactions contemplated hereby; or

(xii) there exist any violations of Law (when either taken individually or in the aggregate) that, in the opinion of Purchaser in its sole discretion, could adversely affect in any manner Purchaser's operation of the Business.

(d) by Sellers, if there has been a material violation or breach by Purchaser of any representation, warranty, agreement or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Sellers set forth in Section 9.1 impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Purchaser of written notice of such violation or breach from Sellers, and (y) has not been waived by Sellers.

11.2    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 11.1 or Section 6.5, this Agreement shall become null and void and have no effect and no party hereto (or any member, stockholder or representative of such party) shall have any liability except as set forth in Section 3.1(e), this Article 11 and Article 12. The provisions of Section 3.1(e), this Article 11, Article 12 and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, shall expressly survive termination of this Agreement. Notwithstanding the foregoing, the termination of this Agreement shall not relieve any Seller or its Related Persons of liability for breach of this Agreement (disregarding any supplement or amendment to any of the Schedules pursuant to Section 6.3(a)) prior to such termination or fraud by, on behalf of or with respect to any Seller.

11.3    Break-Up Fee; Expense Reimbursement. In consideration of Purchaser having expended considerable time and expense in connection with this Agreement and negotiation thereof and Purchaser's willingness to act as the "stalking horse" bidder with respect to the Auction, Sellers believe that Purchaser is entitled to certain bid protections.

(a) If this Agreement is terminated pursuant to Section 11.1(b)(ii) or Section 11.1(b)(iii), then Sellers, jointly and severally, shall pay the Break-Up Fee to Purchaser in immediately available funds, without need for further order of or from the Bankruptcy Court, and such Break-Up Fee shall be due and payable simultaneously with any such termination of this Agreement.

(b)    If this Agreement is terminated pursuant to <u>Section 11.1(a)(ii)</u>, <u>Sections 11.1(b)(ii)-(iii)</u>, <u>Sections 11.1(c)(i)-(vi)</u> or <u>Sections 11.1(c)(viii)-(x)</u>, then Sellers, jointly and severally, shall pay the Expense Reimbursement to Purchaser upon approval of the Expense Reimbursement by the Bankruptcy Court (and in any event, within thirty (30) days following any such termination of this Agreement). For the avoidance of doubt, if this Agreement is terminated pursuant to <u>Section 11.1(b)(ii)</u> or <u>Section 11.1(b)(iii)</u>, each of the Break-Up Fee and the Expense Reimbursement shall be due and payable to Purchaser.

(c)    Each of the Break-Up Fee and the Expense Reimbursement shall be an administrative expense priority obligation under Sections 503(b) and 507(b) of the Bankruptcy Code.

(d)    Sellers agree and acknowledge that Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Purchaser and its Affiliates, and that such due diligence, efforts, negotiation, and execution have provided value to Sellers and, in Sellers' reasonable business judgment, is necessary for the preservation of the value of Sellers' estates. Sellers further agree and acknowledge that the Break-Up Fee and Expense Reimbursement are reasonable in relation to Purchaser's efforts, Purchaser's lost opportunities from pursuing this transaction, and the magnitude of the transactions contemplated hereby. The provision of the Break-Up Fee and the Expense Reimbursement is an integral part of this Agreement, without which Purchaser would not have entered into this Agreement. Sellers' obligation to pay the Break-Up Fee and Expense Reimbursement Amount shall be joint and several among Sellers.

(e)    If Sellers fail to take any action necessary to cause the delivery of the Break-Up Fee or the Expense Reimbursement under circumstances where Purchaser is entitled to the Break-Up Fee or the Expense Reimbursement and, in order to obtain such Break-Up Fee or the Expense Reimbursement, Purchaser commences a Proceeding which results in a judgment in favor of Purchaser, Sellers shall pay to Purchaser, in addition to the Break-Up Fee or the Expense Reimbursement, an amount of cash equal to the costs and expenses (including attorneys' fees) incurred by Purchaser in connection with such Proceeding.

(f)    Sellers hereby acknowledge and agree that the obligation to pay the Break-Up Fee and the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement and shall have administrative priority status against Sellers and their respective estates.

11.4    <u>Exclusive Remedies</u>.  Sellers, on behalf of each Seller and its Related Persons, acknowledges and agrees that any disbursement of the Deposit to Sellers pursuant to <u>Section 3.1(e)</u> shall be deemed liquidated damages and shall be the sole and exclusive recourse of each Seller and its Related Persons against Purchaser and its Related Persons for any loss or damage suffered as a result of any breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Purchaser or the failure of the transactions contemplated by this Agreement to be consummated, and upon payment of the Deposit in accordance with <u>Section 3.1(e)</u>, (i) Purchaser and its Related Persons shall not have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby and (ii) no Seller or any of

40

its Related Persons will have any right of recovery, whether arising under contract Law, tort Law or any other theory of Law, against, and no personal liability shall attach to any Purchaser and its Related Persons, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any legal or equitable Proceeding, by virtue of any statute, regulation or applicable Law, or otherwise. For the avoidance of doubt, the maximum aggregate liability of Purchaser and its Related Persons for losses in connection with this Agreement shall be limited to the Deposit, and under no circumstances will any Seller or any of its Related Persons be entitled to, nor will any Seller or any of its Related Persons seek, obtain or accept, monetary damages or losses of any kind (including damages for the loss of the benefit of the bargain, opportunity cost, loss of premium, time value of money or otherwise, or any consequential, special, expectancy, indirect or punitive damages) in connection with the termination of this Agreement in excess of the amount of the Deposit.

11.5    Specific Performance.

(a)    The parties acknowledge and agree that (i) irreparable damage to Purchaser would occur in the event that any of the provisions of this Agreement are not performed by Sellers in accordance with their specific terms or are otherwise breached or threatened to be breached by any Seller, and (ii) either or both damages and remedies at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by Sellers. Accordingly, Purchaser shall be entitled to obtain equitable relief (without the posting of any bond or other security) with respect to any such breach, including any one or more of a mandatory injunction, specific performance of any one or more of such covenants, promises, or agreements, and an order enjoining Sellers from any threatened, or from the continuation of any actual, breach of the covenants, promises, or agreements contained in this Agreement. Purchaser's right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. The rights set forth in this Section 11.5 shall be in addition to any other rights which Purchaser may have at law or in equity in connection with this Agreement. If any Proceeding is brought to enforce this Agreement against Sellers, Sellers shall waive the defense that there is an adequate remedy at law and agree not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law, or inequitable for any reason. The right to specific performance, injunctive, and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, Purchaser would not have entered into this Agreement. If, prior to the Outside Date, Purchaser brings any Proceeding, in each case in accordance with Section 11.5, to enforce specifically the performance of the terms and provisions hereof, the Outside Date will automatically be extended (y) for the period during which such Proceeding is pending, plus ten (10) Business Days or (z) by such other time period established by the court presiding over such Proceeding, as the case may be.

(b)    Notwithstanding anything to the contrary contained in this Agreement, under no circumstance shall Sellers have the right to seek to enforce specifically any provision of this Agreement or to seek injunctive or other equitable relief with respect to any breach, alleged breach or threatened breach by Purchaser or otherwise under this Agreement or to obtain an injunction against Purchaser.

# ARTICLE 12
# **MISCELLANEOUS**

12.1    <u>Survival</u>.  No representations or warranties of Sellers and Purchaser made in this Agreement shall survive the Closing Date except as otherwise expressly provided in this Agreement. All covenants and agreements of Sellers and Purchaser contained herein shall survive the Closing.

12.2    <u>Further Assurances</u>.  At the request and the sole expense of the requesting party, Purchaser or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3    <u>Successors and Assigns</u>. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns, including any trustee appointed in any of the Bankruptcy Cases or subsequent chapter 7 cases and Sellers, if the Bankruptcy Cases are dismissed. Neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the parties hereto without the prior written consent of the other party or parties hereto (which consent may be granted, withheld, conditioned or delayed in such other party's sole discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect. Notwithstanding the foregoing:

(a)    Without the consent of any Seller or any other Person, Purchaser may (i) assign this Agreement or any of Purchaser's rights, interests or obligations, in whole or in part (including the right or obligation to acquire any of the Purchased Assets or the right or obligation to assume any Assumed Liabilities), under this Agreement to one or more Persons who are Affiliates of Purchaser and (ii) designate any Person who is an Affiliate of Purchaser to perform any of Purchaser's obligations, in whole or in part (including the obligation to acquire any of the Purchased Assets or the obligation to assume any Assumed Liabilities), under this Agreement. In the event of any assignment or designation pursuant to this <u>Section 12.3(a)</u>, Purchaser shall not be relieved of any liability or obligation to Sellers hereunder; and

(b)    Without the consent of any Seller or any other Person, Purchaser may assign this Agreement or any of Purchaser's rights, interests or benefits, in whole or in part, under this Agreement as collateral to any lender of Purchaser; <u>provided</u>, <u>however</u>, no such assignment shall relieve Purchaser of any liability or obligation to Sellers hereunder.

12.4    <u>Governing Law; Jurisdiction</u>.  This Agreement and the agreements, instruments and documents contemplated hereby and all disputes between the parties hereto arising under, in connection with or related to this Agreement or the facts and circumstances leading to its execution and delivery, whether in contract, tort or otherwise, shall be construed, performed and enforced in

accordance with, and governed by, the Laws of the State of Texas, without giving effect to any Laws, rules or provisions (including, without limitation, Laws, rules or provisions relating to choice or conflicts of law) (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws, rules or provisions of any jurisdiction other than the State of Texas, except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under, in connection with or relating to this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under, in connection with or relating to this Agreement and the agreements, instruments and documents contemplated hereby or the facts and circumstances leading to its execution and delivery, whether in contract, tort or otherwise, whether in law or equity, and consent to the jurisdiction of, any state or federal court sitting in Houston, Texas. Each of the parties hereto irrevocably consents to and agrees to submit to the exclusive jurisdiction of such courts, agrees that process may be served upon them in any manner authorized by the Laws of the State of Texas, and hereby waives, and agrees not to assert in any such dispute, to the fullest extent permitted by applicable Law, any claim that (a) such party is not personally subject to the jurisdiction of such courts, (b) such party and such party's property is immune from any legal process issued by such courts or (c) any litigation commenced in such courts is brought in an inconvenient forum.

12.5    Expenses.  Except as otherwise provided in this Agreement, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

12.6    Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date (if any) this Agreement was last amended.

12.7    Notices.  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following

43

addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.7):

>       If to Sellers:
>
>       Michael T. Gibson, Acting CEO
>       Ebony Media Holdings, LLC
>       3700 Green Trails N.
>       Austin, TX 78731
>       Email: mgibson@cvggroupllc.com
>
>       With a copy (which shall not constitute notice) to:
>
>       Pendergraft & Simon, L.L.P.
>       30 2777 Allen Parkway, Site 800
>       Houston, TX 77019
>       Attention: Leonard H. Simon
>       Email: lsimon@pendergraftsimon.com
>       Attention: William P. Haddock
>       Email: whaddock@pendergraftsimon.com
>
>       If to Purchaser:
>
>       Bridgeman Sports and Media LLC
>       3309 Collins Lane
>       Louisville, KY 40245
>       Attention: Charles P. Alexander
>       Email: alexanderindustriesllc@yahoo.com
>
>       With a copy (which shall not constitute notice) to:
>
>       Greenberg Traurig, LLP
>       1000 Louisiana Street, Suite 1700
>       Houston, TX 77002
>       Attention: Shari L. Heyen
>       Email: heyens@gtlaw.com
>
>       and
>
>       Greenberg Traurig, LLP
>       77 West Wacker Drive, Suite 3100
>       Chicago, IL 60601
>       Attention: Hans E. Biebl
>       Email: bieblh@gtlaw.com

   12.8    Amendments; Waivers.    Subject to approval of the Bankruptcy Court, this Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser

44

and Sellers, or in the case of a waiver, by the party hereto waiving compliance. Any waiver by any party hereto of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9    Entire Agreement. This Agreement, together with the Confidentiality Agreement, the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), supersede all other prior oral or written agreements among the parties hereto solely with respect to the matters contained herein and therein, and this Agreement, together with the Confidentiality Agreement the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, contains the entire understanding of the parties hereto solely with respect to the matters covered herein and therein. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the parties with respect hereto and will be deemed joint work product of the parties.

12.10    Seller Disclosures. Sellers shall be entitled to disclose this Agreement to the Bankruptcy Court. After notice to and consultation with Purchaser, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in Sellers' chapter 11 Bankruptcy Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Purchaser, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Purchaser, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction.

12.11    Headings.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Counterparts. This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

12.13  <u>Name Change</u>.  Sellers will deliver to Purchaser at the Closing evidence as to the amendment of organizational documents of each Seller and each Subsidiary changing each Seller's and each such Subsidiary's name to another name which does not include the name "Ebony" or "Jet" or any name confusingly similar thereto. The new names of the Sellers shall be Media Holdings Liquidating Company, LLC and Media Operations Liquidating Company, LLC. The new names of each Subsidiary of Holdings shall be Liquidating Entertainment, LLC, Liquidating Events, LLC, Liquidating Entertainment II, LLC, Liquidating Publishing, LLC and Liquidating Media Foundation, LLC or such other names as Purchase and Sellers each may agree in its reasonable discretion. Immediately following the Closing, each Seller shall, and each Seller shall cause each Subsidiary to, discontinue the use of its current name (and any other tradenames currently utilized by any of Sellers or any Subsidiary) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "EBONY", "Ebony", "Jet" or any name confusingly similar thereto without the prior written consent of Purchaser. From and after the Closing, each Seller covenants and agrees not to, and each Seller shall cause each Subsidiary not to, use or otherwise employ any of the trade names, corporate names, "d/b/a" names or similar Intellectual Property rights utilized by any Seller in the conduct of the Business, which rights shall be included in the Purchased Assets purchased hereunder. Each Seller hereby irrevocably authorizes Purchaser to file, upon the Closing, the Organizational Amendments with the applicable Secretary of State of each Seller's and each Subsidiary's jurisdiction of formation and in each state in which each such Seller or Subsidiary is qualified to do business on each such Seller's and Subsidiary's behalf.

12.14  <u>Payments and Revenues</u>. If after the Closing, Sellers shall receive any payment, revenue or other amount that belongs to Purchaser pursuant to this Agreement, Sellers shall promptly remit or cause to be remitted the same to Purchaser. If after the Closing, Purchaser shall receive any payment, revenue or other amount that belongs to Sellers pursuant to this Agreement, Purchaser shall promptly remit or cause to be remitted the same to Sellers.

12.15  <u>Waiver of Jury Trial</u>.  **EACH PARTY HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY**

**TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT.**

12.16 <u>General Release</u>. Effective upon the Closing, each Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever against Purchaser or any of its Related Persons, that directly or indirectly arise out of, relate to, are based upon, or in any manner are connected with any of Sellers, any of their respective Related Persons or the Business (collectively, the "**Released Claims**") (including, without limitation, any pre-Petition Date Contracts to which Purchaser (or any of its Affiliates) and any Seller were parties and all transactions referred to in such Contracts). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges Purchaser and each of its Related Persons from any claim, cause of action, liability or obligation whatsoever with respect to the Released Claims and (ii) releases, waives and discharges all of the Released Claims against Purchaser and each of its Related Persons.

12.17 <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than Purchaser's Related Persons referred to in <u>Section 12.16</u>.

[*signature pages follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

BRIDGEMAN SPORTS AND MEDIA LLC

By: _____

Name:  Ulysses "Junior" Bridgeman

Title:   Chief Executive Officer

[*signature pages continue*]

**SELLERS:**

EBONY MEDIA HOLDINGS, LLC

By: _____
Name: _Michael T. Gibson_
Title: _Acting CEO_

EBONY MEDIA OPERATIONS, LLC

By: _____
Name: _Michael T. Gibson_
Title: _Acting CEO_

## Schedule 1

## DEFINED TERMS

"**Accounts Receivable**" has the meaning set forth in Section 2.1(a).

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or use the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation Statement**" has the meaning set forth in Section 3.2(a).

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Sellers (a) accept a Qualified Bid, other than that of Purchaser, as the highest or best offer, (b) file a plan of reorganization or liquidation that does not contemplate the sale of the Purchased Assets to Purchaser in accordance to the terms of this Agreement, or (c) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, consolidation, reorganization, liquidation or other similar transaction (by Sellers or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, a material portion or all or substantially all of the Purchased Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser.

"**Ancillary Agreement**" means any other agreement, document or instrument that any Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"**Assigned Contracts**" has the meaning set forth in Section 2.1(b).

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement substantially in the form of **Exhibit B** evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption Notice**" has the meaning set forth in Section 2.5(c).

"**Auction**" means the auction for the sale of Sellers' assets conducted by Sellers if any Qualified Bid is received pursuant to the Bidding Procedures Order.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Sale Order**" means an order issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole and exclusive discretion.

"**Base Amount**" has the meaning set forth in Section 3.1(a)(i).

"**Bidding Procedures Hearing Date**" has the meaning set forth in Section 8.1(a).

"**Bidding Procedures Motion**" means a motion, in form and substance acceptable to Purchaser in its sole and exclusive discretion, to approve the Bidding Procedures Order.

"**Bidding Procedures Order**" means an order, that, among other things, establishes procedures for an auction process to solicit competing bids and includes Purchaser as the stalking horse bidder, Break-Up Fee and Expense Reimbursement, which Bidding Procedures Order shall be acceptable to Purchaser in its sole and exclusive discretion.

"**Bidding Procedures Order Date**" has the meaning set forth in Section 8.1(a).

"**Bill of Sale**" means the Bill of Sale substantially in the form of **Exhibit C** conveying to Purchaser title to all of the Purchased Assets.

"**Books and Records**" has the meaning set forth in Section 2.1(y).

"**Book Inventory**" has the meaning set forth in Section 2.1(c).

"**Break-Up Fee**" means an amount equal to $280,000, which is two percent (2%) of the Purchase Price.

"**Business**" means the print, digital, online, video, event, and related businesses of Sellers, including (a) developing, producing, and promoting content about African-American community and culture in America and worldwide and related publications, products, services, events, content, and related materials, including events and content related to the Power 100; and (b) marketing and distributing such publications, products, services, events, content, and materials to advertisers and audiences in each case under, and to the extent owned by, Sellers, the "Ebony", "Jet", and "Ebony Fashion Fair" trademarks and any derivations thereof (the "**Business Marks**").

"**Business Confidential Information**" has the meaning set forth in Section 6.6(a).

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Texas are authorized by Law or other governmental action to close.

"**Business Marks**" has the meaning set forth in the definition of "Business."

"**Business Software**" means Software owned by any Seller and used in the Business.

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, instruments for the payment of money, certificates of deposit and other time deposits and letters of credit.

"**Casualty**" has the meaning set forth in <u>Section 6.5</u>.

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5) and shall include all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" has the meaning set forth in <u>Section 10.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 10.1</u>.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Company**" has the meaning set forth in the Preamble.

"**Company IT Systems**" means all information technology and computer and data processing and communication systems (including Software, servers, workstations, routers, hubs, switches, circuits, networks, data communications lines) relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information, whether or not in electronic format, owned by, used in or necessary to the conduct of the Business.

"**Confidential Information**" means any information concerning, or which is used in, the Business, and includes, but is not limited to, proprietary technology, operating procedures and methods of operation, financial statements and other financial information, trade secrets, market studies and forecasts, competitive analyses, target markets, advertising techniques, pricing policies and information, the substance of agreements with customers or advertisers, subcontractors and others, marketing and similar arrangements, servicing and training programs and arrangements, customer, advertiser and subcontractor lists, user data, customer or subscriber personal information, customer or subscriber profiles, customer or subscriber preferences, customer or subscriber-related data, and any documents embodying confidential and proprietary information.

"**Confidentiality Agreement**" means that certain Non-Disclosure Agreement, dated as of September 3, 2020, by and among Sellers and Purchaser.

"**Continuation Costs**" has the meaning set forth in <u>Section 2.5(b)</u>.

"**Contract**" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"**Contracts Schedule**" has the meaning set forth in <u>Section 2.5(a)</u>.

"**Copyrights**" means all copyrights and all other rights with respect to works of authorship (including data and databases), and all copyright registrations thereof and applications therefor and renewals, extensions and reversions thereof, rights of publicity, and all other rights corresponding thereto throughout the world (including all moral and economic rights, however denominated).

"**Cure Amounts**" has the meaning set forth in Section 2.8.

"**Cure Amounts Holdback**" has the meaning set forth in Section 3.1(c).

"**Deal Communications**" all communications between or among any of Pendergraft & Simon, LLP, any of the Sellers, their boards of directors, or any of their respective representatives that directly relate to the negotiation, documentation and consummation of the transactions contemplated by this Agreement and any dispute arising under this Agreement.

"**Default**" means (a) a violation, breach, or default, (b) the occurrence of an event that, with the passage of time, the giving of notice, or both, would constitute a violation, breach, or default, or (c) the occurrence of an event that, with or without the passage of time, the giving of notice, or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"**Deposit**" has the meaning set forth in Section 3.1(e).

"**Designation Right Asset**" has the meaning set forth in Section 2.5(b).

"**Designation Rights Period**" means the period of sixty (60) days from and after the Closing Date.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information and advertising rates, business plans, quality control records and procedures, blueprints, accounting, legal and tax files, all files, customer, subscriber, advertiser and supplier files and documents (including credit information), personnel files and employment records relating to employees (including, without limitation, applicable completed I-9 forms), customer, subscriber, advertiser or supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, the Business or the Purchased Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Leased Property, but excluding any materials exclusively related to any Excluded Assets.

"**Domain Name Transfer Agreement**" means the Domain Name Transfer Agreement substantially in the form of **Exhibit D**.

"**Employee Benefit Plans**" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by a Seller or any ERISA

Affiliate and that covers any current or former employee, director, manager, member or consultant of any Seller (or their dependents, spouses or beneficiaries).

"**Employees**" means all individuals employed by Sellers in connection with the Business as of the Closing Date.

"**Encumbrance**" means any Lien (as defined in the Bankruptcy Code), charge, Claim, including claims or liability based on successor liability theories or otherwise, collateral assignment, community property interest, pledge, hypothecation, indenture, Interest, levy, escrow, deed of charge, condition, equitable interest, option, warrant, proxy, voting trust, transfer restriction under any shareholder or similar agreement or the Holdings Operating Agreement or Company Operating Agreement, right of setoff, security agreement, debt, liability, security interest or similar interest, mortgage, easement, encroachment, license, servitude, right of way, right of first refusal, right limited to any Seller personally, restriction or interest of any kind, including any restriction on use or voting under any agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether secured or unsecured, perfected or unperfected, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, written or oral or imposed by any Law, equity or otherwise.

"**Environmental Laws**" has the meaning set forth in Section 4.11.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade of business (whether or not incorporated) which is treated as a single employer with any Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Escrow**" has the meaning set forth in Section 3.1(e).

"**Escrow Agent**" has the meaning set forth in Section 3.1(e).

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Execution Date**" has the meaning set forth in the Preamble.

"**Expense Reimbursement**" means the actual and documented reasonable fees, costs and expenses of Purchaser, including the fees and costs of attorneys, accountants and financial and other advisors in an aggregate amount not to exceed $300,000.

"**Federal Rules of Bankruptcy Procedure**" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to title 11 of the United States Code.

"**Governmental Authority**" means any international, supranational, national, central, federal, state, local, provincial, county, municipal or other court, tribunal, governmental department, agency, board or commission, council, branch, bureau, office, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body,

subdivision or instrumentality, domestic or foreign, or any other body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, military, regulatory or taxing authority or power of any nature.

"**Hazardous Materials**" means (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"**Holdings**" has the meaning set forth in the Preamble.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"**Intellectual Property**" means all intellectual property or similar proprietary rights in any jurisdiction throughout the world, including all (a) Patents and inventions (whether or not patentable and whether or not reduced to practice); (b) Copyrights (including Software); (c) trade secrets, confidential know-how or confidential business information; (d) Trademarks, Internet domain names and Social Media Accounts, and all registrations, applications and renewals thereof; (e) copies and tangible embodiments of any of the foregoing in whatever form or medium, including Software; (f) all rights of publicity; (g) all goodwill associated with any of the foregoing; and (h) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation associated with any of the foregoing.

"**Intellectual Property Assignment Agreement**" means the Intellectual Property Assignment Agreement substantially in the form of **Exhibit E**.

"**Interest**" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"**Internet Domain Names**" has the meaning set forth in Section 2.1(g).

"**Inventory**" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned, including, without limitation, office supplies, parts and accessories, inventory in transit, raw materials, works in process, finished goods, packaging inventory and displays.

"**IP Holdback**" has the meaning set forth in Section 3.1(d).

"**IP License Agreements**" has the meaning set forth in Section 4.7(b).

"**Knowledge**" means any matter, fact or thing that is actually known to any director, officer or manager of Sellers, including Michael Gibson, Willard Jackson, Jacob Walthour, Mallory Gibson.

"**Law**" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order (including, without limitation, the Orders), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"**Leased Property**" means all the real property leased, subleased or licensed by Sellers, all of which are described on **Schedule 2-1** which is used or useful in connection with the operation of the Business.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Material Adverse Effect**" means a state of facts, event, change, development or effect that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on (a) the Business, Purchased Assets, the Assumed Liabilities, the enforceability of any Assigned Contract or Sellers' condition (financial or otherwise), operations, performance, or results of operations, (b) the ability of Sellers to perform Sellers' obligations and to consummate the transactions contemplated under this Agreement in a timely manner; or (c) the validity or enforceability of this Agreement or the rights and remedies of Sellers under this Agreement or any Ancillary Agreement, but excluding any state of facts, event, change, development or effect caused by events, changes or developments relating to the fact that Sellers became debtors under the Bankruptcy Code.

"**Orders**" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"**Ordinary Course of Business**" means, with respect to any Person, actions that are taken in the ordinary and usual course of normal day to day operations of the Business consistent with past practice in effect prior to filing of the Bankruptcy Cases.

"**Organizational Amendments**" has the meaning set forth in Section 10.2(n).

"**Outside Date**" has the meaning set forth in Section 10.1.

"**Patents**" means any domestic or foreign patents, registered design, utility models and applications, drafts and disclosures relating thereto (and any patents or utility models that issue as a result of such applications, drafts and disclosures) and any reissues, divisions, divisionals, continuations, continuations-in-part, provisionals, renewals, extensions, substitutions, reexaminations or invention registrations related to such patents, utility models and applications.

"**Permits**" means all certificates of occupancy or other certificates, permits, concessions, authorizations, grants, easements, variances, exemptions, consents, orders, franchise, filings, approvals, authorizations and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Purchased Assets.

"**Permitted Encumbrance**" means: (a) Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings, all of which are listed on the **Permitted Encumbrances Schedule** attached hereto; (b) statutory liens arising in the Ordinary Course of Business that are not overdue and that do not materially affect the value or use of the affected asset, all of which are listed on the **Permitted Encumbrances Schedule** attached hereto; (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security legislation, all of which are listed on the **Permitted Encumbrances Schedule** attached hereto; and (d) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case materially detract from the value or use of the property subject thereto or materially interfere with the ordinary conduct of the business of Sellers at the property subject thereto.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**Petition Date**" means the date on which the Bankruptcy Cases are filed with the Bankruptcy Court.

"**Personal Information**" means, in addition to any definition provided by any Seller for any similar term (e.g., "personally identifiable information" or "PII") in each Seller's privacy policy, contract or other public-facing statement, all information regarding or capable of being associated with an individual person or device, including (a) information that identifies, could be used to identify or is otherwise identifiable with an individual or a device, including name, physical address, telephone number, email address, financial information, financial account number or government-issued identifier (including Social Security number, driver's license number, passport number), medical, health, or insurance information, gender, date of birth, educational or employment information, and any other data used or intended to be used to identify, contact or precisely locate an individual (e.g., geolocation data), (b) information or data bearing on an individual person's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living, (c) any data regarding an individual's activities online or on a mobile device or other application (e.g., searches conducted, web pages or content visited or viewed), whether or not such information is associated with an identifiable individual, and (d) Internet Protocol addresses, device identifiers or other persistent identifiers. Personal Information also includes any information maintained in association with the foregoing information. Personal Information may relate to any individual, including a current, prospective or former customer or employee of any Person. Personal Information includes information in any form, including paper, electronic and other forms

"**Privacy and Data Security Requirements**" means all (a) Privacy Laws, (b) provisions of any contracts to which any Seller is bound imposing obligations with respect to the collection, use, security, or transfer of Personal Information or Company Data, (c) third person privacy or data security policies with which any Seller has been or is contractually obligated to comply, and (d) Privacy Policies.

"**Privacy Laws**" means (a) all Laws applicable to the Sellers or the operation of the Business related to data privacy, data security, data protection, the transmission of unsolicited commercial emails, phone calls, faxes and mail and marketing campaigns, and the collection, processing and transfer of Personal Information, including across jurisdictional borders, including if and to the extent applicable: (1) the California Online Privacy Act, CANSPAM Act of 2003 (codified at 15 U.S.C. §§ 7701-7713 and 18 U.S.C. § 1037), Sections 17529.1--17529.9 and Section 17538.45 of the California Business and Professions Code, the Junk Fax Prevention Act of 2005 (Pub.L. 109–21), the Do-Not-Call Implementation Act of 2003 (Pub.L. 108–10), the Communications Act of 1934, as amended by the Telecommunications Act of 1996, the Telephone Consumer Protection Act of 1991 (Pub. L. 102–243), General Data Protection Regulation i.e., Regulation (EU) 2016/679, all similar Law to the foregoing, and (2) the requirements set forth in regulations implementing such Laws and published by regulatory authorities such as the Federal Trade Commission, Federal Communications Commission, and applicable European Union data protection authorities. Without limiting the foregoing, Privacy Laws include any Laws that provide rights of privacy or publicity to individuals.

"**Privacy Policies**" means each Seller's (a) external-facing policies or notices provided to third parties relating to Personal Information, privacy and/or the security of Seller Data, Company IT Systems, and other information (e.g., posted privacy policies, notices provided in connection with the collection, handling or use of Personal Information), and (b) internal privacy policies, guidelines and terms and conditions.

"**Proceeding**" means an action, claim, suit, investigation, arbitration or proceeding (including an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"**Purchased Assets**" has the meaning set forth in <u>Section 2.1</u>.

"**Purchase Price**" has the meaning set forth in <u>Section 3.1(a)</u>.

"**Purchaser**" has the meaning set forth in the Preamble.

"**Purchaser Default Termination**" has the meaning set forth in <u>Section 3.1(e)</u>.

"**Qualified Bid**" means competing bids qualified for the Auction in accordance with the Bidding Procedures Order.

"**Rejection Notice**" has the meaning set forth in <u>Section 2.5(d)</u>.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, equityholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers, representatives, successors or permitted assigns of any such Person.

"**Released Claims**" has the meaning set forth in <u>Section 12.16</u>.

"**Required Bankruptcy Deliveries**" means the schedules of assets and liabilities and statements of financial affairs for each Seller, as required by Rule 1007 of the Federal Rules of Bankruptcy Procedure.

"**Retained Privileged Materials**" has the meaning set forth in <u>Section 2.2(m)</u>.

"**Sale Hearing**" means the hearing to consider the entry of the Bankruptcy Sale Order.

"**Schedules**" has the meaning set forth in <u>Section 6.3(a)</u>.

"**Seller**" has the meaning set forth in the Preamble.

"**Seller Data**" means the Seller's Intellectual Property that comprises data and that is material to the Business and contained in any database used or maintained by any Seller.

"**Social Media Accounts**" means any and all accounts, profiles, pages, feeds, registrations and other presences on or in connection with any (a) social media or social networking website or online service, (b) blog or microblog, (c) mobile application, (d) photo, video or other content-sharing website, (e) virtual game world or virtual social world, (f) rating and review website, (g) wiki or similar collaborative content website or (h) message board, bulletin board, or similar forum.

"**Software**" means any and all (a) computer programs, firmware, software (whether in source code, object code or other form), models, algorithms, methodologies and implementations thereof, (b) development tools, descriptions and flow charts, (c) data, metadata, databases and compilations of data, whether machine readable or otherwise and (d) programmers' annotations, notes, documentation, product user manuals, training materials and other work product used to design, plan, organize, maintain, support or develop any of the foregoing, irrespective of the media on which it is recorded.

"**Subsidiary**" means any Person whose securities or other ownership interests having by their terms the power to elect a majority of the board of directors or other persons performing similar functions are owned or controlled, directly or indirectly, by any Seller or one or more Subsidiaries, or which is owned 50% or more, directly or indirectly, by any Seller or any of its Subsidiaries.

"**Tangible Personal Property**" has the meaning set forth in <u>Section 2.1(e)</u>.

"**Tax**" or "**Taxes**" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of Contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, escheat or unclaimed property, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Trademarks**" means all unregistered and registered trademarks and service marks, trademark and service mark applications, common law trademarks and service marks, trade dress and logos, trade names, business names, corporate names, product names and other source or business identifiers and the goodwill associated with any of the foregoing and any renewals and extensions of any of the foregoing, as permitted in the jurisdiction where any such unregistered or registered trademarks are being used.

"**Transaction Taxes**" has the meaning set forth in <u>Section 7.1(a)</u>.

"**Transferred Employees**" has the meaning set forth in <u>Section 6.4(a)</u>.

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, *et seq*, as amended.

**EXHIBIT A**

**ESCROW AGREEMENT**

## FORM OF ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT (this "**Agreement**") is made and entered into as of [●], 2020, by and among Ebony Media Holdings, LLC, a Texas limited liability company ("**Holdings**"), Ebony Media Operations, LLC, a Texas limited liability company (the "**Company**" and together with Holdings, "**Sellers**" and each, a "**Seller**") and Bridgeman Sports and Media LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "**Purchaser**" and, together with the Sellers, sometimes referred to individually as a "**Party**" and collectively as the "**Parties**"), and Friebert & Mattingly Title Group, LLC, a Kentucky limited liability company, as escrow agent (the "**Escrow Agent**"). Capitalized terms not defined herein shall have the meanings assigned to them in that certain Asset Purchase Agreement, dated as of [●], 2020 (the "**Purchase Agreement**"), by and among Sellers and Purchaser.

## RECITALS

**WHEREAS**, the Purchase Agreement provides that if the Bidding Procedures Order entered by the Bankruptcy Court is acceptable to Purchaser in its sole and exclusive discretion, then within three (3) Business Days following the Bidding Procedures Order Date, Purchaser shall deposit into a segregated account cash in an amount equal to $500,000.00 (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") to be held in accordance with the terms of the Purchase Agreement and this Agreement for the purpose of establishing a source of funds to secure the obligations of Purchaser to Sellers; and

**WHEREAS**, the Escrow Agent agrees to hold and distribute the Deposit in accordance with the terms of this Agreement.

**NOW THEREFORE**, in consideration of the promises and agreements of the Parties and the Escrow Agent and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

1.   **Appointment**.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.   **Receipt of Escrow Funds**.  Simultaneous with the execution and delivery of this Agreement, Purchaser is depositing with the Escrow Agent the Deposit by wire transfer of immediately available funds. The Escrow Agent shall initially hold the Deposit in the Deposit Escrow Account. The Deposit (together with any accrued interest thereon, if any) *minus* any payments distributed or paid therefrom in accordance with this Agreement shall constitute the "**Escrow Funds**".

3.   **Investment of Escrow Funds.**

(a)     Unless otherwise instructed in writing by the Parties, the Escrow Agent shall invest and reinvest the Escrow Funds in a non-interest-bearing deposit account insured by the Federal Deposit Insurance Corporation ("**FDIC**") to the applicable limits. Any such rate

changes will be reflected in the monthly statement provided to the Parties. The Escrow Funds shall at all times remain available for distribution in accordance with <u>Section 4</u> below.

(b)    The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Deposit Escrow Account for the preceding month.

4.    **Disposition and Termination of the Escrow Funds.**

(a)    <u>Escrow Funds</u>.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this <u>Section 4(a)</u> as follows:

(i)    Upon receipt of a Joint Release Instruction (as defined herein) with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of such Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)    If at any time either of the Parties receives a Final Determination (as defined herein), then upon receipt by the Escrow Agent of a copy of such Final Determination from any Party, the Escrow Agent shall (A) promptly deliver a copy of such Final Determination to the other Party and (B) on the fifth (5th) Business Day following receipt by the applicable Party from the Escrow Agent of the Final Determination, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Funds) in accordance with such Final Determination. Subject to the terms of this <u>Section 4(a)</u>, the Escrow Agent will act on such Final Determination without further inquiry.

(iii)    Each of Purchaser and the Sellers agree to execute and deliver to the Escrow Agent a Joint Release Instruction as follows:

(A)    within two (2) Business Days following the termination of the Purchase Agreement by Sellers pursuant to Section 11.1(d) of the Purchase Agreement, a Joint Release Instruction instructing the Escrow Agent to release from the Deposit Escrow Account to the Sellers an amount of funds equal to the Escrow Funds;

(B)    within two (2) Business Days after a termination of the Purchase Agreement other than as described in clause (A) above, a Joint Release Instruction instructing the Escrow Agent to release from the Deposit Escrow Account to Purchaser an amount of funds equal to the Escrow Funds; and

(C)    in connection with the Closing, a Joint Release Instruction instructing the Escrow Agent to release (x) to Sellers at the Closing an amount of funds equal to the Deposit (it being acknowledged and agreed between Purchaser and the Sellers that release of such amount shall be credited against the Purchase Price payable to the Sellers) and (y) to Purchaser at the Closing an amount of funds equal to the interest accrued on the Deposit (if any).

(iv)    All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or cashier's check as set forth in the Joint Release Instruction or Final Determination, as applicable.

(v)     In the event a Joint Release Instruction is delivered to the Escrow Agent in accordance with <u>Section 11</u>, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in <u>Exhibits</u> <u>B-1</u> and or <u>B-2</u> annexed hereto (the "**Call Back Authorized Individuals**"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing actually received by the Escrow Agent in accordance with <u>Section 11</u>.

(b)     <u>Certain Definitions</u>.

(i)     "**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Texas or Kentucky are authorized by Law or other governmental action to close.

(ii)     "**Final Determination**" means a final non-appealable order of any court of competent jurisdiction which may be issued, together with (A) a certificate of the prevailing Party to the effect that such judgment is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party.

(iii)     "**Joint Release Instruction**" means the joint written instruction of Purchaser and the Sellers, substantially in the form of <u>Exhibit A</u> hereto, which is executed by Purchaser and the Sellers, to the Escrow Agent directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)     "**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

5.     **Escrow Agent**.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties including but not limited to any fiduciary duty shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement (other than for purposes of defined terms used but not defined herein), nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. The Escrow Agent may rely upon and shall not be liable in the absence of its fraud, willful misconduct or gross negligence for acting or refraining from acting upon any Joint Release Instruction furnished to it hereunder and reasonably believed by it to be genuine and to have been signed and presented by the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit B-1</u> and <u>Exhibit B-2</u> attached

hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be (a) delivered a Joint Release Instruction that eliminates such conflict or (b) directed otherwise in a Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent shall have no liability or obligation with respect to the Escrow Funds except for the Escrow Agent's fraud, willful misconduct or gross negligence. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable, directly or indirectly, for any (a) damages, losses or expenses arising out of the services provided hereunder, other than damages, losses or expenses which result from the Escrow Agent's fraud, gross negligence or willful misconduct, or (b) special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

6. **Resignation and Removal of Escrow Agent.** The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Purchaser and the Sellers acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, at which time of delivery Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the Parties hereto.

7.      **Fees and Expenses**.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid whenever due one-half by Sellers and one-half by Purchaser. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Agreement, or there is any assignment of interest in the subject matter of this Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Agreement or the subject matter hereof, then the Escrow Agent shall be reimbursed for its reasonable and documented costs and expenses resulting therefrom, including reasonable and documented attorneys' fees and expenses.

8.      **Indemnity.**  Each of the Parties shall jointly and severally indemnify, defend and save harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "**Indemnitees**") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "**Escrow Agent Losses**") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of an Indemnitee, except to the extent that such Escrow Agent Losses have been caused by the fraud, gross negligence or willful misconduct of Escrow Agent or any such Indemnitee, or (b) its following any Joint Release Instructions or other proper directions from the Sellers and Purchaser, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof or applicable law. The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement. The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in, the Escrow Funds for the payment of any reasonable claim for indemnification, expenses and amounts due hereunder, provided that the foregoing shall not prevent the distribution of the Escrow Funds as otherwise provided by this Agreement. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, upon thirty (30) days prior written notice to the Parties (including detailed supporting documentation related thereto), to charge against and withdraw from the Escrow Funds for its own account or for the account of an Indemnitee any amounts due to the Escrow Agent or to an Indemnitee under this Section 8. Notwithstanding anything to the contrary herein, Purchaser and the Sellers agree, solely as between themselves, that any obligation for indemnification under this Section 8 (or for reasonable fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Purchaser and one-half by the Sellers. If Purchaser or any Seller bears any indemnification obligation under this Section 8, and the Escrow Agent withdraws part or all of the Escrow Funds to satisfy part or all of such obligation, Purchaser or such Seller shall, as the case may be, within two (2) Business Days of such withdrawal, deposit into the Deposit Escrow Account via wire transfer of immediately available funds an amount equal to the amount withdrawn by the Escrow Agent with respect to

such obligation. The provisions of this <u>Section 8</u> shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

9.     **Tax Matters.**

(a)     Purchaser shall be responsible for and the taxpayer on all taxes due on the interest or income earned on the Escrow Funds for the calendar year in which such interest or income is earned. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b)     The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. Other than in connection with any required withholding, the Parties acknowledge and agree that the Escrow Agent shall have no responsibility for the preparation and/or filing of any tax return with respect to the Escrow Funds or any income earned by the Escrow Funds.

(c)     Should the Escrow Agent be engaged to perform annual tax information reporting for principal payments, all such reporting will be completed at the written direction of Purchaser, such that Purchaser shall continue to be identified as payor and withholding agent. The Escrow Agent will, in accordance with Purchaser's written instructions, file, print and mail information returns to persons or entities receiving disbursements pursuant to the Agreement and transmit withholding amounts as directed by Purchaser.

(d)     The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Friebert & Mattingly and its affiliates. This Agreement and any amendments or attachments are not intended or written to be used, and cannot be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.     **Covenant of Escrow Agent**.  The Escrow Agent hereby agrees and covenants with Purchaser and the Sellers that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except (a) pursuant to the express terms of this Agreement or (b) as otherwise required by law (provided that in the case of clause (b), the Escrow Agent will provide the Parties with prior written notice of such delivery).

11.     **Notices.**  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, to the email address specified

below (provided, that the sending party does not receive an automatically generated message from the recipient's email server that such email could not be delivered to such recipient); or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address or email address for a party as shall be specified in a notice given in accordance with this Section 11):

if to Purchaser, then to:

  Bridgeman Sports and Media LLC
  3309 Collins Lane
  Louisville, KY 40245
  Attention: Charles P. Alexander
  Email: alexanderindustriesllc@yahoo.com

  With a copy (which shall not constitute notice) to:

  Greenberg Traurig, LLP
  1000 Louisiana Street, Suite 1700
  Houston, TX 77002
  Attention: Shari L. Heyen
  Email: heyens@gtlaw.com

  and

  Greenberg Traurig, LLP
  77 West Wacker Drive, Suite 3100
  Chicago, IL 60601
  Attention: Hans E. Biebl
  Email: bieblh@gtlaw.com

or, if to the Sellers, then to:

  Michael T. Gibson, Acting CEO
  Ebony Media Holdings, LLC
  3700 Green Trails N.
  Austin, TX 78731
  Email: mgibson@cvggroupllc.com

  With a copy (which shall not constitute notice) to:

  Pendergraft & Simon, L.L.P.
  30 2777 Allen Parkway, Site 800
  Houston, TX 77019
  Attention: Leonard H. Simon
  Email: lsimon@pendergraftsimon.com

Attention: William P. Haddock
Email: whaddock@pendergraftsimon.com

or, if to the Escrow Agent, then to:

Friebert & Mattingly Title Group, LLC
800 Lily Creek Road #102
Middletown, KY 40243
Attention: Dennis Mattingly
Email: dmattingly@ftgclosings.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (c) or (d) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.   **Termination.**   This Agreement shall terminate on the first to occur of (a) the distribution of all of the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Purchaser and the Sellers after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.   **Miscellaneous.**   The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the Parties. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any Party, except as provided in Sections 6 and 16, without the prior consent of the other Parties. This Agreement shall be governed by and construed under the laws of the State of Texas. Each Party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Texas. The Parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement. This Agreement and any Joint Release Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement or any Joint Release Instruction may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be

8

waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Sections 7 and 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder. Purchaser and the Sellers agree, solely as between themselves, that, notwithstanding anything to the contrary contained in this Agreement or in any other agreement, in the event of any conflict or inconsistency between the terms of this Agreement (on the one hand) and the Purchase Agreement (on the other hand), the terms of the Purchase Agreement shall govern. Any disputes regarding the disposition of the Deposit shall be determined by the Bankruptcy Court.

14.   **Compliance with Court Orders.**   In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, provided, however, Escrow Agent shall immediately notify each of the Parties of any such writ, order or decree as well as the course of action the Escrow Agent intends to take upon the advice of its legal counsel. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties hereto or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.   **Further Assurances.**   Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.   **Assignment.**   No assignment of the interest of any of the Parties hereto shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed). To comply with Federal law including USA Patriot Act requirements, assignees shall provide to the Escrow Agent the appropriate form W-9 or W-8 as applicable and such other forms and documentation that the Escrow Agent may request to verify identification and authorization to act. Notwithstanding the foregoing, the Parties may, without prior written consent of the Escrow Agent but only with the prior written consent of all of the Parties hereto, assign all or a portion of their rights, interests or obligations hereunder to one or more of its affiliates or one or more entities managed by one of their affiliates, provided that no such assignment shall relieve such Party of any obligation hereunder except to the extent actually performed or satisfied by the assignee, and the Parties shall be required to notify the Escrow Agent of such assignment as described above.

17.   **Force Majeure.**   The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or

any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

**18.** **Compliance with Federal Law**. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties hereto agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds with the Escrow Agent pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.     **Use of Friebert & Mattingly Name**.  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Friebert & Mattingly" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

*   *   *   *   *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

<u>PURCHASER</u>:

**BRIDGEMAN SPORTS AND MEDIA LLC**

By: _____
Name:
Its:

SELLERS:

**EBONY MEDIA HOLDINGS, LLC**

By: _____
Name:
Its:

**EBONY MEDIA OPERATIONS, LLC**

By: _____
Name:
Its:

ESCROW AGENT:

**FRIEBERT & MATTINGLY TITLE GROUP, LLC**

By: _____
Name:
Its:

## Schedule 1

### ESCROW AGENT FEE SCHEDULE
### Friebert & Mattingly Title Group, LLC, Escrow Agent

**Acceptance Fee**
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee:  WAIVED**

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on the Deposit Escrow Fund being deposited in a -interest bearing transaction deposit account, FDIC insured to the applicable limits.

      **Fee:  WAIVED**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

      **Fee:  WAIVED**

**Transaction Fees**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

      **Fee:  WAIVED**

**Other Fees**

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for reasonable out-of-pocket expenses or for any services of an extraordinary nature that we or our legal counsel may be called upon from time to time to perform in either an agency or fiduciary capacity.  Our participation in the transactions contemplated by the Agreement is subject to internal approval of the third party depositing monies into the escrow account.

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment

## EXHIBIT A

### Form of Escrow Release Notice – Joint Release Instruction

Friebert & Mattingly Title Group, LLC
800 Lily Creek Road #102
Middletown, KY 40243
Attention: Dennis Mattingly
Telephone: (502) 238-7500
Email: dmattingly@ftgclosings.com

**[Date]**

Re:  Deposit Escrow Agreement dated [●], 2020
Escrow Account no. [    ]

Dear Sir/Madam:

We refer to a Deposit Escrow Agreement dated [●], 2020 between Ebony Media Holdings, LLC, a Texas limited liability company, Ebony Media Operations, a Texas limited liability company, LLC, Bridgeman Sports and Media LLC, a Delaware limited liability company, and Friebert & Mattingly Title Group, LLC, a Kentucky limited liability company, as Escrow Agent (the "**Escrow Agreement**").

Capitalized terms in this letter that are not otherwise defined shall have the same meaning given to them in the Escrow Agreement.

The Parties instruct the Escrow Agent to release the Escrow Fund, or the portion specified below, to the specified party as instructed below.

Amount
(In writing)
Beneficiary
City
Country

**US Instructions:**

Bank
Bank address
ABA Number:
Credit A/C Name:
Credit A/C #:
Credit A/C Address:
If Applicable:

FFC A/C Name:
FFC A/C #:
FFC A/C Address:

**International Instructions:**

Bank Name:
Bank Address
SWIFT Code:
US Pay Through ABA:
Credit A/C Name:
Credit A/C # (IBAN #):
Credit A/C Address:
If Applicable:
     FFC A/C Name:
     FFC A/C # (IBAN #):
     FFC A/C Address:

**BRIDGEMAN SPORTS AND MEDIA LLC**

By: _____
Name:
Title:

**EBONY MEDIA HOLDINGS, LLC**

By: _____
Name:
Date:
Title:

**EBONY MEDIA OPERATIONS, LLC**

By: _____
Name:
Date:
Title:

## **EXHIBIT B-1**

### **Certificate as to Sellers Authorized Signatures**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Sellers and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Sellers.  The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Friebert & Mattingly Title Group, LLC upon the release of Escrow Funds from the escrow account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.


Name / Title /Telephone #                                  Specimen Signature


_____          _____
                Name                                                Signature

_____
                Title

_____
             Telephone #

_____          _____
                Name                                                Signature

_____
                Title

_____
             Telephone #

_____          _____
                Name                                                Signature

_____
                Title

_____
             Telephone #

## EXHIBIT B-2

### Certificate as to Purchaser's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Purchaser and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Purchaser.  The below listed persons (must list at least two individuals) have also been designated Call Back Authorized Individuals and will be notified by Friebert & Mattingly Title Group, LLC upon the release of Escrow Funds from the escrow account(s) unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

Name / Title /Telephone #                                    Specimen Signature


_____          _____
                Name                                                  Signature

_____
                Title

_____
            Telephone #


_____          _____
                Name                                                  Signature

_____
                Title

_____
            Telephone #

**EXHIBIT B**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

## Form of Assignment and Assumption Agreement

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is executed as of [●], 2020 by and among Ebony Media Holdings, LLC, a Texas limited liability company ("**Holdings**"), Ebony Media Operations, LLC, a Texas limited liability company (the "**Company**" and together with Holdings, "**Assignors**" and each, an "**Assignor**"), and Bridgeman Sports and Media LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "**Assignee**"). Assignors and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

This Agreement is being delivered in connection with the Closing under the Purchase Agreement, dated as of [●], 2020, by and among the Assignors, certain affiliates of the Assignors and Assignee (as amended, the "**Purchase Agreement**"). Capitalized terms used but not defined in this Agreement shall have the meanings set forth in the Purchase Agreement.

1. Purchased Assets. In accordance with and subject to the terms of the Purchase Agreement and the Bankruptcy Sale Order, and for the consideration set forth in the Purchase Agreement, the receipt and sufficiency of which Assignors and Assignee hereby acknowledge, Assignors do hereby sell, transfer, convey, assign and deliver to Assignee, effective as of the Closing, all of Assignors' rights, titles and interests in, to and under (a) the Assigned Contracts and (b) the Permits, in each case free and clear of all Encumbrances other than Permitted Encumbrances, as provided, respectively, in Section 2.1(b) and Section 2.1(k) of the Purchase Agreement (other than such Purchased Assets transferred pursuant to any other Ancillary Agreement).

2. Excluded Assets. Assignors do not, and in no event shall Assignors be deemed to, sell, transfer, assign, convey or deliver, and Assignors do hereby retain, all right, title and interest to, in and under only the Excluded Assets, as provided in Section 2.2 of the Purchase Agreement.

3. Assumed Liabilities. In accordance with and subject to the terms of the Purchase Agreement and the Bankruptcy Sale Order, effective as of the Closing, Assignee does hereby assume from Assignors (and from and after the Closing agrees to pay, perform, discharge or otherwise satisfy in accordance with their respective terms or as may otherwise be agreed between Assignee and the relevant obligee), and Assignors do hereby irrevocably convey, transfer and assign to Assignee, the Assumed Liabilities of Assignors only, as provided in Section 2.3 of the Purchase Agreement and other than the Assumed Liabilities that are conveyed, transferred and assigned pursuant to another Ancillary Agreement.

4. Excluded Liabilities. The Parties expressly acknowledge and agree that Assignee is not a successor to any Assignor and does not assume, and shall not be deemed to have assumed or be liable or obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for the Excluded Liabilities, as provided in Section 2.4 of the Purchase Agreement.

5. Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and

conditions set forth in the Purchase Agreement. Nothing contained in this Agreement shall be construed to supersede, limit or qualify any provision of the Purchase Agreement. To the extent there is a conflict between the terms and provisions of this Agreement and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern, supersede and prevail.

6. Further Assurances.

(i)     From time to time after the Closing, as and when requested by any Party and at such requesting Party's expense, any other Party will, and will cause its respective Affiliates to, execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

(ii)     Each Assignor hereby irrevocably designates, makes, constitutes and appoints Assignee, its successors and permitted assigns, as Assignor's true and lawful attorney (and agent-in-fact), with full power of substitution, in Assignor's name and stead, on behalf of and for the benefit of Assignee, its successors and permitted assigns, to: (i) demand and receive any and all of the Purchased Assets and Assumed Liabilities and to give receipts and releases for and in respect of the Purchased Assets and Assumed Liabilities, or any part thereof, (ii) from time to time to institute and prosecute in Assignor's name, at the sole expense and for the benefit of Assignee, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Assignee, its successors and assigns, may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any item of the Purchased Assets and Assumed Liabilities, to defend or compromise any and all actions, suits or proceedings in respect of any item of the Purchased Assets and Assumed Liabilities, and to do all such acts and things in relation thereto as Assignee shall deem advisable, including, without limitation, for the collection or reduction to possession of any of the Purchased Assets and Assumed Liabilities, (iii) endorse Assignor's name on any payment, instrument, notice or other similar document or agreement relating to the Purchased Assets and Assumed Liabilities for the period commencing with the date hereof that may come in to the possession of Assignee or under Assignee's control with respect to the Purchased Assets and Assumed Liabilities, and (iv) to collect the moneys which become due and payable at any time on or after the date hereof under each of the Purchased Assets and Assumed Liabilities. Assignor acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by Assignor.

7. Incorporation by Reference. The terms set forth in Section 1.2 (Interpretation), Section 12.3 (Successors and Assigns), Section 12.4 (Governing Law; Jurisdiction), Section 12.6 (Severability), Section 12.7 (Notices), Section 12.8 (Amendments; Waivers), Section 12.12 (Counterparts) and Section 12.17 (No Third Party Beneficiaries) of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Assignment and Assumption Agreement to be effective as of the Closing.

**ASSIGNORS:**

**EBONY MEDIA HOLDINGS, LLC**

By:_____

Name:

Title:

**EBONY MEDIA OPERATIONS, LLC**

By:_____

Name:

Title:

**ASSIGNEE:**

**BRIDGEMAN SPORTS AND MEDIA LLC**

By:_____
    Name:
    Title:

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT C**

**BILL OF SALE**

## <u>FORM OF BILL OF SALE</u>

Pursuant to that certain Asset Purchase Agreement, dated as of [●], 2020 (as it may be amended from time to time) (the "**Purchase Agreement**"), by and among Ebony Media Holdings, LLC, a Texas limited liability company ("**Holdings**"), Ebony Media Operations, LLC, a Texas limited liability company (the "**Company**" and together with Holdings, "**Sellers**" and each, a "**Seller**"), and Bridgeman Sports and Media LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "**Purchaser**"), this Bill of Sale (this "**Bill of Sale**") is executed as of [●], 2020 and is by Sellers in favor of Purchaser in consideration of the mutual covenants and agreements contained in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. Each Seller, acting pursuant to the Purchase Agreement, hereby sells, transfers, conveys, assigns and delivers to Purchaser and Purchaser's successors and assigns all of such Seller's right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances, sales, transfer or transaction taxes of any kind whatsoever, other than Permitted Encumbrances, as provided in Section 2.1 of the Purchase Agreement.

Capitalized terms used but not defined in this Bill of Sale shall have the meanings set forth in the Purchase Agreement.

1. Each Seller hereby irrevocably designates, makes, constitutes and appoints Purchaser, its successors and permitted assigns, as Seller's true and lawful attorney (and agent-in-fact), with full power of substitution, in Seller's name and stead, on behalf of and for the benefit of Purchaser, its successors and permitted assigns, to: (i) demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, (ii) from time to time to institute and prosecute in Seller's name, at the sole expense and for the benefit of Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which Purchaser, its successors and assigns, may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any item of the Purchased Assets, to defend or compromise any and all actions, suits or proceedings in respect of any item of the Purchased Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable, including, without limitation, for the collection or reduction to possession of any of the Purchased Assets, (iii) endorse Seller's name on any payment, instrument, notice or other similar document or agreement relating to the Purchased Assets for the period commencing with the date hereof that may come in to the possession of Purchaser or under Purchaser's control with respect to the Purchased Assets, and (iv) to collect the moneys which become due and payable at any time on or after the date hereof under every Purchased Asset. Each Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by each Seller.

2. This Bill of Sale is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. Nothing contained in this Bill of Sale shall be construed to supersede, limit or qualify any provision of the Purchase Agreement. To the extent there is a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the

Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern, supersede and prevail.

3. This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Bill of Sale is for the sole benefit of Purchaser and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

4. From time to time after the Closing, as and when requested by any Seller or Purchaser, any other such party will, and will cause its respective Affiliates to, execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Bill of Sale.

5. The terms set forth in Section 1.2 (Interpretation), Section 12.3 (Successors and Assigns), Section 12.4 (Governing Law; Jurisdiction), Section 12.6 (Severability), Section 12.7 (Notices), Section 12.8 (Amendments; Waivers), Section 12.12 (Counterparts) and Section 12.17 (No Third Party Beneficiaries) of the Purchase Agreement are incorporated by reference herein, except that, as applicable, any and all references to "this Agreement" shall mean and refer to this Bill of Sale.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the Sellers have executed this Bill of Sale to be effective as of the Closing.

**SELLERS:**

**EBONY MEDIA HOLDINGS, LLC**

By:_____
    Name:
    Title:

**EBONY MEDIA OPERATIONS, LLC**

By:_____
    Name:
    Title:

[Signature Page to Bill of Sale]

**EXHIBIT D**

**DOMAIN NAME TRANSFER AGREEMENT**

## FORM OF DOMAIN NAME TRANSFER AGREEMENT

This **DOMAIN NAME TRANSFER AGREEMENT** (this "**Assignment of Domain Names**") is executed as of [●] 2020 by and among Ebony Media Holdings, LLC, a Texas limited liability company ("**Holdings**"), Ebony Media Operations, LLC, a Texas limited liability company (the "**Company**" and together with Holdings, "**Transferors**" and each, a "**Transferor**"), and Bridgeman Sports and Media LLC, a Delaware limited liability company ("**Transferee**").

**WHEREAS,** pursuant to that certain Asset Purchase Agreement dated [●], 2020 (the "**Purchase Agreement**"), Transferors sold to Transferee certain assets together with all intangible property rights relating thereto, including but not limited to the right to certain domain names;

**WHEREAS**, a Transferor is the registrant of the domain names identified on Schedule A hereto (the "**Domain Names**") which are registered with the registrars identified therein (the "**Registrars**");

**WHEREAS**, the parties desire that the Transferors transfer and assign to Transferee and Transferee accepts the Domain Names on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Transferors do hereby assign and transfer to Transferee, effective as of the closing as set forth in the Purchase Agreement, all right, title, and interest in and to the Domain Names.

Transferors agree to perform all affirmative acts which may be necessary to implement and perfect the above-described transfer of rights and to secure transfer of the registrations of the Domain Names before the Registrars of same and agree to follow Transferee's instructions in order to effectuate the transfer of the Domain Name registrations in a timely manner. Specifically, Transferors agree to and shall prepare and transmit the necessary Registrant Name Change Agreements (RNCA's) or other written authorizations and/or instructions and or to correspond with the applicable registrars to instruct and authorize transfer of the Domain Names, including by providing to Transferee a functioning user name and password, where available, sufficient for Transferee to immediately begin to administer the Domain Names, as well as to cooperate with Transferee in obtaining and/or providing information required in any proceedings relating to the Domain Names.

This Assignment of Domain Names may be executed in one or more counterparts (including by means of facsimile), each of which when executed shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  This Assignment of Domain Names shall be governed by and construed in accordance with the laws of the State of Delaware.

IN WITNESS WHEREOF, the parties have executed this Assignment of Domain Names as of the first date set forth above.

**TRANSFERORS**:  
EBONY MEDIA HOLDINGS, LLC  
EBONY MEDIA OPERATIONS, LLC

By:_____  
Name: _____  
Title: _____

**TRANSFEREE**:  
BRIDGEMAN SPORTS AND MEDIA LLC

By:_____  
Name: _____  
Title: _____

**SCHEDULE A**

**DOMAIN NAMES**

| |
|---|
| |
| |
| |
| |
| |

**EXHIBIT E**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

# FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement ("**Intellectual Property Assignment**") is executed as of [●], 2020 by and among **Ebony Media Operations, LLC**, a Texas limited liability company, **Ebony Media Holdings, LLC**, a Texas limited liability company (collectively "**Assignors**"), and **Bridgeman Sports and Media LLC**, a Delaware limited liability company ("**Assignee**").

## RECITALS

A.    The Assignors are the owner of the trademarks and service marks set forth on Schedule A hereto, together with the goodwill of the business associated therewith (collectively referred to as the "**Trademarks**");

B.    The Assignors are owner of the copyrights set forth on Schedule B hereto, (collectively referred to as the "**Copyrights**");

C.    Pursuant to the terms of that certain Asset Purchase Agreement dated as of the date hereof by and among the Assignors and the Assignee (the "**Purchase Agreement**"), it has been agreed that the Assignors will transfer all of their right, title and interest in and to the Trademarks and Copyrights to the Assignee; and

D.    Each Assignor desires to assign all of its respective right, title and interest in and to the Trademarks and Copyrights owned by said Assignor to the Assignee and the Assignee desires to acquire the Trademarks and Copyrights.

## AGREEMENTS

For the good and valuable consideration set forth in the Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, the Assignors and the Assignee hereby agree as follows:

1.    Assignors do hereby sell, transfer, convey, assign and deliver to the Assignee, Assignors' entire worldwide right, title and interest in and to, the Trademarks, together with the goodwill respectively symbolized thereby, as well as any and all trademark/service mark applications and registrations, associated therewith, all as listed on Schedule A attached hereto and made a part hereof; together with all renewals thereof; all income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past or future infringements thereof; and any and all United States and/or foreign trademark (or service mark) registrations which may issue on same in the future. Together with Assignors' entire right, title and interest in, as well as the goodwill of the business associated with, the Trademarks being assigned to Assignee, are any and all rights and privileges in the United States, as well as throughout the entire world, associated with same, including the right to sue for any and all past infringements which may have occurred at any time up to the date of this Agreement.

2.    Assignors do hereby sell, transfer, convey, assign and deliver to the Assignee, Assignors' entire worldwide right, title and interest in and to the Copyrights, as collectively listed on Schedule

52803005

<u>B</u> attached hereto and made a part hereof; together with all extensions and renewals thereof; all income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including, without limitation, damages and payments for past or future infringements thereof; and any and all United States and/or foreign copyright registration which may issue on same in the future.  Together with Assignors' entire right, title and interest in the Copyrights being assigned to Assignee, are any and all rights and privileges in the United States, as well as throughout the entire world, associated with same, including the right to sue for any and all past infringements which may have occurred at any time up to the date of this Agreement.

3.      Assignors hereby request the United States Patent and Trademark Office the U.S. Copyright Office and equivalent government authorities in located in foreign countries to record this Intellectual Property Assignment.

4.      From time to time, as and when requested by the Assignee, each Assignor will execute further papers and do such other acts as may be necessary or reasonably requested by the Assignee to vest full title in and to all of the Trademarks and Copyrights in the Assignee and to facilitate the recordation of same before the United States Patent and Trademark Office the U.S. Copyright Office and equivalent government authorities in located in foreign countries. In the event the Assignee (or its designee) is unable for any reason, after reasonable effort, to secure Assignors' signatures on any document needed in connection with the actions specified in this paragraph, each Assignor hereby irrevocably designates and appoints the Assignee and its duly authorized officers and agents as said Assignor's agent and attorney in fact, which appointment is coupled with an interest, to act for and in said Assignor's behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Intellectual Property Agreement with the same legal force and effect as if executed by said Assignor.

5.      This Intellectual Property Assignment shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

6.      No amendment of any provision of this Intellectual Property Assignment shall be valid unless the same shall be in writing and signed by the Assignors and the Assignee. No waiver by any party of any provision of this Intellectual Property Assignment or any default or breach of covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the party against whom the waiver is to be effective nor shall such waiver be deemed to extend to any prior or subsequent default or breach of covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

8.      This Intellectual Property Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the undersigned have executed this Intellectual Property Assignment to be effective as of the closing contemplated in the Purchase Agreement.

ASSIGNORS:                                      ASSIGNEE:

**EBONY MEDIA OPERATIONS, LLC**                 **BRIDGEMAN SPORTS AND MEDIA LLC**


By:_____                    By:_____
Name:_____                    Name:_____
Its:_____                    Its:_____


**EBONY MEDIA HOLDINGS, LLC**


By:_____
Name:_____
Its:_____

[Signature Page to Intellectual Property Assignment Agreement]

## Schedule A

**Trademarks**

**DISCLOSURE SCHEDULES**

**TO THE**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**EBONY MEDIA HOLDINGS, LLC**

**AND**

**EBONY MEDIA OPERATIONS, LLC,**

**AS SELLERS,**

**AND**

**BRIDGEMAN SPORTS AND MEDIA LLC,**

**AS PURCHASER,**

**DATED AS OF OCTOBER 7, 2020**

**<u>Schedule B</u>**

**Copyrights**

# 2.1 (b) Assigned Contracts

None.

## Schedule 2.1(c)

## BOOK INVENTORY

| Description | Quantity | Location | |
|---|---|---|---|
| Special Issue Prints ( President Obama, Michelle Obama and Michael Jackson) | Approx. 9,000 copies | Storage Unit in | Chicago |

CUSTOMER: EBONY MEDIA OPERATIONS INC.
CUSTOMER ID: 27DTP

CHICAGO, IL
BUILDING ID: PV

| SKP BOX # | MAJOR DESCRIPTION/ TITLE & BROAD DESCRIPTION | ALPHA FROM/ START VOL OR CD# | ALPHA TO/ END VOL OR CD# | FROM DATE | TO DATE | MINOR DESCRIPTION/ # OF ITEMS IN BOX OR DESCRIPTION OF CONTENT | REFERENCE 1/ FURTHER DESCRIPTION | BOX TYPE | CUBIC FT | RECEIPT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| RF089873842 | UNBOUND EBONY | VOL 1 | VOL 2 | 11/1/1945 | 12/31/1951 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873843 | UNBOUND EBONY | VOL 3 | VOL 4 | 1/1/1952 | 12/31/1955 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873844 | UNBOUND EBONY | VOL 5 | VOL 6 | 1/1/1956 | 10/31/1959 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873845 | UNBOUND EBONY | VOL 7 | VOL 8 | 8/1/1960 | 12/31/1963 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873846 | UNBOUND EBONY | VOL 9 | VOL 10 | 1/1/1967 | 9/1/1969 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873847 | UNBOUND EBONY | VOL 11 | VOL 12 | 2/1/1967 | 7/31/1969 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873848 | UNBOUND EBONY | VOL 13 | VOL 14 | 5/1/1970 | 6/30/1973 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873849 | UNBOUND EBONY | VOL 15 | VOL 16 | 12/1/1973 | 7/1/1976 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873850 | UNBOUND EBONY | VOL 17 | VOL 18 | 8/1/1976 | 11/30/1979 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873851 | UNBOUND EBONY | VOL 19 | VOL 20 | 1/31/1979 | 11/1/1979 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873852 | UNBOUND EBONY | VOL 21 | VOL 22 | 3/1/1982 | 3/31/1982 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873853 | UNBOUND EBONY | VOL 23 | VOL 24 | 4/1/1985 | 3/31/1988 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873854 | UNBOUND EBONY | VOL 25 | VOL 26 | 4/1/1988 | 4/30/1991 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873855 | UNBOUND EBONY | VOL 27 | VOL 28 | 5/1/1991 | 11/30/1994 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873856 | UNBOUND EBONY | VOL 29 | VOL 30 | 12/1/1994 | 2/28/1998 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873857 | UNBOUND EBONY | VOL 31 | VOL 32 | 9/1/1998 | 3/31/2001 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873858 | UNBOUND EBONY | VOL 33 | VOL 34 | 4/1/2001 | 2/28/2004 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873859 | UNBOUND EBONY | VOL 35 | VOL 36 | 7/1/2005 | 12/31/2007 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873860 | UNBOUND EBONY | VOL 37 | VOL 38 | 2/1/2008 | 6/30/2010 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873861 | UNBOUND EBONY | VOL 39 | VOL 40 | 7/1/2010 | 1/31/2014 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873862 | UNBOUND EBONY | VOL 41 | VOL 43 | 2/1/2014 | 1/31/2019 | 3 | | 2 | 2 | 7/31/2020 |
| RF089873865 | UNBOUND EBONY, EXTRA COPIES | VOL 1 | VOL 2 | 6/1/2007 | 1/31/2010 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873866 | UNBOUND EBONY, EXTRA COPIES | VOL 3 | VOL 4 | 3/1/2010 | 2/1/2013 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873867 | UNBOUND EBONY, EXTRA COPIES | VOL 5 | VOL 6 | 2/1/2010 | 11/30/2014 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873868 | UNBOUND EBONY, EXTRA COPIES | VOL 7 | VOL 8 | 2/1/2014 | 11/30/2017 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873869 | UNBOUND EBONY, EXTRA COPIES | VOL 9 | VOL 10 | 2/1/2016 | 12/31/2017 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873870 | UNBOUND EBONY, JUNIOR | VOL 1 | VOL 3 | 7/1/1975 | 8/31/1982 | 3 | | 3 | 2 | 7/31/2020 |
| RF089873871 | UNBOUND EBONY, JUNIOR | VOL 4 | VOL 5 | 7/1/1982 | 8/30/1984 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873863 | UNBOUND EBONY ; SOUTH AFRICA | VOL 1 | VOL 2 | 11/1/1995 | 8/30/1996 | 2 | | 2 | 2 | 7/31/2020 |
| RF089873864 | UNBOUND EBONY ; SOUTH AFRICA | VOL 3 | VOL 4 | 2/1/1997 | 7/31/1999 | 2 | | 2 | 2 | 7/31/2020 |
| RF078579304 | BOUND EBONY | VOL 4 | VOL 5 | 11/1/1945 | 10/31/1949 | 6 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579299 | BOUND EBONY | VOL 5 | VOL 8 | 11/1/1949 | 10/31/1953 | 4 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873872 | BOUND EBONY | VOL 9 | VOL 12 | 11/1/1953 | 10/31/1957 | 4 | | 2 | 2 | 7/31/2020 |
| RF089873873 | BOUND EBONY | VOL 13 | VOL 16 | 11/1/1957 | 10/31/1961 | 4 | | 2 | 2 | 7/31/2020 |

2020-AUG-24

CUSTOMER: EBONY MEDIA OPERATIONS INC.
CUSTOMER ID: 27DTP

| SKP BOX # | MAJOR DESCRIPTION/ TITLE & BROAD DESCRIPTION | ALPHA FROM/ START VOL OR CD# | ALPHA TO/ END VOL OR CD# | FROM DATE | TO DATE | MINOR DESCRIPTION/ # OF ITEMS IN BOX OR DESCRIPTION OF CONTENT | REFERENCE 1/ FURTHER DESCRIPTION | BOX TYPE | CUBIC FT | RECEIPT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| RF089873874 | BOUND EBONY | VOL 17 | VOL 20 | 11/1/1961 | 10/31/1965 | 4 | | 2 | 2 | 7/31/2020 |
| RF089873875 | BOUND EBONY | VOL 21 | VOL 23 | 11/1/1965 | 10/31/1968 | 4 | | 2 | 2 | 7/31/2020 |
| RF089873876 | BOUND EBONY | VOL 24 | VOL 26 | 11/1/1968 | 10/30/1971 | 5 | | 2 | 2 | 7/31/2020 |
| RF089873877 | BOUND EBONY | VOL 27 | VOL 29 | 5/30/1972 | 10/31/1974 | 5 | | 2 | 2 | 7/31/2020 |
| RF089873878 | BOUND EBONY | VOL 30 | VOL 32 | 11/1/1974 | 10/31/1977 | 5 | | 2 | 2 | 7/31/2020 |
| RF089873879 | BOUND EBONY | VOL 33 | VOL 35 | 11/1/1977 | 10/31/1980 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873880 | BOUND EBONY | VOL 36 | VOL 38 | 5/1/1981 | 10/31/1983 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873881 | BOUND EBONY | VOL 39 | VOL 41 | 11/1/1983 | 10/31/1986 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873882 | BOUND EBONY | VOL 42 | VOL 44 | 11/1/1986 | 10/31/1989 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873883 | BOUND EBONY | VOL 45 | VOL 47 | 5/1/1990 | 10/31/1992 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873884 | BOUND EBONY | VOL 48 | VOL 50 | 11/1/1992 | 10/31/1995 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873885 | BOUND EBONY | VOL 51 | VOL 53 | 5/1/1996 | 10/31/1998 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873886 | BOUND EBONY | VOL 54 | VOL 56 | 11/1/1993 | 10/31/2001 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873887 | BOUND EBONY | VOL 57 | VOL 59 | 11/1/2001 | 10/31/2004 | 6 | | 2 | 2 | 7/31/2020 |
| RF089873888 | BOUND EBONY | VOL 60 | VOL 61 | 5/1/2005 | 4/30/2006 | 3 | | 2 | 2 | 7/31/2020 |
| RF089873895 | BOUND EBONY - COMPARABLE ADVER | VOL 1 | VOL 5 | 3/1/1950 | 12/31/1955 | 5 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873893 | BOUND EBONY - ADVERTISING READ | VOL 5 | VOL 8 | 3/1/1950 | 12/31/1952 | 3 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873894 | BOUND EBONY - ADVERTISING READ | VOL 8 | VOL 11 | 1/1/1953 | 12/31/1955 | 3 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873891 | BOUND EBONY - CURRENT ISSUE RE | VOL 5 | VOL 8 | 3/1/1950 | 12/31/1952 | 3 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873892 | BOUND EBONY - CURRENT ISSUE RE | VOL 8 | VOL 11 | 1/1/1953 | 12/31/1955 | 3 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873896 | BOUND EBONY - MARKET CHARACTER | VOL 1 | VOL 2 | 7/1/1953 | 10/31/1953 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873897 | BOUND EBONY - COOPER ROMANCE | VOL 1 | VOL 1 | 11/1/1953 | 6/30/1954 | 1 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873889 | BOUND EBONY - SOUTH AFRICA | VOL 1 | VOL 2 | 11/1/1995 | 10/31/1997 | 4 | | 1.2 | 1.2 | 7/31/2020 |
| RF089873890 | BOUND EBONY - SOUTH AFRICA | VOL 3 | VOL 5 | 12/1/1997 | 6/30/2000 | 6 | | 1.2 | 1.2 | 7/31/2020 |
| RF090537461 | UNBOUND JET | VOL 1 | VOL 3 | 6/10/1954 | 12/31/1970 | 3 | | 1.2 | 1.2 | 7/31/2020 |
| RF078578950 | UNBOUND JET | VOL 4 | VOL 5 | 10/14/1971 | 5/17/1973 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078578949 | UNBOUND JET | VOL 6 | VOL 7 | 10/31/1974 | 2/24/1977 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579054 | UNBOUND JET | VOL 8 | VOL 9 | 3/3/1977 | 7/19/1979 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579053 | UNBOUND JET | VOL 10 | VOL 11 | 12/18/1980 | 2/28/1983 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579052 | UNBOUND JET | VOL 12 | VOL 13 | 3/7/1983 | 7/21/1986 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579051 | UNBOUND JET | VOL 14 | VOL 15 | 8/4/1986 | 2/26/1990 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579050 | UNBOUND JET | VOL 16 | VOL 17 | 3/5/1990 | 1/3/1994 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579303 | UNBOUND JET | VOL 18 | VOL 19 | 1/10/1994 | 12/22/1997 | 2 | | 1.2 | 1.2 | 7/31/2020 |
| RF078579302 | UNBOUND JET | VOL 20 | VOL 21 | 1/12/1998 | 7/16/2001 | 2 | | 1.2 | 1.2 | 7/31/2020 |

CUSTOMER: EBONY MEDIA OPERATIONS INC.
CUSTOMER ID: 27DTP

CHICAGO, IL
BUILDING ID: PV

| SKP BOX # | MAJOR DESCRIPTION/ TITLE & BROAD DESCRIPTION | ALPHA FROM/ START VOL OR CD# | ALPHA TO/ END VOL OR CD# | FROM DATE | TO DATE | MINOR DESCRIPTION/ # OF ITEMS IN BOX OR DESCRIPTION OF CONTENT | REFERENCE 1/ FURTHER DESCRIPTION | BOX TYPE | CUBIC FT | RECEIPT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| RF07857930J | UNBOUND JET | VOL 22 | VOL 23 | 7/23/2001 | 1/3/2005 | 2 | | | 1.2 | 7/31/2020 |
| RF078579300 | UNBOUND JET | VOL 24 | VOL 25 | 1/10/2005 | 2/25/2008 | 2 | | | 1.2 | 7/31/2020 |
| RF078579306 | UNBOUND JET | VOL 26 | VOL 27 | 3/24/2008 | 1/3/2011 | 2 | | | 1.2 | 7/31/2020 |
| RF078579305 | UNBOUND JET | VOL 28 | VOL 30 | 1/10/2010 | 6/23/2014 | 3 | | | 1.2 | 7/31/2020 |
| RF078579140 | BOUND JET | VOL 1 | VOL 10 | 11/1/1951 | 11/30/1956 | 10 | | | 1.2 | 7/31/2020 |
| RF078579136 | BOUND JET | VOL 11 | VOL 20 | 11/1/1956 | 10/31/1961 | 10 | | | 1.2 | 7/31/2020 |
| RF078579137 | BOUND JET | VOL 21 | VOL 30 | 10/1/1961 | 10/31/1966 | 10 | | | 1.2 | 7/31/2020 |
| RF078579138 | BOUND JET | VOL 31 | VOL 40 | 10/13/1966 | 9/30/1971 | 10 | | | 1.2 | 7/31/2020 |
| RF078579143 | BOUND JET | VOL 41 | VOL 48 | 9/1/1971 | 9/18/1975 | 16 | | | 1.2 | 7/31/2020 |
| RF078579144 | BOUND JET | VOL 49 | VOL 56 | 9/25/1975 | 9/13/1979 | 16 | | | 1.2 | 7/31/2020 |
| RF078579145 | BOUND JET | VOL 57 | VOL 64 | 9/20/1979 | 9/5/1983 | 16 | | | 1.2 | 7/31/2020 |
| RF078579139 | BOUND JET | VOL 65 | VOL 74 | 9/12/1983 | 6/27/1988 | 20 | | | 1.2 | 7/31/2020 |
| RF078579141 | BOUND JET | VOL 75 | VOL 84 | 1/9/1989 | 10/31/1993 | 20 | | | 1.2 | 7/31/2020 |
| RF078579055 | BOUND JET | VOL 85 | VOL 93 | 11/1/1993 | 5/25/1998 | 18 | | | 1.2 | 7/31/2020 |
| RF078579058 | BOUND JET | VOL 94 | VOL 100 | 6/1/1998 | 12/10/2001 | 14 | | | 1.2 | 7/31/2020 |
| RF078579142 | BOUND JET | VOL 101 | VOL 109 | 12/17/2001 | 4/3/2006 | 17 | | | 1.2 | 7/31/2020 |
| RF078578746 | DIGITAL COLLECTION-EBONY D1 | 72539 | 81120 | 2/1/1998 | 8/31/1998 | 88 CDS | | | 1.2 | 7/31/2020 |
| RF078578608 | DIGITAL COLLECTION-EBONY D1 | 81312 | 82218 | 9/1/1998 | 1/31/1999 | 80 CDS | | | 1.2 | 7/31/2020 |
| RF078578747 | DIGITAL COLLECTION-EBONY D1 | 82393 | 90600 | 2/1/1999 | 6/30/1999 | 80 CDS | | | 1.2 | 7/31/2020 |
| RF078578748 | DIGITAL COLLECTION-EBONY D1 | 90799 | 91601 | 7/1/1999 | 11/30/1999 | 81 CDS | | | 1.2 | 7/31/2020 |
| RF078805558 | DIGITAL COLLECTION-EBONY D1 | 91760 | 419 | 5/31/1999 | 12/1/1999 | 86 CDS | | | 1.2 | 7/31/2020 |
| RF078578753 | DIGITAL COLLECTION-EBONY D1 | 755 | 2011 | 6/1/2000 | 10/31/2000 | 77 CDS | | | 1.2 | 7/31/2020 |
| RF078578749 | DIGITAL COLLECTION-EBONY D1 | 2283 | 10557 | 11/1/2000 | 5/31/2001 | 82 CDS | | | 1.2 | 7/31/2020 |
| RF078578750 | DIGITAL COLLECTION-EBONY D1 | 10786 | 12020 | 6/1/2001 | 12/31/2001 | 81 CDS | | | 1.2 | 7/31/2020 |
| RF078579018 | DIGITAL COLLECTION-EBONY D1 | 12420 | 20516 | 1/1/2002 | 6/30/2002 | 80 CDS | | | 1.2 | 7/31/2020 |
| RF078579021 | DIGITAL COLLECTION-EBONY D1 | 20704 | 30300 | 7/1/2002 | 5/31/2003 | 139 CDS | | | 1.2 | 7/31/2020 |
| RF078579015 | DIGITAL COLLECTION-EBONY D1 | 30405 | 31342 | 6/1/2003 | 2/28/2004 | 162 CDS | | | 1.2 | 7/31/2020 |
| RF078579017 | DIGITAL COLLECTION-EBONY D1 | 31491 | 58 | 3/1/2004 | 5/31/2006 | 162 CDS | | | 1.2 | 7/31/2020 |
| RF078579020 | DIGITAL COLLECTION-EBONY D1 | 79 | 646 | 6/1/2006 | 2/28/2008 | 175 CDS | | | 1.2 | 7/31/2020 |
| RF078579024 | DIGITAL COLLECTION-EBONY D1 | 1126 | 1844 | 8/1/2009 | 11/30/2011 | 146 CDS-IN COPY PAPER BOX | | | 1.2 | 7/31/2020 |
| RF078579023 | DIGITAL COLLECTION-EBONY D1 | 4163 | 4325 | 12/1/2017 | 1/31/2011 | 70 CDS | | | 1.2 | 7/31/2020 |
| RF078579297 | DIGITAL COLLECTION-EBONY D2 | 688 | 1278 | 4/1/2008 | 4/30/2010 | 174 CDS | | | 1.2 | 7/31/2020 |
| RF078579298 | DIGITAL COLLECTION-EBONY D2 | 1294 | 1776 | 5/1/2010 | 9/30/2011 | 171 CDS | | | 1.2 | 7/31/2020 |
| RF078579019 | DIGITAL COLLECTION-EBONY D2 | 1800 | 2248 | 10/1/2011 | 12/31/2012 | 171 CDS | | | 1.2 | 7/31/2020 |

CUSTOMER: EBONY MEDIA OPERATIONS INC.
CUSTOMER ID: 27DTP

| SKP BOX # | MAJOR DESCRIPTION/ TITLE & BROAD DESCRIPTION | ALPHA FROM/ START VOL OR CD# | ALPHA TO/ END VOL OR CD# | FROM DATE | TO DATE | MINOR DESCRIPTION/ # OF ITEMS IN BOX OR DESCRIPTION OF CONTENT | REFERENCE 1/ FURTHER DESCRIPTION | BOX TYPE | CUBIC FT | RECEIPT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| RF078578998 | DIGITAL COLLECTION-EBONY D2 | 2280 | 2900 | 2/1/2013 | 5/31/2014 | 176 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078578999 | DIGITAL COLLECTION-EBONY D2 | 2900 | 3297 | 6/1/2014 | 6/30/2015 | 166 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078579001 | DIGITAL COLLECTION-EBONY D2 | 3352 | 3971 | 7/1/2015 | 8/31/2017 | 165 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078579002 | DIGITAL COLLECTION-EBONY D2 | --- | --- | 1/1/2007 | 11/30/2017 | 163 CDS MISC | PHOTOS/CORP/B.U. | 1.2 | 1.2 | 7/31/2020 |
| RF078579003 | DIGITAL COLLECTION-EBONY D2 | --- | --- | 2/1/2009 | 12/31/2010 | 28 CDS | RECREATES/ADS | 1.2 | 1.2 | 7/31/2020 |
| RF083512655 | DIGITAL COLLECTION-EBONY D3 | 1 | 171 | 5/8/2006 | 1/3/2011 | 171 CDS | CORPORATE | 1.2 | 1.2 | 7/31/2020 |
| RF083512653 | DIGITAL COLLECTION-EBONY D3 | 172 | 315 | 1/3/2011 | 9/6/2013 | 144 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF083512656 | DIGITAL COLLECTION-EBONY D3 | 316 | 416 | 4/16/2013 | 2/27/2018 | 101 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078005561 | DIGITAL COLLECTION-EBONY D3 | 215 | 661 | 11/1/2006 | 3/31/2008 | 144 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078005563 | DIGITAL COLLECTION-EBONY D3 | 661 | 930 | 3/1/2008 | 11/1/2014 | 103 CDS | ALSO BLACK BRILLIANCE | 1.2 | 1.2 | 7/31/2020 |
| RF078005559 | DIGITAL COLLECTION-EBONY D3 | 930 | 1487 | 11/1/2008 | 1/31/2010 | 177 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF091539655 | DIGITAL COLLECTION-EBONY D3 | 1546 | 2065 | 2/1/2011 | 7/31/2012 | 174 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF091539653 | DIGITAL COLLECTION-EBONY D3 | 2095 | 2697 | 7/1/2012 | 2/28/2014 | 178 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078005562 | DIGITAL COLLECTION-EBONY D3 | 2209 | 3418 | 9/1/2012 | 9/30/2014 | 173 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078005564 | DIGITAL COLLECTION-EBONY D3 | 3260 | 3905 | 5/1/2015 | 1/31/2017 | 157 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF078005565 | DIGITAL COLLECTION-EBONY D3 | 3905 | 4264 | 12/31/2016 | 8/31/2018 | 84 CDS | | 1.2 | 1.2 | 7/31/2020 |
| RF083512657 | DIGITAL COLLECTION-EBONY/JET | 101 | 101 | 1/1/1991 | 12/31/2014 | 101 CDS | PHOTOS/COVERS | 1.2 | 1.2 | 7/31/2020 |
| RF078578751 | DIGITAL COLLECTION-EBONY/JET | --- | --- | 1/1/2006 | 12/31/2013 | 156 CDS | MISC: SHOWS/AUDIO/ADS | 1.2 | 1.2 | 7/31/2020 |
| RF078579002 | DIGITAL COLLECTION-EBONY/JET | 4163 | 4325 | 1/1/2006 | 12/31/2015 | 161 CDS | ADS /FASHION FAIR | 1.2 | 1.2 | 7/31/2020 |
| RF078578996 | DIGITAL COLLECTION-EBONY/JET | --- | --- | 1/1/2009 | 12/31/2010 | 96 CDS/DISKS | MISC DISKS | 1.2 | 1.2 | 7/31/2020 |
| RF078579025 | DIGITAL COLLECTION-JET D1 - | 1 | 80 | 7/26/1999 | 11/17/2003 | 85 CDS - IN COPY PAPER BOX | PHOTO SHOOTS | 1.2 | 1.2 | 7/31/2020 |
| RF078578752 | DIGITAL COLLECTION-JET D1 - | 81 | 175 | 11/24/2003 | 12/31/2005 | 128 CDS - IN COPY PAPER BOX | PHOTO SHOOTS | 1.2 | 1.2 | 7/31/2020 |
| RF078578755 | DIGITAL COLLECTION-JET D1 - | 95 | 180 | 3/8/2004 | 10/31/2005 | 152 CDS-COPY PAPER BOX | PHOTO SHOOTS | 1.2 | 1.2 | 7/31/2020 |
| RF078578995 | DIGITAL COLLECTION-JET D2 | 1 | 90 | 1/1/2007 | 12/31/2008 | 145 CDS | MISC PHOTOS | 1.2 | 1.2 | 7/31/2020 |
| RF078578896 | DIGITAL COLLECTION-JET D2 | 180 | 310 | 10/31/2007 | 5/19/2008 | 142 CDS | PHOTOS | 1.2 | 1.2 | 7/31/2020 |
| RF078005560 | DIGITAL COLLECTION-JET D2 | 311 | 342 | 5/26/2008 | 2/2/2009 | 115 CDS | PHOTOS/COVERS /MISC | 1.2 | 1.2 | 7/31/2020 |
| RF078578997 | DIGITAL COLLECTION-JET D2 | --- | --- | 1/1/2006 | 12/31/2008 | 177 CDS | PHOTOS/MISC DISKS | 1.2 | 1.2 | 7/31/2020 |
| RF095470041 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1996 | 12/31/2006 | 216 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470032 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1997 | 12/31/2006 | 204 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470036 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1997 | 12/31/2003 | 230 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470035 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1998 | 12/31/2003 | 245 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470043 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1998 | 12/31/2008 | 227 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470042 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/1999 | 12/31/2006 | 331 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470038 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/2000 | 12/31/2000 | 196 CDS JPC | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |

CUSTOMER: EBONY MEDIA OPERATIONS INC.
CUSTOMER ID: 27DTP

CHICAGO, IL
BUILDING ID: PV

| SKP BOX # | MAJOR DESCRIPTION/ TITLE & BROAD DESCRIPTION | ALPHA FROM/ START VOL OR CD# | ALPHA TO/ END VOL OR CD# | FROM DATE | TO DATE | MINOR DESCRIPTION/ # OF ITEMS IN BOX OR DESCRIPTION OF CONTENT | REFERENCE 1/ FURTHER DESCRIPTION | BOX TYPE | CUBIC FT | RECEIPT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| RF095470033 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/2002 | 12/31/2003 | 253 CDS JPC | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470030 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/2005 | 12/31/2008 | 106 CDS, JPC | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470031 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 1/1/2005 | 12/31/2008 | 370 CDS JOHNSON | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470040 | DIGITAL COLLECTION-EBONY | *PBO | *PBO | 6/1/2006 | 12/31/2011 | 4 CDS, 48 LTDS, FCC COMPONEN | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470039 | DIGITAL COLLECTION-EBONY/JET | *PBO | *PBO | 1/1/2007 | 12/31/2008 | 418 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470034 | DIGITAL COLLECTION-JET/EBONY | *PBO | *PBO | 1/1/1960 | 12/31/2000 | 305 CDS | 200 W MICHIGAN | 2.4 | 2.4 | 8/6/2020 |
| RF095470037 | DIGITAL COLLECTION-JET ARCHIVE | *PBO | *PBO | 1/1/2004 | 12/31/2006 | 72 CDS (see note & LOOSE FILES | 200 W MICHIGAN | 1.2 | 1.2 | 8/6/2020 |

Note to Box #RF095470037:
- Missing Compact Disc #15, Jet issues 8/28/2006 through 9/11/2006
- Missing Compact Disc #16, Jet issues 7/25/2005 through 8/1/2005

*PBO = Packed By Owner

2020-AUG-24

**Schedule 2.1(f)**

**COPYRIGHTS AND TRADEMARKS**

*ACTIVE 52067311*

# Copyrights

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | November-45 | B684 |
| EBONY | December-45 | B685 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-46 | B13921 |
| EBONY | February-46 | B18090 |
| EBONY | March-46 | B18091 |
| EBONY | April-46 | B18092 |
| EBONY | May-46 | B19052 |
| EBONY | June-46 | |
| EBONY | July-46 | B31928 |
| EBONY | August-46 | B31929 |
| EBONY | September-46 | B49003 |
| EBONY | October-46 | B49004 |
| EBONY | November-46 | B49005 |
| EBONY | December-46 | B81044 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-47 | B81045 |
| EBONY | February-47 | B81046 |
| EBONY | March-47 | B81047 |
| EBONY | April-47 | B81048 |
| EBONY | May-47 | B81049 |
| EBONY | June-47 | B81050 |
| EBONY | July-47 | B174617 |
| EBONY | August-47 | B174618 |
| EBONY | September-47 | B174619 |
| EBONY | October-47 | B174620 |
| EBONY | November-47 | B174621 |
| EBONY | December-47 | B174622 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-48 | B174623 |
| EBONY | February-48 | B174624 |
| EBONY | March-48 | B174625 |
| EBONY | April-48 | B174626 |
| EBONY | May-48 | B174627 |
| EBONY | June-48 | B174628 |
| EBONY | July-48 | B174629 |
| EBONY | August-48 | B174630 |
| EBONY | September-48 | B210299 |
| EBONY | October-48 | B210300 |
| EBONY | November-48 | B210301 |
| EBONY | December-48 | B210302 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-49 | B210303 |
| EBONY | February-49 | B210304 |
| EBONY | March-49 | B210305 |
| EBONY | April-49 | B210306 |
| EBONY | May-49 | B210307 |
| EBONY | June-49 | B210308 |
| EBONY | July-49 | B210309 |
| EBONY | August-49 | B210310 |
| EBONY | September-49 | B252625 |
| EBONY | October-49 | B252626 |
| EBONY | November-49 | B252627 |
| EBONY | December-49 | B252628 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-50 | RE12114 |
| EBONY | February-50 | RE12106 |
| EBONY | March-50 | RE12107 |
| EBONY | April-50 | RE12108 |
| EBONY | May-50 | RE12109 |
| EBONY | June-50 | RE12110 |
| EBONY | July-50 | RE12111 |
| EBONY | August-50 | RE13845 |
| EBONY | September-50 | RE12112 |
| EBONY | October-50 | RE12113 |
| EBONY | November-50 | RE12114 |
| EBONY | December-50 | RE12115 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-51 | |
| EBONY | February-51 | B284869 |
| EBONY | March-51 | RE34465 |
| EBONY | April-51 | RE34466 |
| EBONY | May-51 | RE34467 |
| EBONY | June-51 | RE34468 |
| EBONY | July-51 | RE34469 |
| EBONY | August-51 | RE34470 |
| EBONY | September-51 | RE34471 |
| EBONY | October-51 | RE34472 |
| EBONY | November-51 | RE34473 |
| EBONY | December-51 | RE34474 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-52 | RE34475 |
| EBONY | February-52 | |
| EBONY | March-52 | |
| EBONY | April-52 | |
| EBONY | May-52 | |
| EBONY | June-52 | RE68286 |
| EBONY | July-52 | RE68287 |
| EBONY | August-52 | RE68288 |
| EBONY | September-52 | RE68289 |
| EBONY | October-52 | RE68290 |
| EBONY | November-52 | RE68291 |
| EBONY | December-52 | RE68292 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-53 | RE68293 |
| EBONY | February-53 | RE80616 |
| EBONY | March-53 | RE80617 |
| EBONY | April-53 | RE80618 |
| EBONY | May-53 | RE80622 |
| EBONY | June-53 | RE80619 |
| EBONY | July-53 | RE80620 |
| EBONY | August-53 | RE80621 |
| EBONY | September-53 | RE80623 |
| EBONY | October-53 | RE80624 |
| EBONY | November-53 | RE80625 |
| EBONY | December-53 | RE80626 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-54 | RE80627 |
| EBONY | February-54 | RE80628 |
| EBONY | March-54 | RE115617 |
| EBONY | April-54 | RE115618 |
| EBONY | May-54 | RE115619 |
| EBONY | June-54 | RE115620 |
| EBONY | July-54 | RE115621 |
| EBONY | August-54 | RE115622 |
| EBONY | September-54 | RE115623 |
| EBONY | October-54 | RE115624 |
| EBONY | November-54 | RE115625 |
| EBONY | December-54 | RE115626 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-55 | RE115627 |
| EBONY | February-55 | RE155793 |
| EBONY | March-55 | RE155794 |
| EBONY | April-55 | RE155795 |
| EBONY | May-55 | RE155796 |
| EBONY | June-55 | RE155797 |
| EBONY | July-55 | RE155798 |
| EBONY | August-55 | RE155799 |
| EBONY | September-55 | RE155800 |
| EBONY | October-55 | RE155801 |
| EBONY | November-55 | RE155802 |
| EBONY | December-55 | RE155803 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-56 | RE155804 |
| EBONY | February-56 | B580587 |
| EBONY | March-56 | B580588 |
| EBONY | April-56 | B593608 |
| EBONY | May-56 | B593607 |
| EBONY | June-56 | B616989 |
| EBONY | July-56 | B616990 |
| EBONY | August-56 | B616991 |
| EBONY | September-56 | B616992 |
| EBONY | October-56 | B616993 |
| EBONY | November-56 | B635049 |
| EBONY | December-56 | B635048 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-57 | B635046 |
| EBONY | February-57 | RE247315 |
| EBONY | March-57 | RE247318 |
| EBONY | April-57 | RE247317 |
| EBONY | May-57 | RE247316 |
| EBONY | June-57 | RE247319 |
| EBONY | July-57 | RE247320 |
| EBONY | August-57 | RE247321 |
| EBONY | September-57 | RE247322 |
| EBONY | October-57 | RE247323 |
| EBONY | November-57 | RE247324 |
| EBONY | December-57 | RE247325 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|--------------------|
| EBONY | January-58 | RE247326 |
| EBONY | February-58 | B710920 |
| EBONY | March-58 | RE288679 |
| EBONY | April-58 | RE288678 |
| EBONY | May-58 | RE288677 |
| EBONY | June-58 | RE288680 |
| EBONY | July-58 | RE288681 |
| EBONY | August-58 | RE288682 |
| EBONY | September-58 | RE288683 |
| EBONY | October-58 | RE288684 |
| EBONY | November-58 | RE288674 |
| EBONY | December-58 | RE288675 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-59 | RE288676 |
| EBONY | February-59 | RE327324 |
| EBONY | March-59 | RE327325 |
| EBONY | April-59 | RE327327 |
| EBONY | May-59 | RE327328 |
| EBONY | June-59 | RE327326 |
| EBONY | July-59 | RE327329 |
| EBONY | August-59 | RE327330 |
| EBONY | September-59 | RE327331 |
| EBONY | October-59 | RE327332 |
| EBONY | November-59 | RE327333 |
| EBONY | December-59 | RE327334 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-60 | RE327335 |
| EBONY | February-60 | RE377826 |
| EBONY | March-60 | RE379144 |
| EBONY | April-60 | RE377827 |
| EBONY | May-60 | RE377828 |
| EBONY | June-60 | RE377829 |
| EBONY | July-60 | RE377830 |
| EBONY | August-60 | RE377831 |
| EBONY | September-60 | RE377832 |
| EBONY | October-60 | RE377833 |
| EBONY | November-60 | RE377834 |
| EBONY | December-60 | RE377835 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-61 | RE377825 |
| EBONY | February-61 | RE444896 |
| EBONY | March-61 | RE444897 |
| EBONY | April-61 | RE444898 |
| EBONY | May-61 | RE444899 |
| EBONY | June-61 | RE444900 |
| EBONY | July-61 | RE444901 |
| EBONY | August-61 | RE443928 |
| EBONY | September-61 | RE444902 |
| EBONY | October-61 | RE444903 |
| EBONY | November-61 | RE444893 |
| EBONY | December-61 | RE444895 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-62 | RE444894 |
| EBONY | February-62 | RE444904 |
| EBONY | March-62 | RE444905 |
| EBONY | April-62 | RE522536 |
| EBONY | May-62 | RE522537 |
| EBONY | June-62 | RE522538 |
| EBONY | July-62 | RE522539 |
| EBONY | August-62 | RE522540 |
| EBONY | September-62 | RE522541 |
| EBONY | October-62 | RE522542 |
| EBONY | November-62 | RE522543 |
| EBONY | December-62 | RE522544 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-63 | R5225455 |
| EBONY | February-63 | RE543716 |
| EBONY | March-63 | RE543723 |
| EBONY | April-63 | RE543717 |
| EBONY | May-63 | RE543721 |
| EBONY | June-63 | RE543720 |
| EBONY | July-63 | RE543719 |
| EBONY | August-63 | RE543722 |
| EBONY | September-63 | RE543718 |
| EBONY | October-63 | RE543724 |
| EBONY | November-63 | RE543727 |
| EBONY | December-63 | RE543726 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
| --- | --- | --- |
| EBONY | January-64 | RE543725 |
| EBONY | February-64 | RE579554 |
| EBONY | March-64 | RE579553 |
| EBONY | April-64 | RE579555 |
| EBONY | May-64 | RE579556 |
| EBONY | June-64 | RE579557 |
| EBONY | July-64 | RE579558 |
| EBONY | August-64 | RE579559 |
| EBONY | September-64 | RE579560 |
| EBONY | October-64 | RE579561 |
| EBONY | November-64 | RE579562 |
| EBONY | December-64 | RE579564 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-65 | RE579563 |
| EBONY | February-65 | RE643207 |
| EBONY | March-65 | RE643208 |
| EBONY | April-65 | RE643209 |
| EBONY | May-65 | RE643210 |
| EBONY | June-65 | RE643211 |
| EBONY | July-65 | RE643212 |
| EBONY | August-65 | RE643213 |
| EBONY | September-65 | RE643216 |
| EBONY | October-65 | RE643217 |
| EBONY | November-65 | RE643214 |
| EBONY | December-65 | RE643215 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-66 | RE643218 |
| EBONY | February-66 | RE679745 |
| EBONY | March-66 | RE679750 |
| EBONY | April-66 | RE679746 |
| EBONY | May-66 | RE679749 |
| EBONY | June-66 | RE679748 |
| EBONY | July-66 | RE679747 |
| EBONY | August-66 | RE679755 |
| EBONY | September-66 | RE679754 |
| EBONY | October-66 | RE679753 |
| EBONY | November-66 | RE679752 |
| EBONY | December-66 | RE679751 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-67 | RE679756 |
| EBONY | February-67 | RE691379 |
| EBONY | March-67 | RE691381 |
| EBONY | April-67 | RE691380 |
| EBONY | May-67 | RE691385 |
| EBONY | June-67 | RE691384 |
| EBONY | July-67 | RE691383 |
| EBONY | August-67 | RE691382 |
| EBONY | September-67 | RE691377 |
| EBONY | October-67 | RE691378 |
| EBONY | November-67 | RE691376 |
| EBONY | December-67 | RE691375 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-68 | RE691374 |
| EBONY | February-68 | RE733834 |
| EBONY | March-68 | RE733833 |
| EBONY | April-68 | RE733837 |
| EBONY | May-68 | RE733836 |
| EBONY | June-68 | RE733835 |
| EBONY | July-68 | RE733838 |
| EBONY | August-68 | RE733844 |
| EBONY | September-68 | RE733843 |
| EBONY | October-68 | RE733842 |
| EBONY | November-68 | RE733841 |
| EBONY | December-68 | RE733840 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-69 | RE733839 |
| EBONY | February-69 | RE760893 |
| EBONY | March-69 | RE760874 |
| EBONY | April-69 | RE760894 |
| EBONY | May-69 | RE760896 |
| EBONY | June-69 | RE760897 |
| EBONY | July-69 | RE760895 |
| EBONY | August-69 | RE760898 |
| EBONY | September-69 | RE760899 |
| EBONY | October-69 | RE760902 |
| EBONY | November-69 | RE760903 |
| EBONY | December-69 | RE760901 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-70 | RE247326 |
| EBONY | February-70 | RE788081 |
| EBONY | March-70 | RE788085 |
| EBONY | April-70 | RE788084 |
| EBONY | May-70 | RE788082 |
| EBONY | June-70 | RE788083 |
| EBONY | July-70 | RE788086 |
| EBONY | August-70 | RE788088 |
| EBONY | September-70 | RE788087 |
| EBONY | October-70 | RE788090 |
| EBONY | November-70 | RE788089 |
| EBONY | December-70 | RE788091 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-71 | RE788092 |
| EBONY | February-71 | RE653394 |
| EBONY | March-71 | RE653393 |
| EBONY | April-71 | RE653397 |
| EBONY | May-71 | RE653396 |
| EBONY | June-71 | RE653395 |
| EBONY | July-71 | RE812125 |
| EBONY | August-71 | RE812126 |
| EBONY | September-71 | RE812127 |
| EBONY | October-71 | RE812131 |
| EBONY | November-71 | RE812130 |
| EBONY | December-71 | RE812129 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-72 | RE812128 |
| EBONY | February-72 | RE830368 |
| EBONY | March-72 | RE830369 |
| EBONY | April-72 | RE830373 |
| EBONY | May-72 | RE830371 |
| EBONY | June-72 | RE830370 |
| EBONY | July-72 | RE830374 |
| EBONY | August-72 | RE830372 |
| EBONY | September-72 | RE830378 |
| EBONY | October-72 | RE830377 |
| EBONY | November-72 | RE830375 |
| EBONY | December-72 | RE830376 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-73 | RE830379 |
| EBONY | February-73 | RE850477 |
| EBONY | March-73 | RE850476 |
| EBONY | April-73 | RE850480 |
| EBONY | May-73 | RE850479 |
| EBONY | June-73 | RE850478 |
| EBONY | July-73 | RE850481 |
| EBONY | August-73 | RE850482 |
| EBONY | September-73 | RE850483 |
| EBONY | October-73 | RE850484 |
| EBONY | November-73 | RE850485 |
| EBONY | December-73 | RE850486 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-74 | RE850487 |
| EBONY | February-74 | RE871093 |
| EBONY | March-74 | RE871095 |
| EBONY | April-74 | RE871094 |
| EBONY | May-74 | RE871097 |
| EBONY | June-74 | RE871096 |
| EBONY | July-74 | RE871099 |
| EBONY | August-74 | RE871100 |
| EBONY | September-74 | RE871098 |
| EBONY | October-74 | RE871101 |
| EBONY | November-74 | RE871104 |
| EBONY | December-74 | RE871103 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-75 | RE871102 |
| EBONY | February-75 | RE887564 |
| EBONY | March-75 | RE887525 |
| EBONY | April-75 | RE887524 |
| EBONY | May-75 | RE887567 |
| EBONY | June-75 | RE887566 |
| EBONY | July-75 | RE887565 |
| EBONY | August-75 | RE887568 |
| EBONY | September-75 | RE887573 |
| EBONY | October-75 | RE887572 |
| EBONY | November-75 | RE887571 |
| EBONY | December-75 | RE887570 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-76 | RE887569 |
| EBONY | February-76 | RE904117 |
| EBONY | March-76 | RE904118 |
| EBONY | April-76 | RE904119 |
| EBONY | May-76 | RE904126 |
| EBONY | June-76 | RE904125 |
| EBONY | July-76 | RE904124 |
| EBONY | August-76 | RE904123 |
| EBONY | September-76 | RE904122 |
| EBONY | October-76 | RE904121 |
| EBONY | November-76 | RE904120 |
| EBONY | December-76 | RE904127 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-77 | RE904128 |
| EBONY | February-77 | RE924003 |
| EBONY | March-77 | RE924004 |
| EBONY | April-77 | RE924007 |
| EBONY | May-77 | RE924006 |
| EBONY | June-77 | RE924005 |
| EBONY | July-77 | RE924008 |
| EBONY | August-77 | RE924009 |
| EBONY | September-77 | RE924010 |
| EBONY | October-77 | RE924011 |
| EBONY | November-77 | RE924064 |
| EBONY | December-77 | RE924063 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-78 | RE294062 |
| EBONY | February-78 | RE247326 |
| EBONY | March-78 | TX298389 |
| EBONY | April-78 | TX94293 |
| EBONY | May-78 | TX94294 |
| EBONY | June-78 | TX94295 |
| EBONY | July-78 | TX94296 |
| EBONY | August-78 | TX294292 |
| EBONY | September-78 | TX166596 |
| EBONY | October-78 | TX166595 |
| EBONY | November-78 | TX166593 |
| EBONY | December-78 | TX166594 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-79 | |
| EBONY | February-79 | TX192467 |
| EBONY | March-79 | TX233602 |
| EBONY | April-79 | TX233601 |
| EBONY | May-79 | TX291181 |
| EBONY | June-79 | TX291180 |
| EBONY | July-79 | TX291179 |
| EBONY | August-79 | TX341038 |
| EBONY | September-79 | TX341035 |
| EBONY | October-79 | TX341034 |
| EBONY | November-79 | TX378415 |
| EBONY | December-79 | TX378414 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-80 | |
| EBONY | February-80 | |
| EBONY | March-80 | |
| EBONY | April-80 | |
| EBONY | May-80 | TX527018 |
| EBONY | June-80 | TX527020 |
| EBONY | July-80 | TX527019 |
| EBONY | August-80 | TX546184 |
| EBONY | September-80 | TX573019 |
| EBONY | October-80 | TX578278 |
| EBONY | November-80 | TX599713 |
| EBONY | December-80 | TX639030 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-81 | |
| EBONY | February-81 | TX651719 |
| EBONY | March-81 | TX697313 |
| EBONY | April-81 | TX694250 |
| EBONY | May-81 | TX719698 |
| EBONY | June-81 | TX739349 |
| EBONY | July-81 | TX744183 |
| EBONY | August-81 | TX765124 |
| EBONY | September-81 | TX787257 |
| EBONY | October-81 | TX806342 |
| EBONY | November-81 | TX822947 |
| EBONY | December-81 | TX910952 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-82 | Tx896271 |
| EBONY | February-82 | TX865386 |
| EBONY | March-82 | TX887811 |
| EBONY | April-82 | TX903567 |
| EBONY | May-82 | TX925428 |
| EBONY | June-82 | TX937334 |
| EBONY | July-82 | TX954564 |
| EBONY | August-82 | TX104696 |
| EBONY | September-82 | TX1040697 |
| EBONY | October-82 | TX104698 |
| EBONY | November-82 | TX104690 |
| EBONY | December-82 | TX1040691 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-83 | TX1090567 |
| EBONY | February-83 | TX1090566 |
| EBONY | March-83 | TX1090568 |
| EBONY | April-83 | TX1090569 |
| EBONY | May-83 | TX1119325 |
| EBONY | June-83 | TX1154211 |
| EBONY | July-83 | TX1154212 |
| EBONY | August-83 | TX1184923 |
| EBONY | September-83 | TX1184924 |
| EBONY | October-83 | TX1226289 |
| EBONY | November-83 | TX1226288 |
| EBONY | December-83 | TX1280073 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | February-84 | TX1280074 |
| EBONY | March-84 | TX1339698 |
| EBONY | April-84 | TX1339699 |
| EBONY | May-84 | TX1339700 |
| EBONY | June-84 | TX1392746 |
| EBONY | July-84 | TX1392745 |
| EBONY | August-84 | TX1442565 |
| EBONY | September-84 | TX1442567 |
| EBONY | October-84 | TX1442566 |
| EBONY | November-84 | TX1546509 |
| EBONY | December-84 | TX1546507 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-85 | TX1546506 |
| EBONY | February-85 | TX1546508 |
| EBONY | March-85 | TX1546510 |
| EBONY | April-85 | TX1546511 |
| EBONY | May-85 | TX1691437 |
| EBONY | June-85 | TX1687269 |
| EBONY | July-85 | TX1689438 |
| EBONY | August-85 | TX1687874 |
| EBONY | September-85 | TX1687873 |
| EBONY | October-85 | TX1687875 |
| EBONY | November-85 | TX1761259 |
| EBONY | December-85 | TX1761260 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-86 | TX1761264 |
| EBONY | February-86 | TX1771991 |
| EBONY | March-86 | TX1771989 |
| EBONY | April-86 | TX1831165 |
| EBONY | May-86 | TX1831167 |
| EBONY | June-86 | TX1831163 |
| EBONY | July-86 | TX1908878 |
| EBONY | August-86 | TX1908879 |
| EBONY | September-86 | TX1908800 |
| EBONY | October-86 | TX1992349 |
| EBONY | November-86 | TX2002624 |
| EBONY | December-86 | TX2001229 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-87 | TX1993425 |
| EBONY | February-87 | TX1992350 |
| EBONY | March-87 | TX2157253 |
| EBONY | April-87 | TX2194906 |
| EBONY | May-87 | TX2194905 |
| EBONY | June-87 | TX2195001 |
| EBONY | July-87 | TX2194907 |
| EBONY | August-87 | TX2194996 |
| EBONY | September-87 | TX2194984 |
| EBONY | October-87 | TX2194988 |
| EBONY | November-87 | TX2194904 |
| EBONY | December-87 | TX2338009 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | Janaury-88 | TX2338010 |
| EBONY | February-88 | TX2338008 |
| EBONY | March-88 | TX2338002 |
| EBONY | April-88 | TX2338006 |
| EBONY | May-88 | TX2338011 |
| EBONY | June-88 | TX2338007 |
| EBONY | July-88 | TX2626185 |
| EBONY | August-88 | TX2626187 |
| EBONY | September-88 | TX2626182 |
| EBONY | October-88 | TX2626183 |
| EBONY | November-88 | TX2626186 |
| EBONY | December-88 | TX2632386 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-89 | TX2626181 |
| EBONY | February-89 | TX2626188 |
| EBONY | March-89 | TX2626184 |
| EBONY | April-89 | TX2620898 |
| EBONY | May-89 | TX2620897 |
| EBONY | June-89 | TX2620896 |
| EBONY | July-89 | TX2620894 |
| EBONY | August-89 | TX2620895 |
| EBONY | September-89 | TX2712532 |
| EBONY | October-89 | TX2712531 |
| EBONY | November-89 | TX2712530 |
| EBONY | December-89 | TX2712539 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | Janaury-90 | TX2712538 |
| EBONY | February-90 | TX2918812 |
| EBONY | March-90 | TX2918817 |
| EBONY | April-90 | TX2919636 |
| EBONY | May-90 | TX2917837 |
| EBONY | June-90 | TX2932712 |
| EBONY | July-90 | TX2919680 |
| EBONY | August-90 | TX2932713 |
| EBONY | September-90 | TX3043914 |
| EBONY | October-90 | TX3043912 |
| EBONY | November-90 | TX3043911 |
| EBONY | December-90 | TX3043910 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January -91 | TX3043913 |
| EBONY | February-91 | TX3043915 |
| EBONY | March-91 | TX3092078 |
| EBONY | April-91 | TX3092077 |
| EBONY | May-91 | TX3093999 |
| EBONY | June-91 | TX3246174 |
| EBONY | July-91 | TX3246187 |
| EBONY | August-91 | TX3246177 |
| EBONY | September-91 | TX3246176 |
| EBONY | October-91 | TX3246175 |
| EBONY | November-91 | TX3246181 |
| EBONY | December-91 | TX3246182 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-92 | TX3283290 |
| EBONY | February-92 | TX3283291 |
| EBONY | March-92 | TX3275528 |
| EBONY | April-92 | TX3415956 |
| EBONY | May-92 | TX3415957 |
| EBONY | June-92 | TX3415958 |
| EBONY | July-92 | TX3415962 |
| EBONY | August-92 | TX3449784 |
| EBONY | September-92 | TX3449782 |
| EBONY | October-92 | TX3449786 |
| EBONY | November-92 | SE/GROUP TX3457344 |
| EBONY | December-92 | SE/GROUP TX3457344 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | February-93 | SE/GROUP TX3539335 |
| EBONY | March-93 | SE/GROUP TX3539335 |
| EBONY | April-93 | SE/GROUP TX3539335 |
| EBONY | May-93 | SE/GROUP TX3629223 |
| EBONY | June-93 | SE/GROUP TX3629223 |
| EBONY | July-93 | SE/GROUP TX3629223 |
| EBONY | August-93 | SE/GROUP TX3629243 |
| EBONY | September-93 | SE/GROUP TX3629243 |
| EBONY | October-93 | SE/GROUP TX3629243 |
| EBONY | November-93 | SE/GROUP TX 3796093 |
| EBONY | December-93 | SE/GROUP TX 3796093 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-94 | SE/GROUP TX3796093 |
| EBONY | February-94 | SE/GROUP TX3855271 |
| EBONY | March-94 | SE/GROUP TX3855271 |
| EBONY | April-94 | SE/GROUP TX3855271 |
| EBONY | May-94 | SE/GROUP TX3915620 |
| EBONY | June-94 | SE/GROUP TX3915620 |
| EBONY | July-94 | SE/GROUP TX3915620 |
| EBONY | August-94 | SE/GROUP TX3925365 |
| EBONY | September-94 | SE/GROUP TX3925365 |
| EBONY | October-94 | SE/GROUP TX3925365 |
| EBONY | November-94 | SE/GROUP TX3973607 |
| EBONY | December-94 | SE/GROUP TX3973607 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-95 | SE/GROUP TX3973607 |
| EBONY | February-95 | SE/GROUP TX4045275 |
| EBONY | March-95 | SE/GROUP TX4045275 |
| EBONY | April-95 | SE/GROUP TX4045275 |
| EBONY | May-95 | SE/GROUP TX4054117 |
| EBONY | June-95 | SE/GROUP TX4054117 |
| EBONY | July-95 | SE/GROUP TX4054117 |
| EBONY | August-95 | SE/GROUP TX4123223 |
| EBONY | September-95 | SE/GROUP TX4123223 |
| EBONY | October-95 | SE/GROUP TX4123223 |
| EBONY | November-95 | SE/GROUP TX4195308 |
| EBONY | December-95 | SE/GROUP TX4195308 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-96 | SE/GROUP TX4195308 |
| EBONY | February-96 | SE/GROUP TX4204903 |
| EBONY | March-96 | SE/GROUP TX4204903 |
| EBONY | April-96 | SE/GROUP TX4204903 |
| EBONY | May-96 | SE/GROUP TX4311444 |
| EBONY | June-96 | SE/GROUP TX4311444 |
| EBONY | July-96 | SE/GROUP TX4311444 |
| EBONY | August-96 | SE/GROUP TX4332986 |
| EBONY | September-96 | SE/GROUP TX4332986 |
| EBONY | October-96 | SE/GROUP TX4332986 |
| EBONY | November-96 | SE/GROUP TX4388922 |
| EBONY | December-96 | SE/GROUP TX4388922 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-97 | SE/GROUP TX4388922 |
| EBONY | February-97 | SE/GROUP TX4437380 |
| EBONY | March-97 | SE/GROUP TX4437380 |
| EBONY | April-97 | SE/GROUP TX4437380 |
| EBONY | May-97 | SE/GROUP TX4513276 |
| EBONY | June-97 | SE/GROUP TX4513276 |
| EBONY | July-97 | SE/GROUP TX4513276 |
| EBONY | August-97 | SE/GROUP TX4534829 |
| EBONY | September-97 | SE/GROUP TX4534829 |
| EBONY | October-97 | SE/GROUP TX4534829 |
| EBONY | November-97 | SE/GROUP TX4554956 |
| EBONY | December-97 | SE/GROUP TX4554956 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-98 | SE/GROUP TX4554956 |
| EBONY | February-98 | SE/GROUP TX4621042 |
| EBONY | March-98 | SE/GROUP TX4621042 |
| EBONY | April-98 | SE/GROUP TX4621042 |
| EBONY | May-98 | SE/GROUP TX4705708 |
| EBONY | June-98 | SE/GROUP TX4705708 |
| EBONY | July-98 | SE/GROUP TX4705708 |
| EBONY | August-98 | SE/GROUP TX4759246 |
| EBONY | September-98 | SE/GROUP TX4759246 |
| EBONY | October-98 | SE/GROUP TX4759246 |
| EBONY | November-98 | SE/GROUP TX4827292 |
| EBONY | December-98 | SE/GROUP TX4827292 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-99 | SE/GROUP TX4827292 |
| EBONY | February-99 | SE/GROUP TX4873552 |
| EBONY | March-99 | SE/GROUP TX4873552 |
| EBONY | April-99 | SE/GROUP TX4873552 |
| EBONY | May-99 | SE/GROUP TX4920142 |
| EBONY | June-99 | SE/GROUP TX4920142 |
| EBONY | July-99 | SE/GROUP TX4920142 |
| EBONY | August-99 | SE/GROUP TX5006128 |
| EBONY | September-99 | SE/GROUP TX5006128 |
| EBONY | October-99 | SE/GROUP TX5006128 |
| EBONY | November-99 | SE/GROUP TX5201573 |
| EBONY | December-99 | SE/GROUP TX5201573 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-00 | SE/GROUP TX5201574 |
| EBONY | February-00 | SE/GROUP TX5201574 |
| EBONY | March-00 | SE/GROUP TX5201574 |
| EBONY | April-00 | SE/GROUP TX5201574 |
| EBONY | May-00 | SE/GROUP TX5006447 |
| EBONY | June-00 | SE/GROUP TX5006447 |
| EBONY | July-00 | SE/GROUP TX5006447 |
| EBONY | August-00 | SE/GROUP TX5006447 |
| EBONY | September-00 | SE/GROUP TX5219863 |
| EBONY | October-00 | SE/GROUP TX5219863 |
| EBONY | November-00 | SE/GROUP TX5219863 |
| EBONY | December-00 | SE/GROUP TX5219863 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-01 | SE TX6078916 |
| EBONY | February-01 | SE/GROUP TX6078912 |
| EBONY | March-01 | SE/GROUP TX6078912 |
| EBONY | April-01 | SE/GROUP TX6078912 |
| EBONY | May-01 | SE/GROUP TX6078913 |
| EBONY | June-01 | SE/GROUP TX6078913 |
| EBONY | July-01 | SE/GROUP TX6078913 |
| EBONY | August-01 | SE/GROUP TX6078914 |
| EBONY | September-01 | SE/GROUP TX6078914 |
| EBONY | October-01 | SE/GROUP TX6078914 |
| EBONY | November-01 | SE/GROUP TX6078915 |
| EBONY | December-01 | SE/GROUP TX6078915 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-02 | SE/GROUP TX6078915 |
| EBONY | February-02 | SE/GROUP TX5577528 |
| EBONY | March-02 | SE/GROUP TX5577528 |
| EBONY | April-02 | SE/GROUP TX5577528 |
| EBONY | May-02 | SE/GROUP TX5577529 |
| EBONY | June-02 | SE/GROUP TX5577529 |
| EBONY | July-02 | SE/GROUP TX5577529 |
| EBONY | August-02 | SE/GROUP TX5683179 |
| EBONY | September-02 | SE/GROUP TX5683179 |
| EBONY | October-02 | SE/GROUP TX5683179 |
| EBONY | November-02 | SE/GROUP TX5683178 |
| EBONY | December-02 | SE/GROUP TX5683178 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-03 | SE/GROUP TX5683178 |
| EBONY | February-03 | SE/GROUP TX5840710 |
| EBONY | March-03 | SE/GROUP TX5840710 |
| EBONY | April-03 | SE/GROUP TX5840710 |
| EBONY | May-03 | SE/GROUP TX5806671 |
| EBONY | June-03 | SE/GROUP TX5806671 |
| EBONY | July-03 | SE/GROUP TX5806671 |
| EBONY | August-03 | SE/GROUP TX5925365 |
| EBONY | September-03 | SE/GROUP TX5925365 |
| EBONY | October-03 | SE/GROUP TX5925365 |
| EBONY | November-03 | SE/GROUP TX5879504 |
| EBONY | December-03 | SE/GROUP TX5879504 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-04 | SE/GROUP TX5879504 |
| EBONY | February-04 | SE/GROUP TX5999844 |
| EBONY | March-04 | SE/GROUP TX5999844 |
| EBONY | April-04 | SE/GROUP TX5999844 |
| EBONY | May-04 | SE/GROUP TX5999845 |
| EBONY | June-04 | SE/GROUP TX5999845 |
| EBONY | July-04 | SE/GROUP TX5999845 |
| EBONY | August-04 | SE/GROUP TX6099424 |
| EBONY | September-04 | SE/GROUP TX6099424 |
| EBONY | October-04 | SE/GROUP TX6099424 |
| EBONY | November-04 | SE/GROUP TX6099398 |
| EBONY | December-04 | SE/GROUP TX6099398 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-05 | SE/GROUP TX6099398 |
| EBONY | February-05 | SE/GROUP TX6236433 |
| EBONY | March-05 | SE/GROUP TX6236433 |
| EBONY | April-05 | SE/GROUP TX6236433 |
| EBONY | May-05 | SE/GROUP TX6236434 |
| EBONY | June-05 | SE/GROUP TX6236434 |
| EBONY | July-05 | SE/GROUP TX6236434 |
| EBONY | August-05 | SE/GROUP TX6297973 |
| EBONY | September-05 | SE/GROUP TX6297973 |
| EBONY | October-05 | SE/GROUP TX6297973 |
| EBONY | November-05 | SE/GROUP TX6297974 |
| EBONY | December-05 | SE/GROUP TX6297974 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | January-06 | SE/GROUP TX6297974 |
| EBONY | February-06 | SE/GROUP TX6397716 |
| EBONY | March-06 | SE/GROUP TX6397716 |
| EBONY | April-06 | SE/GROUP TX6397716 |
| EBONY | May-06 | SE/GROUP TX6397717 |
| EBONY | June-06 | SE/GROUP TX6397717 |
| EBONY | July-06 | SE/GROUP TX6397717 |
| EBONY | August-06 | |
| EBONY | September-06 | |
| EBONY | October-06 | |
| EBONY | November-06 | SE/GROUP TX6497438 |
| EBONY | December-06 | SE/GROUP TX6497438 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-07 | SE/GROUP TX6497438 |
| EBONY | February-07 | SE/GROUP TX6611148 |
| EBONY | March-07 | SE/GROUP TX6611148 |
| EBONY | April-07 | SE/GROUP TX6611148 |
| EBONY | May-07 | SE/GROUP TX6611147 |
| EBONY | June-07 | SE/GROUP TX6611147 |
| EBONY | July-07 | SE/GROUP TX6611147 |
| EBONY | August-07 | SE/GROUP TX6627473 |
| EBONY | September-07 | SE/GROUP TX6627473 |
| EBONY | October-07 | SE/GROUP TX6631370 |
| EBONY | November-07 | SE/GROUP TX6631370 |
| EBONY | December-07 | SE/GROUP TX6631370 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | January-08 | |
| EBONY | February-08 | |
| EBONY | March-08 | |
| EBONY | April-08 | SE/GROUP TX6648784 |
| EBONY | May-08 | SE/GROUP TX6648784 |
| EBONY | June-08 | SE/GROUP TX6648784 |
| EBONY | July-08 | SE/GROUP TX6662012 |
| EBONY | August-08 | SE/GROUP TX6662012 |
| EBONY | September-08 | SE/GROUP TX6662012 |
| EBONY | October-08 | SE/GROUP TX6663950 |
| EBONY | November-08 | SE/GROUP TX6663950 |
| EBONY | December-08 | SE/GROUP TX6663950 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | January-09 | SE TX6682145 |
| EBONY | February-09 | SE/GROUP TX6686128 |
| EBONY | March-09 | SE/GROUP TX6686128 |
| EBONY | April-09 | SE/GROUP TX6686096 |
| EBONY | May-09 | SE/GROUP TX6686096 |
| EBONY | June-09 | SE/GROUP TX6686096 |
| EBONY | July/August 2009 | SE/GROUP TX6702553 |
| EBONY | September-09 | SE/GROUP TX6702553 |
| EBONY | October-09 | SE/GROUP TX6705777 |
| EBONY | November-09 | SE/GROUP TX6705777 |
| EBONY | December 2009/January 2010 | SE/GROUP TX6705777 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| EBONY | February-10 | SE/GROUP TX6770739 |
| EBONY | March-10 | SE/GROUP TX6770739 |
| EBONY | April-10 | SE/GROUP TX6608216 |
| EBONY | May-10 | SE/GROUP TX6608216 |
| EBONY | June-10 | SE/GROUP TX6608216 |
| EBONY | July-10 | SE/GROUP TX6786589 |
| EBONY | August-10 | SE/GROUP TX6786589 |
| EBONY | September-10 | SE/GROUP TX6786589 |
| EBONY | October-10 | SE/GROUP TX6786620 |
| EBONY | November-10 | SE/GROUP TX6786620 |
| EBONY | December 2010/January 2011 | SE/GROUP TX6786620 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| EBONY | February-11 | SE/GROUP TX6787198 |
| EBONY | March-11 | SE/GROUP TX6787198 |
| EBONY | April-11 | SE/GROUP TX6787198 |
| EBONY | May-11 | SE/GROUP TX6787199 |
| EBONY | June-11 | SE/GROUP TX6787199 |
| EBONY | July-11 | SE/GROUP TX6787199 |
| EBONY | August-11 | SE/GROUP TX6787199 |
| EBONY | September-11 | TX7660880 |
| EBONY | October-11 | TX7660880 |
| EBONY | November-11 | TX7660875 |
| EBONY | December 2011/January 2012 | TX7660875 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | March-12 | TX7660901 |
| EBONY | April-12 | TX7660901 |
| EBONY | May-12 | TX7660896 |
| EBONY | June-12 | TX7660896 |
| EBONY | July-12 | TX7660896 |
| EBONY | August-12 | TX7660889 |
| EBONY | September-12 | TX7660889 |
| EBONY | October-12 | TX7660889 |
| EBONY | November-12 | TX7660884 |
| EBONY | December 2012/January 2013 | TX7660884 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| EBONY | February-13 | TX0 7962059 |
| EBONY | March-13 | TX0 7962059 |
| EBONY | April-13 | TX0 7962059 |
| EBONY | May-13 | TX0 7962071 |
| EBONY | June-13 | TX0 7962071 |
| EBONY | July-13 | TX0 7962071 |
| EBONY | August-13 | TX0 7962067 |
| EBONY | September-13 | TX0 7962067 |
| EBONY | October-13 | TX0 7962067 |
| EBONY | November-13 | TX0 7962048 |
| EBONY | December 2013/January 2014 | TX0 7962048 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
| --- | --- | --- |
| EBONY | February-14 | TX0 7962022 |
| EBONY | March-14 | TX0 7962022 |
| EBONY | April-14 | TX0 7962022 |
| EBONY | May-14 | TX0 7962022 |
| EBONY | June-14 | TX0 7962029 |
| EBONY | July-14 | TX0 7962029 |
| EBONY | August-14 | TX0 7962029 |
| EBONY | September-14 | TX0 7962036 |
| EBONY | October-14 | TX0 7962036 |
| EBONY | November-14 | TX0 7962036 |
| EBONY | December-14 | TX0 7962036 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | November 1, 1951 | B 346009 |
| JET | November 8, 1951 | B 346010 |
| JET | November 15, 1951 | B 346011 |
| JET | November 22, 1951 | B 346012 |
| JET | November 29, 1951 | B 346013 |
| JET | December 6, 1951 | B 346014 |
| JET | December 13, 1951 | B 346015 |
| JET | December 20, 1951 | B 346016 |
| JET | December 27, 1951 | B 346017 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 3, 1952 | B 348226 |
| JET | January 10, 1952 | B 346018 |
| JET | January 17, 1952 | B 346019 |
| JET | January 24, 1952 | B 346020 |
| JET | January 31, 1952 | B 346021 |
| JET | February 7, 1952 | B 346022 |
| JET | February 14, 1952 | B 346023 |
| JET | February 21, 1952 | B 346024 |
| JET | February 28, 1952 | B 369547 |
| JET | March 6, 1952 | B 369548 |
| JET | March 13, 1952 | B 369549 |
| JET | March 20, 1952 | B 369550 |
| JET | March 27, 1952 | B 369551 |
| JET | April 3, 1952 | B 369552 |
| JET | April 10, 1952 | B 369553 |
| JET | April 17, 1952 | B 369554 |
| JET | April 24, 1952 | B 369555 |
| JET | May 1, 1952 | B 369556 |
| JET | May 8, 1952 | B 369557 |
| JET | May 15, 1952 | B 369558 |
| JET | May 22, 1952 | B 369559 |
| JET | May 29, 1952 | B 369560 |
| JET | June 5, 1952 | B 369561 |
| JET | June 12, 1952 | B 369562 |
| JET | June 19, 1952 | B 369563 |
| JET | June 26, 1952 | B 369564 |
| JET | July 3, 1952 | B 369565 |
| JET | July 10, 1952 | B 369566 |
| JET | July 17, 1952 | B 369567 |
| JET | July 24, 1952 | B 369568 |
| JET | July 31, 1952 | B 369569 |
| JET | August 7, 1952 | B 369570 |
| JET | August 14, 1952 | B 409475 |
| JET | August 21, 1952 | B 409476 |
| JET | August 28, 1952 | B 409477 |
| JET | September 4, 1952 | B 409478 |
| JET | September 11, 1952 | B 409479 |
| JET | September 18, 1952 | B 409480 |
| JET | September 25, 1952 | B 409481 |
| JET | October 2, 1952 | B 409482 |
| JET | October 9, 1952 | B 409483 |
| JET | October 16, 1952 | B 409484 |
| JET | October 23, 1952 | B 409485 |
| JET | October 30, 1952 | B 409486 |
| JET | November 6, 1952 | B 409487 |
| JET | November 13, 1952 | B 418067 |

| JET | November 20, 1952 | B 418068 |
| JET | November 27, 1952 | B 418069 |
| JET | December 4, 1952  | B 418070 |
| JET | December 11, 1952 | B 418071 |
| JET | December 18, 1952 | B 418072 |
| JET | December 25, 1952 | B 418073 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 1, 1953 | B 418074 |
| JET | January 8, 1953 | B 418075 |
| JET | January 15, 1953 | B 418076 |
| JET | January 22, 1953 | B 418077 |
| JET | January 29, 1953 | B 418078 |
| JET | February 5, 1953 | B 418079 |
| JET | February 12, 1953 | B 418080 |
| JET | February 19, 1953 | B 418081 |
| JET | February 26, 1953 | B 418082 |
| JET | March 5, 1953 | B 418083 |
| JET | March 12, 1953 | B 418084 |
| JET | March 19, 1953 | B 418085 |
| JET | March 26, 1953 | B 418086 |
| JET | April 2, 1953 | B 425839 |
| JET | April 9, 1953 | B 425840 |
| JET | April 16, 1953 | B 425841 |
| JET | April 23, 1953 | B 425842 |
| JET | April 30, 1953 | B 425843 |
| JET | May 7, 1953 | B 425844 |
| JET | May 14, 1953 | B 425845 |
| JET | May 21, 1953 | B 425846 |
| JET | May 28, 1953 | B 425847 |
| JET | June 4, 1953 | B 425848 |
| JET | June 11, 1953 | B 425849 |
| JET | June 18, 1953 | B 425850 |
| JET | June 25, 1953 | B 425851 |
| JET | July 2, 1953 | B 425852 |
| JET | July 9, 1953 | B 425853 |
| JET | July 16, 1953 | B 425854 |
| JET | July 23, 1953 | B 425855 |
| JET | July 30, 1953 | B 458439 |
| JET | August 6, 1953 | B 458440 |
| JET | August 13, 1953 | B 458441 |
| JET | August 20, 1953 | B 458442 |
| JET | August 27, 1953 | B 458443 |
| JET | September 3, 1953 | B 458444 |
| JET | September 10, 1953 | B 458445 |
| JET | September 17, 1953 | B 458446 |
| JET | September 24, 1953 | B 458447 |
| JET | October 1, 1953 | B 458448 |
| JET | October 8, 1953 | B 458449 |
| JET | October 15, 1953 | B 458450 |
| JET | October 22, 1953 | B 458451 |
| JET | October 29, 1953 | B 458452 |
| JET | November 5, 1953 | B 458453 |
| JET | November 12, 1953 | B 458454 |

| | | |
|---|---|---|
| JET | November 19, 1953 | B 458455 |
| JET | November 26, 1953 | B 458456 |
| JET | December 3, 1953 | B 458457 |
| JET | December 10, 1953 | B 458458 |
| JET | December 17, 1953 | B 458459 |
| JET | December 24, 1953 | B 458460 |
| JET | December 31, 1953 | B 458461 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 7, 1954 | B 458462 |
| JET | January 14, 1954 | B 458463 |
| JET | January 21, 1954 | B 458464 |
| JET | January 28, 1954 | B 458465 |
| JET | February 4, 1954 | B 458466 |
| JET | February 11, 1954 | B 458467 |
| JET | February 18, 1954 | B 458468 |
| JET | February 25, 1954 | B 504218 |
| JET | March 4, 1954 | B 504219 |
| JET | March 11, 1954 | B 504220 |
| JET | March 18, 1954 | B 504221 |
| JET | March 25, 1954 | B 504222 |
| JET | April 1, 1954 | B 504223 |
| JET | April 8, 1954 | B 504224 |
| JET | April 15, 1954 | B 504225 |
| JET | April 22, 1954 | B 504226 |
| JET | April 29, 1954 | B 504227 |
| JET | May 6, 1954 | B 504228 |
| JET | May 13, 1954 | B 508951 |
| JET | May 20, 1954 | B 508952 |
| JET | May 27, 1954 | B 508953 |
| JET | June 3, 1954 | B 508954 |
| JET | June 10, 1954 | B 508955 |
| JET | June 17, 1954 | B 508956 |
| JET | June 24, 1954 | B 508957 |
| JET | July 1, 1954 | B 508958 |
| JET | July 8, 1954 | B 508959 |
| JET | July 15, 1954 | B 508960 |
| JET | July 22, 1954 | B 508961 |
| JET | July 29, 1954 | |
| JET | August 5, 1954 | |
| JET | August 12, 1954 | B 508962 |
| JET | August 19, 1954 | B 508963 |
| JET | August 26, 1954 | B 508964 |
| JET | September 2, 1954 | B 508965 |
| JET | September 9, 1954 | B 508966 |
| JET | September 16, 1954 | B 508967 |
| JET | September 23, 1954 | B 508968 |
| JET | September 30, 1954 | B 508969 |
| JET | October 7, 1954 | B 508970 |
| JET | October 14, 1954 | |
| JET | October 21, 1954 | B 508972 |
| JET | October 28, 1954 | |
| JET | November 4, 1954 | B 508974 |
| JET | November 11, 1954 | B 508975 |
| JET | November 18, 1954 | |

| | | |
|---|---|---|
| JET | November 25, 1954 | B 508977 |
| JET | December 2, 1954 | B 508950 |
| JET | December 9, 1954 | B 519750 |
| JET | December 16, 1954 | B 519751 |
| JET | December 23, 1954 | B 519752 |
| JET | December 30, 1954 | B 519753 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 5, 1961 | B 923849 |
| JET | January 12, 1961 | B 923848 |
| JET | January 19, 1961 | B 933421 |
| JET | January 26, 1961 | B 923847 |
| JET | February 2, 1961 | B 933422 |
| JET | February 9, 1961 | B 923846 |
| JET | February 16, 1961 | B 923845 |
| JET | February 23, 1961 | B 923844 |
| JET | March 2, 1961 | B 923843 |
| JET | March 9, 1961 | B 923842 |
| JET | March 16, 1961 | B 923841 |
| JET | March 23, 1961 | B 923840 |
| JET | March 30, 1961 | B 923839 |
| JET | April 6, 1961 | B 923838 |
| JET | April 13, 1961 | B 923837 |
| JET | April 20, 1961 | B 923836 |
| JET | April 27, 1961 | B 923835 |
| JET | May 4, 1961 | B 923834 |
| JET | May 11, 1961 | B 923833 |
| JET | May 18, 1961 | B 923832 |
| JET | May 25, 1961 | B 923831 |
| JET | June 1, 1961 | B 923830 |
| JET | June 8, 1961 | B 923829 |
| JET | June 15, 1961 | B 923828 |
| JET | June 22, 1961 | B 923827 |
| JET | June 29, 1961 | B 923826 |
| JET | July 6, 1961 | B 923825 |
| JET | July 13, 1961 | B 923824 |
| JET | July 20, 1961 | B 923823 |
| JET | July 27, 1961 | B 923822 |
| JET | August 3, 1961 | B 923821 |
| JET | August 10, 1961 | B 923820 |
| JET | August 17, 1961 | B 923819 |
| JET | August 24, 1961 | B 923818 |
| JET | August 31, 1961 | B 923817 |
| JET | September 7, 1961 | B 923816 |
| JET | September 14, 1961 | B 923815 |
| JET | September 21, 1961 | B 943410 |
| JET | September 28, 1961 | B 943411 |
| JET | October 5, 1961 | B 943412 |
| JET | October 12, 1961 | B 943413 |
| JET | October 19, 1961 | B 943414 |
| JET | October 26, 1961 | B 943415 |
| JET | November 2, 1961 | B 943416 |
| JET | November 9, 1961 | B 943417 |
| JET | November 16, 1961 | B 943418 |

| | | |
|---|---|---|
| JET | November 23, 1961 | B 943419 |
| JET | November 30, 1961 | B 943420 |
| JET | December 7, 1961 | B 943424 |
| JET | December 14, 1961 | B 943421 |
| JET | December 21, 1961 | B 943422 |
| JET | December 28, 1961 | B 943423 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 4, 1962 | B 943408 |
| JET | January 11, 1962 | B 943409 |
| JET | January 18, 1962 | B 974491 |
| JET | January 25, 1962 | B 974492 |
| JET | February 1, 1962 | B 974493 |
| JET | February 8, 1962 | B 974494 |
| JET | February 15, 1962 | B 974495 |
| JET | February 22, 1962 | B 974496 |
| JET | March 1, 1962 | B 974497 |
| JET | March 8, 1962 | B 974498 |
| JET | March 15, 1962 | B 974499 |
| JET | March 22, 1962 | B 974500 |
| JET | March 29, 1962 | B 974501 |
| JET | April 5, 1962 | B 974502 |
| JET | April 12, 1962 | B 974503 |
| JET | April 19, 1962 | B 974504 |
| JET | April 26, 1962 | B 974505 |
| JET | May 3, 1962 | B 974506 |
| JET | May 10, 1962 | B 974507 |
| JET | May 17, 1962 | B 974508 |
| JET | May 24, 1962 | B 974509 |
| JET | May 31, 1962 | B 974510 |
| JET | June 7, 1962 | B 9357 |
| JET | June 14, 1962 | B 9358 |
| JET | June 21, 1962 | B 9359 |
| JET | June 28, 1962 | B 9360 |
| JET | July 5, 1962 | B 24523 |
| JET | July 12, 1962 | B 9361 |
| JET | July 19, 1962 | B 9362 |
| JET | July 26, 1962 | B 9363 |
| JET | August 2, 1962 | B 9364 |
| JET | August 9, 1962 | B 9365 |
| JET | August 16, 1962 | B 9366 |
| JET | August 23, 1962 | B 9367 |
| JET | August 30, 1962 | B 9368 |
| JET | September 6, 1962 | B 9369 |
| JET | September 13, 1962 | B 9370 |
| JET | September 20, 1962 | B 9371 |
| JET | September 27, 1962 | B 9372 |
| JET | October 4, 1962 | B 9373 |
| JET | October 11, 1962 | B 9374 |
| JET | October 18, 1962 | B 9375 |
| JET | October 25, 1962 | B 9376 |
| JET | November 1, 1962 | B 9377 |
| JET | November 8, 1962 | B 9378 |
| JET | November 15, 1962 | B 9379 |

| JET | November 22, 1962 | B 9380 |
| JET | November 29, 1962 | B 9381 |
| JET | December 6, 1962 | B 9382 |
| JET | December 13, 1962 | B 24522 |
| JET | December 20, 1962 | B 33033 |
| JET | December 27, 1962 | B 33034 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 3, 1963 | B 33035 |
| JET | January 10, 1963 | B 33036 |
| JET | January 17, 1963 | B 33037 |
| JET | January 24, 1963 | B 33038 |
| JET | January 31, 1963 | B 33039 |
| JET | February 7, 1963 | B 33041 |
| JET | February 14, 1963 | B 33040 |
| JET | February 21, 1963 | B 33890 |
| JET | February 28, 1963 | B 33042 |
| JET | March 7, 1963 | B 33043 |
| JET | March 14, 1963 | B 33044 |
| JET | March 21, 1963 | B 33045 |
| JET | March 28, 1963 | B 33046 |
| JET | April 4, 1963 | B 33047 |
| JET | April 11, 1963 | B 33048 |
| JET | April 18, 1963 | B 33049 |
| JET | April 25, 1963 | B 58256 |
| JET | May 2, 1963 | B 58258 |
| JET | May 9, 1963 | B 58266 |
| JET | May 16, 1963 | B 58265 |
| JET | May 23, 1963 | B 58248 |
| JET | May 30, 1963 | B 58249 |
| JET | June 6, 1963 | B 58257 |
| JET | June 13, 1963 | B 58250 |
| JET | June 20, 1963 | B 58252 |
| JET | June 27, 1963 | B 58255 |
| JET | July 4, 1963 | B 58263 |
| JET | July 11, 1963 | B 58253 |
| JET | July 18, 1963 | B 58261 |
| JET | July 25, 1963 | B 58262 |
| JET | August 1, 1963 | B 58251 |
| JET | August 8, 1963 | B 58254 |
| JET | August 15, 1963 | B 58260 |
| JET | August 22, 1963 | B 58259 |
| JET | August 29, 1963 | B 58264 |
| JET | September 5, 1963 | B 64714 |
| JET | September 12, 1963 | B 64715 |
| JET | September 19, 1963 | B 64716 |
| JET | September 26, 1963 | B 64717 |
| JET | October 3, 1963 | B 88933 |
| JET | October 10, 1963 | B 88934 |
| JET | October 17, 1963 | B 88935 |
| JET | October 24, 1963 | B 88936 |
| JET | October 31, 1963 | B 88937 |
| JET | November 7, 1963 | B 88938 |
| JET | November 14, 1963 | B 88939 |

| | | |
|---|---|---|
| JET | November 21, 1963 | B 88940 |
| JET | November 28, 1963 | B 88941 |
| JET | December 5, 1963 | B 88942 |
| JET | December 12, 1963 | B 88943 |
| JET | December 19, 1963 | B 88944 |
| JET | December 26, 1963 | B 88945 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 2, 1964 | B 88946 |
| JET | January 9, 1964 | B 88947 |
| JET | January 16, 1964 | B 88948 |
| JET | January 23, 1964 | B 88949 |
| JET | January 30, 1964 | B 88950 |
| JET | February 6, 1964 | B 98867 |
| JET | February 13, 1964 | B 98868 |
| JET | February 20, 1964 | B 98869 |
| JET | February 27, 1964 | B 98870 |
| JET | March 5, 1964 | B 98871 |
| JET | March 12, 1964 | B 98872 |
| JET | March 19, 1964 | B 98873 |
| JET | March 26, 1964 | B 98874 |
| JET | March 26, 1964 | B 117217 |
| JET | April 2, 1964 | B 117218 |
| JET | April 9, 1964 | B 117219 |
| JET | April 16, 1964 | B 117220 |
| JET | April 23, 1964 | B 117221 |
| JET | April 30, 1964 | B 117223 |
| JET | May 7, 1964 | B 117222 |
| JET | May 14, 1964 | B 117215 |
| JET | May 21, 1964 | B 117216 |
| JET | May 28, 1964 | B 132827 |
| JET | June 4, 1964 | B 132828 |
| JET | June 11, 1964 | B 132829 |
| JET | June 18, 1964 | B 132830 |
| JET | June 25, 1964 | B 132831 |
| JET | July 2, 1964 | B 132832 |
| JET | July 9, 1964 | B 132833 |
| JET | July 16, 1964 | B 132834 |
| JET | July 23, 1964 | B 132839 |
| JET | July 30, 1964 | B 132840 |
| JET | August 6, 1964 | B 132841 |
| JET | August 13, 1964 | B 132842 |
| JET | August 20, 1964 | B 132843 |
| JET | August 27, 1964 | B 132844 |
| JET | September 3, 1964 | B 167350 |
| JET | September 10, 1964 | B 167351 |
| JET | September 17, 1964 | B 167352 |
| JET | September 24, 1964 | B 167353 |
| JET | October 1, 1964 | B 167354 |
| JET | October 8, 1964 | B 167355 |
| JET | October 15, 1964 | B 167356 |
| JET | October 22, 1964 | B 167357 |
| JET | October 29, 1964 | B 167358 |
| JET | November 5, 1964 | B 167359 |

| | | |
|-----|-------------------|-----------|
| JET | November 12, 1964 | B 167360 |
| JET | November 19, 1964 | B 167361 |
| JET | November 26, 1964 | B 167363 |
| JET | December 3, 1964  | B 167364 |
| JET | December 10, 1964 | B 167365 |
| JET | December 17, 1964 | B 167366 |
| JET | December 24, 1964 | B 167367 |
| JET | December 31, 1964 | B 167368 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 7, 1965 | B 167362 |
| JET | January 14, 1965 | B 167370 |
| JET | January 21, 1965 | B 167369 |
| JET | January 28, 1965 | B 167371 |
| JET | February 4, 1965 | B 167372 |
| JET | February 11, 1965 | B 167373 |
| JET | February 18, 1965 | B 167374 |
| JET | February 25, 1965 | B 182005 |
| JET | March 4, 1965 | B 176629 |
| JET | March 11, 1965 | B 176630 |
| JET | March 18, 1965 | B 176631 |
| JET | March 25, 1965 | B 182004 |
| JET | April 1, 1965 | B 191438 |
| JET | April 8, 1965 | B 191439 |
| JET | April 15, 1965 | B 191440 |
| JET | April 22, 1965 | B 191441 |
| JET | April 29, 1965 | B 191442 |
| JET | May 6, 1965 | B 208790 |
| JET | May 13, 1965 | B 208789 |
| JET | May 20, 1965 | B 208788 |
| JET | May 27, 1965 | B 208787 |
| JET | June 3, 1965 | B 208786 |
| JET | June 10, 1965 | B 208785 |
| JET | June 17, 1965 | B 208784 |
| JET | June 24, 1965 | B 208783 |
| JET | July 1, 1965 | B 208782 |
| JET | July 8, 1965 | B 208781 |
| JET | July 15, 1965 | B 208780 |
| JET | July 22, 1965 | B 208779 |
| JET | July 29, 1965 | B 208778 |
| JET | August 5, 1965 | B 208777 |
| JET | August 12, 1965 | B 208776 |
| JET | August 19, 1965 | B 208775 |
| JET | August 26, 1965 | |
| JET | September 2, 1965 | B 255009 |
| JET | September 9, 1965 | B 255010 |
| JET | September 16, 1965 | B 255011 |
| JET | September 23, 1965 | B 255012 |
| JET | September 30, 1965 | B 255013 |
| JET | October 7, 1965 | B 255014 |
| JET | October 14, 1965 | B 255018 |
| JET | October 21, 1965 | B 255019 |
| JET | October 28, 1965 | B 255022 |
| JET | November 4, 1965 | B 255027 |
| JET | November 11, 1965 | B 255023 |
| JET | November 18, 1965 | B 255026 |

| JET | November 25, 1965 | B 255025 |
| JET | December 2, 1965 | B 255024 |
| JET | December 9, 1965 | B 255015 |
| JET | December 16, 1965 | B 255021 |
| JET | December 23, 1965 | B 255020 |
| JET | December 30, 1965 | B 255016 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 6, 1966 | B 255017 |
| JET | January 13, 1966 | B 262170 |
| JET | January 20, 1966 | B 262169 |
| JET | January 27, 1966 | B 262175 |
| JET | February 3, 1966 | B 262165 |
| JET | February 10, 1966 | B 262174 |
| JET | February 17, 1966 | B 262173 |
| JET | February 24, 1966 | B 262163 |
| JET | March 3, 1966 | B 262166 |
| JET | March 10, 1966 | B 262167 |
| JET | March 17, 1966 | B 262168 |
| JET | March 24, 1966 | B 262171 |
| JET | March 31, 1966 | B 262172 |
| JET | April 7, 1966 | B 262162 |
| JET | April 14, 1966 | B 262161 |
| JET | April 21, 1966 | B 262160 |
| JET | April 28, 1966 | B 262164 |
| JET | May 5, 1966 | B 284440 |
| JET | May 12, 1966 | B 284438 |
| JET | May 19, 1966 | B 284431 |
| JET | May 26, 1966 | B 284434 |
| JET | June 2, 1966 | B 284441 |
| JET | June 9, 1966 | B 284436 |
| JET | June 16, 1966 | B 284442 |
| JET | June 23, 1966 | B 284435 |
| JET | June 30, 1966 | B 284433 |
| JET | July 7, 1966 | B 284437 |
| JET | July 14, 1966 | B 284432 |
| JET | July 21, 1966 | B 293639 |
| JET | July 28, 1966 | B 284439 |
| JET | August 4, 1966 | B 293640 |
| JET | August 11, 1966 | B 306398 |
| JET | August 18, 1966 | B 306399 |
| JET | August 25, 1966 | B 306400 |
| JET | September 1, 1966 | B 306401 |
| JET | September 8, 1966 | B 306402 |
| JET | September 15, 1966 | B 306403 |
| JET | September 22, 1966 | B 306405 |
| JET | September 29, 1966 | B 306407 |
| JET | October 6, 1966 | B 306406 |
| JET | October 13, 1966 | B 306411 |
| JET | October 20, 1966 | B 306409 |
| JET | October 27, 1966 | B 306408 |
| JET | November 3, 1966 | B 306414 |
| JET | November 10, 1966 | B 306412 |
| JET | November 17, 1966 | B 306410 |

| JET | November 24, 1966 | B 306413 |
| JET | December 1, 1966 | B 306404 |
| JET | December 8, 1966 | B 323552 |
| JET | December 15, 1966 | B 323547 |
| JET | December 22, 1966 | B 323544 |
| JET | December 29, 1966 | B 323543 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 5, 1967 | B 323542 |
| JET | January 12, 1967 | B 323541 |
| JET | January 19, 1967 | B 323550 |
| JET | January 26, 1967 | B 323549 |
| JET | February 2, 1967 | B 323548 |
| JET | February 9, 1967 | B 323551 |
| JET | February 16, 1967 | B 323546 |
| JET | February 23, 1967 | B 323545 |
| JET | March 2, 1967 | B 339599 |
| JET | March 9, 1967 | B 339600 |
| JET | March 16, 1967 | B 339598 |
| JET | March 23, 1967 | B 339602 |
| JET | March 30, 1967 | B 339601 |
| JET | April 6, 1967 | B 343046 |
| JET | April 13, 1967 | B 343045 |
| JET | April 20, 1967 | B 343049 |
| JET | April 27, 1967 | B 343048 |
| JET | May 4, 1967 | B 343047 |
| JET | May 11, 1967 | B 343050 |
| JET | May 18, 1967 | B 343051 |
| JET | May 25, 1967 | B 364373 |
| JET | June 1, 1967 | B 364374 |
| JET | June 8, 1967 | B 364375 |
| JET | June 15, 1967 | B 364376 |
| JET | June 22, 1967 | B 364377 |
| JET | June 29, 1967 | B 364378 |
| JET | July 6, 1967 | B 364379 |
| JET | July 13, 1967 | B 364380 |
| JET | July 20, 1967 | B 364381 |
| JET | July 27, 1967 | B 364382 |
| JET | August 3, 1967 | B 364372 |
| JET | August 10, 1967 | B 364371 |
| JET | August 17, 1967 | B 395910 |
| JET | August 24, 1967 | B 395916 |
| JET | August 31, 1967 | B 395922 |
| JET | September 7, 1967 | B 395906 |
| JET | September 14, 1967 | B 395924 |
| JET | September 21, 1967 | B 395915 |
| JET | September 28, 1967 | B 395925 |
| JET | October 5, 1967 | B 395921 |
| JET | October 12, 1967 | B 395907 |
| JET | October 19, 1967 | B 395911 |
| JET | October 26, 1967 | B 395912 |
| JET | November 2, 1967 | B 395913 |
| JET | November 9, 1967 | B 395917 |
| JET | November 16, 1967 | B 395926 |

| JET | November 23, 1967 | B 395908 |
| JET | November 30, 1967 | B 395909 |
| JET | December 7, 1967 | B 395923 |
| JET | December 14, 1967 | B 395918 |
| JET | December 21, 1967 | B 395920 |
| JET | December 28, 1967 | B 395919 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 4, 1968 | B 395914 |
| JET | January 11, 1968 | B 422072 |
| JET | January 18, 1968 | B 422071 |
| JET | January 25, 1968 | B 422073 |
| JET | February 1, 1968 | B 422070 |
| JET | February 8, 1968 | B 422069 |
| JET | February 15, 1968 | B 422068 |
| JET | February 22, 1968 | B 422067 |
| JET | February 29, 1968 | B 422066 |
| JET | March 7, 1968 | B 422065 |
| JET | March 14, 1968 | B 422064 |
| JET | March 21, 1968 | B 422063 |
| JET | March 28, 1968 | B 422062 |
| JET | April 4, 1968 | B 422061 |
| JET | April 11, 1968 | B 422060 |
| JET | April 18, 1968 | B 422059 |
| JET | April 25, 1968 | B 422058 |
| JET | May 2, 1968 | B 436654 |
| JET | May 9, 1968 | B 436655 |
| JET | May 16, 1968 | B 436656 |
| JET | May 23, 1968 | B 436652 |
| JET | May 30, 1968 | B 436653 |
| JET | June 6, 1968 | B 436660 |
| JET | June 13, 1968 | B 436657 |
| JET | June 20, 1968 | B 436658 |
| JET | June 27, 1968 | B 436659 |
| JET | July 4, 1968 | B 436651 |
| JET | July 11, 1968 | B 460256 |
| JET | July 18, 1968 | B 460268 |
| JET | July 25, 1968 | B 460257 |
| JET | August 1, 1968 | B 460258 |
| JET | August 8, 1968 | B 460259 |
| JET | August 15, 1968 | B 460260 |
| JET | August 22, 1968 | B 460261 |
| JET | August 29, 1968 | B 460262 |
| JET | September 5, 1968 | B 460263 |
| JET | September 12, 1968 | B 460264 |
| JET | September 19, 1968 | B 460265 |
| JET | September 26, 1968 | B 460266 |
| JET | October 3, 1968 | B 460267 |
| JET | October 10, 1968 | B 460269 |
| JET | October 17, 1968 | B 475752 |
| JET | October 24, 1968 | B 475756 |
| JET | October 31, 1968 | B 475757 |
| JET | November 7, 1968 | B 475749 |
| JET | November 14, 1968 | B 475760 |

| | | |
|-----|------------------|-----------|
| JET | November 21, 1968 | B 475755 |
| JET | November 28, 1968 | B 475750 |
| JET | December 5, 1968 | B 475754 |
| JET | December 12, 1968 | B 475758 |
| JET | December 19, 1968 | B 475759 |
| JET | December 26, 1968 | B 475751 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 2, 1969 | B 475753 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 4, 1979 | TX 471775 |
| JET | January 11, 1979 | TX 192457 |
| JET | January 18, 1979 | TX 192458 |
| JET | January 25, 1979 | TX 192459 |
| JET | February 1, 1979 | TX 192460 |
| JET | February 8, 1979 | TX 192461 |
| JET | February 15, 1979 | TX 233593 |
| JET | February 22, 1979 | TX 233588 |
| JET | March 1, 1979 | TX 233589 |
| JET | March 8, 1979 | TX 243706 |
| JET | March 15, 1979 | TX 233594 |
| JET | March 22, 1979 | TX 233590 |
| JET | March 29, 1979 | TX 233592 |
| JET | April 5, 1979 | TX 233596 |
| JET | April 12, 1979 | TX 233595 |
| JET | April 19, 1979 | TX 233591 |
| JET | April 26, 1979 | TX 291168 |
| JET | May 3, 1979 | TX 291164 |
| JET | May 10, 1979 | TX 291167 |
| JET | May 17, 1979 | TX 291169 |
| JET | May 24, 1979 | TX 291170 |
| JET | May 31, 1979 | TX 291171 |
| JET | June 7, 1979 | TX 291166 |
| JET | June 14, 1979 | TX 291165 |
| JET | June 21, 1979 | TX 291173 |
| JET | June 28, 1979 | TX 291172 |
| JET | July 5, 1979 | TX 341028 |
| JET | July 12, 1979 | TX 341027 |
| JET | July 19, 1979 | TX 341029 |
| JET | July 26, 1979 | TX 341026 |
| JET | August 2, 1979 | TX 341023 |
| JET | August 9, 1979 | TX 341022 |
| JET | August 16, 1979 | TX 341020 |
| JET | August 23, 1979 | TX 341019 |
| JET | August 30, 1979 | TX 341021 |
| JET | September 6, 1979 | TX 341025 |
| JET | September 13, 1979 | TX 341024 |
| JET | September 20, 1979 | TX 341018 |
| JET | September 27, 1979 | TX 341030 |
| JET | October 4, 1979 | TX 378409 |
| JET | October 11, 1979 | TX 378408 |
| JET | October 18, 1979 | TX 378407 |
| JET | October 25, 1979 | TX 378406 |
| JET | November 1, 1979 | TX 378405 |
| JET | November 8, 1979 | TX 378404 |
| JET | November 15, 1979 | TX 378401 |

| JET | November 22, 1979 | TX 378402 |
| JET | November 29, 1979 | TX 378403 |
| JET | December 6, 1979 | |
| JET | December 13, 1979 | |
| JET | December 20, 1979 | |
| JET | December 27, 1979 | |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | | |
| JET | May 1, 1980 | TX 526999 |
| JET | May 8, 1980 | TX 527006 |
| JET | May 15, 1980 | TX 527007 |
| JET | May 22, 1980 | TX 527008 |
| JET | May 29, 1980 | TX 527010 |
| JET | June 5, 1980 | TX 527009 |
| JET | June 12, 1980 | TX 527012 |
| JET | June 19, 1980 | TX 527011 |
| JET | June 26, 1980 | TX 527004 |
| JET | July 3, 1980 | TX 527000 |
| JET | July 10, 1980 | TX 527002 |
| JET | July 17, 1980 | TX 527001 |
| JET | July 24, 1980 | TX 527005 |
| JET | July 31, 1980 | TX 527003 |
| JET | August 7, 1980 | TX 546179 |
| JET | August 14, 1980 | TX 546181 |
| JET | August 21, 1980 | TX 546180 |
| JET | August 28, 1980 | TX 546178 |
| JET | September 4, 1980 | TX 573016 |
| JET | September 11, 1980 | TX 573017 |
| JET | September 18, 1980 | TX 573015 |
| JET | September 25, 1980 | TX 573014 |
| JET | October 2, 1980 | TX 578273 |
| JET | October 9, 1980 | TX 578271 |
| JET | October 16, 1980 | TX 578274 |
| JET | October 23, 1980 | TX 578272 |
| JET | October 30, 1980 | TX 578275 |
| JET | November 6, 1980 | TX 599711 |

| JET | November 13, 1980 | TX 599710 |
| JET | November 20, 1980 | TX 599709 |
| JET | November 27, 1980 | TX 642847 |
| JET | December 4, 1980 | TX 666504 |
| JET | December 11, 1980 | TX 666503 |
| JET | December 18, 1980 | TX 644032 |
| JET | December 25, 1980 | TX 627391 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 12, 1987 | TX 2001992 |
| JET | January 19, 1987 | TX 2001993 |
| JET | January 26, 1987 | TX 2002751 |
| JET | February 2, 1987 | TX 2193549 |
| JET | February 9, 1987 | TX 2193542 |
| JET | February 16, 1987 | TX 2193541 |
| JET | February 23, 1987 | TX 2193540 |
| JET | March 2, 1987 | TX 2193539 |
| JET | March 9, 1987 | TX 2193538 |
| JET | March 16, 1987 | TX 2193537 |
| JET | March 23, 1987 | TX 2200405 |
| JET | March 30, 1987 | TX 2198867 |
| JET | April 6, 1987 | TX 2200406 |
| JET | April 13, 1987 | TX 2200407 |
| JET | April 20, 1987 | TX 2200408 |
| JET | April 27, 1987 | TX 2200409 |
| JET | May 4, 1987 | TX 2200410 |
| JET | May 11, 1987 | TX 2200411 |
| JET | May 18, 1987 | TX 2200412 |
| JET | May 25, 1987 | TX 2218603 |
| JET | June 1, 1987 | TX 2200420 |
| JET | June 8, 1987 | TX 2193543 |
| JET | June 15, 1987 | TX 2200404 |
| JET | June 22, 1987 | TX 2200419 |
| JET | June 29, 1987 | TX 2200418 |
| JET | July 6, 1987 | TX 2200417 |
| JET | July 13, 1987 | TX 2200416 |
| JET | July 20, 1987 | TX 2200415 |
| JET | July 27, 1987 | TX 2200414 |
| JET | August 3, 1987 | TX 2200413 |
| JET | August 10, 1987 | TX 2198925 |
| JET | August 17, 1987 | TX 2198926 |
| JET | August 24, 1987 | TX 2200402 |
| JET | August 31, 1987 | TX 2193536 |
| JET | September 7, 1987 | TX 2193544 |
| JET | September 14, 1987 | TX 2193534 |
| JET | September 21, 1987 | TX 2193550 |
| JET | September 28, 1987 | TX 2193551 |
| JET | October 5, 1987 | TX 2193535 |
| JET | October 12, 1987 | TX 2193533 |
| JET | October 19, 1987 | TX 2193532 |
| JET | October 26, 1987 | TX 2193548 |
| JET | November 2, 1987 | TX 2193547 |
| JET | November 9, 1987 | TX 2193546 |
| JET | November 16, 1987 | TX 2193545 |
| JET | November 23, 1987 | TX 2200403 |

| JET | November 30, 1987 | |
| JET | December 7, 1987 | TX 2397455 |
| JET | December 14, 1987 | TX 2397447 |
| JET | December 21, 1987 | TX 2397452 |
| JET | Dec 28, 1987 - Jan 4, 1988 | TX 2397462 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|---------------------|
| JET | January 11, 1988 | TX 2397458 |
| JET | January 18, 1988 | TX 2397442 |
| JET | January 25, 1988 | TX 2397448 |
| JET | February 1, 1988 | TX 2397459 |
| JET | February 8, 1988 | TX 2397453 |
| JET | February 15, 1988 | TX 2397457 |
| JET | February 22, 1988 | TX 2397460 |
| JET | February 29, 1988 | TX 2397444 |
| JET | March 7, 1988 | TX 2397449 |
| JET | March 14, 1988 | TX 2397461 |
| JET | March 21, 1988 | TX 2397451 |
| JET | March 28, 1988 | TX 2397454 |
| JET | April 4, 1988 | TX 2397445 |
| JET | April 11, 1988 | TX 2322057 |
| JET | April 18, 1988 | TX 2397456 |
| JET | April 25, 1988 | TX 2397441 |
| JET | May 2, 1988 | TX 2397446 |
| JET | May 9, 1988 | TX 2397463 |
| JET | May 16, 1988 | TX 2397450 |
| JET | May 23, 1988 | TX 2397443 |
| JET | May 30, 1988 | TX 2456528 |
| JET | June 6, 1988 | TX 2456542 |
| JET | June 13, 1988 | TX 2453851 |
| JET | June 20, 1988 | TX 2453852 |
| JET | June 27, 1988 | TX 2453850 |
| JET | July 4, 1988 | TX 2456539 |
| JET | July 11, 1988 | TX 2456536 |
| JET | July 18, 1988 | TX 2456537 |
| JET | July 25, 1988 | TX 2456543 |
| JET | August 1, 1988 | TX 2456544 |
| JET | August 8, 1988 | TX 2456533 |
| JET | August 15, 1988 | TX 2456538 |
| JET | August 22, 1988 | TX 2456534 |
| JET | August 29, 1988 | TX 2456535 |
| JET | September 5, 1988 | TX 2456547 |
| JET | September 12, 1988 | TX 2456546 |
| JET | September 19, 1988 | TX 2456529 |
| JET | September 26, 1988 | TX 2456532 |
| JET | October 3, 1988 | TX 2453848 |
| JET | October 10, 1988 | TX 2453853 |
| JET | October 17, 1988 | TX 2456545 |
| JET | October 24, 1988 | TX 2456541 |
| JET | October 31, 1988 | TX 2456540 |
| JET | November 7, 1988 | TX 2456530 |
| JET | November 14, 1988 | TX 2456531 |
| JET | November 21, 1988 | TX 2453849 |

| JET | November 28, 1988 | TX 2453847 |
| JET | December 5, 1988 | TX 2640603 |
| JET | December 12, 1988 | TX 2640608 |
| JET | December 19, 1988 | TX 2640606 |
| JET | December 26, 1988 | TX2640609 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 9, 1995 | SE/GROUP TX 4005288 |
| JET | January 16, 1995 | SE/GROUP TX 4005288 |
| JET | January 23, 1995 | SE/GROUP TX 4005288 |
| JET | January 30, 1995 | SE/GROUP TX 4005288 |
| JET | February 6, 1995 | SE/GROUP TX 4005288 |
| JET | February 13, 1995 | SE/GROUP TX 4005288 |
| JET | February 20, 1995 | SE/GROUP TX 4005288 |
| JET | February 27, 1995 | SE/GROUP TX 4005288 |
| JET | March 6, 1995 | SE/GROUP TX 4005288 |
| JET | March 13, 1995 | SE/GROUP TX 4005288 |
| JET | March 20, 1995 | SE/GROUP TX 4005288 |
| JET | March 27, 1995 | SE/GROUP TX 4005288 |
| JET | April 3, 1995 | SE/GROUP TX 4067513 |
| JET | April 10, 1995 | SE/GROUP TX 4067513 |
| JET | April 17, 1995 | SE/GROUP TX 4067513 |
| JET | April 24, 1995 | SE/GROUP TX 4067513 |
| JET | May 1, 1995 | SE/GROUP TX 4067513 |
| JET | May 8, 1995 | SE/GROUP TX 4067513 |
| JET | May 15, 1995 | SE/GROUP TX 4067513 |
| JET | May 22, 1995 | SE/GROUP TX 4067513 |
| JET | May 29, 1995 | SE/GROUP TX 4067513 |
| JET | June 5, 1995 | SE/GROUP TX 4067513 |
| JET | June 12, 1995 | SE/GROUP TX4123233 |
| JET | June 19, 1995 | SE/GROUP TX4123233 |
| JET | June 26, 1995 | SE/GROUP TX4123233 |
| JET | July 3, 1995 | SE/GROUP TX4123233 |
| JET | July 10, 1995 | SE/GROUP TX4123233 |
| JET | July 17, 1995 | SE/GROUP TX4123233 |
| JET | July 24, 1995 | SE/GROUP TX4123233 |
| JET | July 31, 1995 | SE/GROUP TX4123233 |
| JET | August 7, 1995 | SE/GROUP TX4123233 |
| JET | August 14, 1995 | SE/GROUP TX4123233 |
| JET | August 21, 1995 | SE/GROUP TX4123233 |
| JET | August 28, 1995 | SE/GROUP TX4123233 |
| JET | September 4, 1995 | SE/GROUP TX4123233 |
| JET | September 11, 1995 | SE/GROUP TX 4224474 |
| JET | September 18, 1995 | SE/GROUP TX 4224474 |
| JET | September 25, 1995 | SE/GROUP TX 4224474 |
| JET | October 2, 1995 | SE/GROUP TX 4224474 |
| JET | October 9, 1995 | SE/GROUP TX 4224474 |
| JET | October 16, 1995 | SE/GROUP TX 4224474 |
| JET | October 23, 1995 | SE/GROUP TX 4224474 |
| JET | October 30, 1995 | SE/GROUP TX 4224474 |
| JET | November 6, 1995 | SE/GROUP TX 4224474 |
| JET | November 13, 1995 | SE/GROUP TX 4224474 |
| JET | November 20, 1995 | SE/GROUP TX 4224474 |

| JET | November 27, 1995 | SE/GROUP TX 4224474 |
| JET | December 4, 1995 | SE/GROUP TX 4224474 |
| JET | December 11, 1995 | SE/GROUP TX 4247980 |
| JET | December 18, 1995 | SE/GROUP TX 4247980 |
| JET | Dec 25, 1995 - Jan 1, 1996 | SE/GROUP TX 4247980 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 8, 1996 | SE/GROUP TX 4247981 |
| JET | January 15, 1996 | SE/GROUP TX 4247981 |
| JET | January 22, 1996 | SE/GROUP TX 4247981 |
| JET | January 29, 1996 | SE/GROUP TX 4247981 |
| JET | February 5, 1996 | SE/GROUP TX 4247981 |
| JET | February 12, 1996 | SE/GROUP TX 4247981 |
| JET | February 19, 1996 | SE/GROUP TX 4247981 |
| JET | February 26, 1996 | SE/GROUP TX 4247981 |
| JET | March 4, 1996 | SE/GROUP TX 4247981 |
| JET | March 11, 1996 | SE/GROUP TX 4327784 |
| JET | March 18, 1996 | SE/GROUP TX 4327784 |
| JET | March 25, 1996 | SE/GROUP TX 4327784 |
| JET | April 1, 1996 | SE/GROUP TX 4327784 |
| JET | April 8, 1996 | SE/GROUP TX 4327784 |
| JET | April 15, 1996 | SE/GROUP TX 4327784 |
| JET | April 22, 1996 | SE/GROUP TX 4327784 |
| JET | April 29, 1996 | SE/GROUP TX 4327784 |
| JET | May 6, 1996 | SE/GROUP TX 4327784 |
| JET | May 13, 1996 | SE/GROUP TX 4327784 |
| JET | May 20, 1996 | SE/GROUP TX 4327784 |
| JET | May 27, 1996 | SE/GROUP TX 4327784 |
| JET | June 3, 1996 | SE/GROUP TX 4327784 |
| JET | June 10, 1996 | SE/GROUP TX 4336696 |
| JET | June 17, 1996 | SE/GROUP TX 4336696 |
| JET | June 24, 1996 | SE/GROUP TX 4336696 |
| JET | July 1, 1996 | SE/GROUP TX 4336696 |
| JET | July 8, 1996 | SE/GROUP TX 4336696 |
| JET | July 15, 1996 | SE/GROUP TX 4336696 |
| JET | July 22, 1996 | SE/GROUP TX 4336696 |
| JET | July 29, 1996 | SE/GROUP TX 4336696 |
| JET | August 5, 1996 | SE/GROUP TX 4336696 |
| JET | August 12, 1996 | SE/GROUP TX 4336696 |
| JET | August 19, 1996 | SE/GROUP TX 4336696 |
| JET | August 26, 1996 | SE/GROUP TX 4336696 |
| JET | September 2, 1996 | SE/GROUP TX 4336696 |
| JET | September 9, 1996 | SE/GROUP TX 4388859 |
| JET | September 16, 1996 | SE/GROUP TX 4388859 |
| JET | September 23, 1996 | SE/GROUP TX 4388859 |
| JET | September 30, 1996 | SE/GROUP TX 4388859 |
| JET | October 7, 1996 | SE/GROUP TX 4388859 |
| JET | October 14, 1996 | SE/GROUP TX 4388859 |
| JET | October 21, 1996 | SE/GROUP TX 4388859 |
| JET | October 28, 1996 | SE/GROUP TX 4388859 |
| JET | November 4, 1996 | SE/GROUP TX 4388859 |
| JET | November 11, 1996 | SE/GROUP TX 4388859 |
| JET | November 18, 1996 | SE/GROUP TX 4388859 |

| | | |
|---|---|---|
| JET | November 25, 1996 | SE/GROUP TX 4388859 |
| JET | December 2, 1996 | SE/GROUP TX 4388859 |
| JET | December 9, 1996 | SE/GROUP TX 4506004 |
| JET | December 16, 1996 | SE/GROUP TX 4506004 |
| JET | December 23, 1996 | SE/GROUP TX 4506004 |
| JET | Dec 30, 1996 - Jan 6, 1997 | SE/GROUP TX 4506004 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 13, 1997 | SE/GROUP TX 4506003 |
| JET | January 20, 1997 | SE/GROUP TX 4506003 |
| JET | January 27, 1997 | SE/GROUP TX 4506003 |
| JET | February 3, 1997 | SE/GROUP TX 4506003 |
| JET | February 10, 1997 | SE/GROUP TX 4506003 |
| JET | February 17, 1997 | SE/GROUP TX 4506003 |
| JET | February 24, 1997 | SE/GROUP TX 4506003 |
| JET | March 3, 1997 | SE/GROUP TX 4506003 |
| JET | March 10, 1997 | SE/GROUP TX 4513277 |
| JET | March 17, 1997 | SE/GROUP TX 4513277 |
| JET | March 24, 1997 | SE/GROUP TX 4513277 |
| JET | March 31, 1997 | SE/GROUP TX 4513277 |
| JET | April 7, 1997 | SE/GROUP TX 4513277 |
| JET | April 14, 1997 | SE/GROUP TX 4513277 |
| JET | April 21, 1997 | SE/GROUP TX 4513277 |
| JET | April 28, 1997 | SE/GROUP TX 4513277 |
| JET | May 5, 1997 | SE/GROUP TX 4513277 |
| JET | May 12, 1997 | SE/GROUP TX 4513277 |
| JET | May 19, 1997 | SE/GROUP TX 4513277 |
| JET | May 26, 1997 | SE/GROUP TX 4513277 |
| JET | June 2, 1997 | SE/GROUP TX 4513277 |
| JET | June 9, 1997 | SE/GROUP TX 4534786 |
| JET | June 16, 1997 | SE/GROUP TX 4534786 |
| JET | June 23, 1997 | SE/GROUP TX 4534786 |
| JET | June 30, 1997 | SE/GROUP TX 4534786 |
| JET | July 7, 1997 | SE/GROUP TX 4534786 |
| JET | July 14, 1997 | SE/GROUP TX 4534786 |
| JET | July 21, 1997 | SE/GROUP TX 4534786 |
| JET | July 28, 1997 | SE/GROUP TX 4534786 |
| JET | August 4, 1997 | SE/GROUP TX 4534786 |
| JET | August 11, 1997 | SE/GROUP TX 4534786 |
| JET | August 18, 1997 | SE/GROUP TX 4534786 |
| JET | August 25, 1997 | SE/GROUP TX 4534786 |
| JET | September 1, 1997 | SE/GROUP TX 4534786 |
| JET | September 8, 1997 | SE/GROUP TX 4554955 |
| JET | September 15, 1997 | SE/GROUP TX 4554955 |
| JET | September 22, 1997 | SE/GROUP TX 4554955 |
| JET | September 29, 1997 | SE/GROUP TX 4554955 |
| JET | October 6, 1997 | SE/GROUP TX 4554955 |
| JET | October 13, 1997 | SE/GROUP TX 4554955 |
| JET | October 20, 1997 | SE/GROUP TX 4554955 |
| JET | October 27, 1997 | SE/GROUP TX 4554955 |
| JET | November 3, 1997 | SE/GROUP TX 4554955 |
| JET | November 10, 1997 | SE/GROUP TX 4554955 |
| JET | November 17, 1997 | SE/GROUP TX 4554955 |
| JET | November 24, 1997 | SE/GROUP TX 4554955 |

| | | |
|---|---|---|
| JET | December 1, 1997 | SE/GROUP TX 4554955 |
| JET | December 8, 1997 | SE/GROUP TX 4621041 |
| JET | December 15, 1997 | SE/GROUP TX 4621041 |
| JET | December 22, 1997 | SE/GROUP TX 4621041 |
| JET | Dec 29, 1997 - Jan 5, 1998 | SE/GROUP TX 4621041 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|---|---|---|
| JET | January 12, 1998 | SE/GROUP TX 4621040 |
| JET | January 19, 1998 | SE/GROUP TX 4621040 |
| JET | January 26, 1998 | SE/GROUP TX 4621040 |
| JET | February 2, 1998 | SE/GROUP TX 4621040 |
| JET | February 9, 1998 | SE/GROUP TX 4621040 |
| JET | February 16, 1998 | SE/GROUP TX 4621040 |
| JET | February 23, 1998 | SE/GROUP TX 4621040 |
| JET | March 2, 1998 | SE/GROUP TX 4621040 |
| JET | March 9, 1998 | SE/GROUP TX 4621040 |
| JET | March 16, 1998 | SE/GROUP TX 4705709 |
| JET | March 23, 1998 | SE/GROUP TX 4705709 |
| JET | March 30, 1998 | SE/GROUP TX 4705709 |
| JET | April 6, 1998 | SE/GROUP TX 4705709 |
| JET | April 13, 1998 | SE/GROUP TX 4705709 |
| JET | April 20, 1998 | SE/GROUP TX 4705709 |
| JET | April 27, 1998 | SE/GROUP TX 4705709 |
| JET | May 4, 1998 | SE/GROUP TX 4705709 |
| JET | May 11, 1998 | SE/GROUP TX 4705709 |
| JET | May 18, 1998 | SE/GROUP TX 4705709 |
| JET | May 25, 1998 | SE/GROUP TX 4705709 |
| JET | June 1, 1998 | SE/GROUP TX 4705709 |
| JET | June 8, 1998 | SE/GROUP TX 4705709 |
| JET | June 15, 1998 | SE/GROUP TX 4754267 |
| JET | June 22, 1998 | SE/GROUP TX 4754267 |
| JET | June 29, 1998 | SE/GROUP TX 4754267 |
| JET | July 6, 1998 | SE/GROUP TX 4754267 |
| JET | July 13, 1998 | SE/GROUP TX 4754267 |
| JET | July 20, 1998 | SE/GROUP TX 4754267 |
| JET | July 27, 1998 | SE/GROUP TX 4754267 |
| JET | August 3, 1998 | SE/GROUP TX 4754267 |
| JET | August 10, 1998 | SE/GROUP TX 4754267 |
| JET | August 17, 1998 | SE/GROUP TX 4754267 |
| JET | August 24, 1998 | SE/GROUP TX 4754267 |
| JET | August 31, 1998 | SE/GROUP TX 4754267 |
| JET | September 7, 1998 | SE/GROUP TX 4754267 |
| JET | September 14, 1998 | SE/GROUP TX 4827294 |
| JET | September 21, 1998 | SE/GROUP TX 4827294 |
| JET | September 28, 1998 | SE/GROUP TX 4827294 |
| JET | October 5, 1998 | SE/GROUP TX 4827294 |
| JET | October 12, 1998 | SE/GROUP TX 4827294 |
| JET | October 19, 1998 | SE/GROUP TX 4827294 |
| JET | October 26, 1998 | SE/GROUP TX 4827294 |
| JET | November 2, 1998 | SE/GROUP TX 4827294 |
| JET | November 9, 1998 | SE/GROUP TX 4827294 |
| JET | November 16, 1998 | SE/GROUP TX 4827294 |
| JET | November 23, 1998 | SE/GROUP TX 4827294 |

| | | |
|---|---|---|
| JET | November 30, 1998 | SE/GROUP TX 4827294 |
| JET | December 7, 1998 | SE/GROUP TX 4827294 |
| JET | December 14, 1998 | SE/GROUP TX 4873694 |
| JET | December 21, 1998 | SE/GROUP TX 4873694 |
| JET | Dec 28, 1998 - Jan 4, 1999 | SE/GROUP TX 4873694 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|-----------|--------------------|
| JET | January 11, 1999 | SE/GROUP TX 4870926 |
| JET | January 18, 1999 | SE/GROUP TX 4870926 |
| JET | January 25, 1999 | SE/GROUP TX 4870926 |
| JET | February 1, 1999 | SE/GROUP TX 4870926 |
| JET | February 8, 1999 | SE/GROUP TX 4870926 |
| JET | February 15, 1999 | SE/GROUP TX 4870926 |
| JET | February 22, 1999 | SE/GROUP TX 4870926 |
| JET | March 1, 1999 | SE/GROUP TX 4870926 |
| JET | March 8, 1999 | SE/GROUP TX 4870926 |
| JET | March 15, 1999 | SE/GROUP TX 4870926 |
| JET | March 22, 1999 | SE/GROUP TX 4870926 |
| JET | March 29, 1999 | SE/GROUP TX 4920154 |
| JET | April 5, 1999 | SE/GROUP TX 4920154 |
| JET | April 12, 1999 | SE/GROUP TX 4920154 |
| JET | April 19, 1999 | SE/GROUP TX 4920154 |
| JET | April 26, 1999 | SE/GROUP TX 4920154 |
| JET | May 3, 1999 | SE/GROUP TX 4920154 |
| JET | May 10, 1999 | SE/GROUP TX 4920154 |
| JET | May 17, 1999 | SE/GROUP TX 4920154 |
| JET | May 24, 1999 | SE/GROUP TX 4920154 |
| JET | May 31, 1999 | SE/GROUP TX 4920154 |
| JET | June 7, 1999 | SE/GROUP TX 4920154 |
| JET | June 14, 1999 | SE/GROUP TX 4920154 |
| JET | June 21, 1999 | SE/GROUP TX 4920154 |
| JET | June 28, 1999 | SE/GROUP TX 5006123 |
| JET | July 5, 1999 | SE/GROUP TX 5006123 |
| JET | July 12, 1999 | SE/GROUP TX 5006123 |
| JET | July 19, 1999 | SE/GROUP TX 5006123 |
| JET | July 26, 1999 | SE/GROUP TX 5006123 |
| JET | August 2, 1999 | SE/GROUP TX 5006123 |
| JET | August 9, 1999 | SE/GROUP TX 5006123 |
| JET | August 16, 1999 | SE/GROUP TX 5006123 |
| JET | August 23, 1999 | SE/GROUP TX 5006123 |
| JET | August 30, 1999 | SE/GROUP TX 5006123 |
| JET | September 6, 1999 | SE/GROUP TX 5006123 |
| JET | September 13, 1999 | SE/GROUP TX 5006123 |
| JET | September 20, 1999 | SE/GROUP TX 5006123 |
| JET | September 27, 1999 | SE/GROUP TX 5006123 |
| JET | October 4, 1999 | SE/GROUP TX 5201571 |
| JET | October 11, 1999 | SE/GROUP TX 5201571 |
| JET | October 18, 1999 | SE/GROUP TX 5201571 |
| JET | October 25, 1999 | SE/GROUP TX 5201571 |
| JET | November 1, 1999 | SE/GROUP TX 5201571 |
| JET | November 8, 1999 | SE/GROUP TX 5201571 |
| JET | November 15, 1999 | SE/GROUP TX 5201571 |
| JET | November 22, 1999 | SE/GROUP TX 5201571 |

| JET | November 29, 1999 | SE/GROUP TX 5201571 |
| JET | December 6, 1999 | SE/GROUP TX 5201571 |
| JET | December 13, 1999 | SE/GROUP TX 5201571 |
| JET | December 20, 1999 | SE/GROUP TX 5201571 |
| JET | Dec 27, 1999 - Jan 3, 2000 | SE/GROUP TX 5201571 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|---|---|---|---|
| JET | January 10, 2000 | SE /GROUP | TX 5-201-572 |
| JET | January 17, 2000 | SE /GROUP | TX 5-201-573 |
| JET | January 24, 2000 | SE /GROUP | TX 5-201-574 |
| JET | January 31, 2000 | SE /GROUP | TX 5-201-575 |
| JET | February 7, 2000 | SE /GROUP | TX 5-201-576 |
| JET | February 14, 2000 | SE /GROUP | TX 5-201-577 |
| JET | February 21, 2000 | SE /GROUP | TX 5-201-578 |
| JET | February 28, 2000 | SE /GROUP | TX 5-201-579 |
| JET | March 6, 2000 | SE /GROUP | TX 5-201-580 |
| JET | March 13, 2000 | SE /GROUP | TX 5-201-581 |
| JET | March 20, 2000 | SE /GROUP | TX 5-201-582 |
| JET | March 27, 2000 | SE /GROUP | TX 5-201-583 |
| JET | April 3, 2000 | SE/GROUP | TX 5-006-440 |
| JET | April 10, 2000 | SE/GROUP | TX 5-006-440 |
| JET | April 17, 2000 | SE/GROUP | TX 5-006-440 |
| JET | April 24, 2000 | SE/GROUP | TX 5-006-440 |
| JET | May 1, 2000 | SE/GROUP | TX 5-006-440 |
| JET | May 8, 2000 | SE/GROUP | TX 5-006-440 |
| JET | May 15, 2000 | SE/GROUP | TX 5-006-440 |
| JET | May 22, 2000 | SE/GROUP | TX 5-006-440 |
| JET | May 29, 2000 | SE/GROUP | TX 5-006-440 |
| JET | June 5, 2000 | SE/GROUP | TX 5-006-440 |
| JET | June 12, 2000 | SE/GROUP | TX 5-006-440 |
| JET | June 19, 2000 | SE/GROUP | TX 5-006-440 |
| JET | June 26, 2000 | SE/GROUP | TX 5-006-440 |
| JET | July 3, 2000 | SE/GROUP | TX 5-006-440 |
| JET | July 10, 2000 | SE/GROUP | TX 5-006-441 |
| JET | July 17, 2000 | SE/GROUP | TX 5-006-441 |
| JET | July 24, 2000 | SE/GROUP | TX 5-006-441 |
| JET | July 31, 2000 | SE/GROUP | TX 5-006-441 |
| JET | August 7, 2000 | SE/GROUP | TX 5-219-864 |
| JET | August 14, 2000 | SE/GROUP | TX 5-219-864 |
| JET | August 21, 2000 | SE/GROUP | TX 5-219-864 |
| JET | August 28, 2000 | SE/GROUP | TX 5-219-864 |
| JET | September 4, 2000 | SE/GROUP | TX 5-219-864 |
| JET | September 11, 2000 | SE/GROUP | TX 5-219-864 |
| JET | September 18, 2000 | SE/GROUP | TX 5-219-864 |
| JET | September 25, 2000 | SE/GROUP | TX 5-219-864 |
| JET | October 2, 2000 | SE/GROUP | TX 5-219-864 |
| JET | October 9, 2000 | SE/GROUP | TX 5-219-864 |
| JET | October 16, 2000 | SE/GROUP | TX 5-219-864 |
| JET | October 23, 2000 | SE/GROUP | TX 5-219-864 |
| JET | October 30, 2000 | SE/GROUP | TX 5-219-864 |
| JET | November 6, 2000 | SE/GROUP | TX 5-219-864 |
| JET | November 13, 2000 | SE/GROUP | TX 5-219-865 |
| JET | November 20, 2000 | SE/GROUP | TX 5-219-865 |

| JET | November 27, 2000 | SE/GROUP | TX 5-219-865 |
| JET | December 4, 2000 | SE/GROUP | TX 6-078-911 |
| JET | December 11, 2000 | SE/GROUP | TX 6-078-911 |
| JET | December 18, 2000 | SE/GROUP | TX 6-078-911 |
| JET | Dec 25, 2000 - Jan 1, 2001 | SE/GROUP | TX 6-078-911 |
| JET | | | |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER |
|----------|------------|---------------------|
| JET | January 8, 2001 | SE/GROUP TX 6-078-910 |
| JET | January 15, 2001 | SE/GROUP TX 6-078-910 |
| JET | January 22, 2001 | SE/GROUP TX 6-078-910 |
| JET | January 29, 2001 | SE/GROUP TX 6-078-910 |
| JET | February 5, 2001 | SE/GROUP TX 6-078-910 |
| JET | February 12, 2001 | SE/GROUP TX 6-078-910 |
| JET | February 19, 2001 | SE/GROUP TX 6-078-910 |
| JET | February 26, 2001 | SE/GROUP TX 6-078-910 |
| JET | March 5, 2001 | SE/GROUP TX 6-078-910 |
| JET | March 12, 2001 | SE/GROUP TX 6-078-910 |
| JET | March 19, 2001 | SE/GROUP TX 5-463-552 |
| JET | March 26, 2001 | SE/GROUP TX 5-463-552 |
| JET | April 2, 2001 | SE/GROUP TX 5-463-552 |
| JET | April 9, 2001 | SE/GROUP TX 5-463-552 |
| JET | April 16, 2001 | SE/GROUP TX 5-463-552 |
| JET | April 23, 2001 | SE/GROUP TX 5-463-552 |
| JET | April 30, 2001 | SE/GROUP TX 5-463-552 |
| JET | May 7, 2001 | SE/GROUP TX 5-463-552 |
| JET | May 14, 2001 | SE/GROUP TX 5-463-552 |
| JET | May 21, 2001 | SE/GROUP TX 5-463-552 |
| JET | May 28, 2001 | SE/GROUP TX 5-463-552 |
| JET | June 4, 2001 | SE/GROUP TX 5-463-552 |
| JET | June 11, 2001 | SE/GROUP TX 5-463-552 |
| JET | June 18, 2001 | SE/GROUP TX 5-463-551 |
| JET | June 25, 2001 | SE/GROUP TX 5-463-551 |
| JET | July 2, 2001 | SE/GROUP TX 5-463-551 |
| JET | July 9, 2001 | SE/GROUP TX 5-463-551 |
| JET | July 16, 2001 | SE/GROUP TX 5-463-551 |
| JET | July 23, 2001 | SE/GROUP TX 5-463-551 |
| JET | July 30, 2001 | SE/GROUP TX 5-463-551 |
| JET | August 6, 2001 | SE/GROUP TX 5-463-551 |
| JET | August 13, 2001 | SE/GROUP TX 5-463-551 |
| JET | August 20, 2001 | SE/GROUP TX 5-463-551 |
| JET | August 27, 2001 | SE/GROUP TX 5-463-551 |
| JET | September 3, 2001 | SE/GROUP TX 5-463-551 |
| JET | September 10, 2001 | SE/GROUP TX 5-463-551 |
| JET | September 17, 2001 | SE/GROUP TX 5-463-551 |
| JET | September 24, 2001 | SE/GROUP TX 5-463-553 |
| JET | October 1, 2001 | SE/GROUP TX 5-463-553 |
| JET | October 8, 2001 | SE/GROUP TX 5-463-553 |
| JET | October 15, 2001 | SE/GROUP TX 5-463-553 |
| JET | October 22, 2001 | SE/GROUP TX 5-463-553 |
| JET | October 29, 2001 | SE/GROUP TX 5-463-553 |
| JET | November 5, 2001 | SE/GROUP TX 5-463-553 |
| JET | November 12, 2001 | SE/GROUP TX 5-463-553 |
| JET | November 19, 2001 | SE/GROUP TX 5-463-553 |

| JET | November 26, 2001 | SE/GROUP | TX 5-463-553 |
| JET | December 3, 2001 | SE/GROUP | TX 5-463-553 |
| JET | December 10, 2001 | SE/GROUP | TX 5-463-553 |
| JET | December 17, 2001 | SE/GROUP | TX 5-463-553 |
| JET | Dec 24 - 31, 2001 | SE/GROUP | TX 5-463-553 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|-----------|---------------------|--|
| JET | January 7, 2002 | SE | TX 5-607-346 |
| JET | January 14, 2002 | SE/GROUP | TX 5-577-527 |
| JET | January 21, 2002 | SE/GROUP | TX 5-577-527 |
| JET | January 28, 2002 | SE/GROUP | TX 5-577-527 |
| JET | February 4, 2002 | SE/GROUP | TX 5-577-527 |
| JET | February 11, 2002 | SE/GROUP | TX 5-577-527 |
| JET | February 18, 2002 | SE/GROUP | TX 5-577-527 |
| JET | February 25, 2002 | SE/GROUP | TX 5-577-527 |
| JET | March 4, 2002 | SE/GROUP | TX 5-577-527 |
| JET | March 11, 2002 | SE/GROUP | TX 5-577-527 |
| JET | March 18, 2002 | SE/GROUP | TX 5-577-527 |
| JET | March 25, 2002 | SE/GROUP | TX 5-577-527 |
| JET | April 1, 2002 | SE/GROUP | TX 5-557-526 |
| JET | April 8, 2002 | SE/GROUP | TX 5-557-526 |
| JET | April 15, 2002 | SE/GROUP | TX 5-557-526 |
| JET | April 22, 2002 | SE/GROUP | TX 5-557-526 |
| JET | April 29, 2002 | SE/GROUP | TX 5-557-526 |
| JET | May 6, 2002 | SE/GROUP | TX 5-557-526 |
| JET | May 13, 2002 | SE/GROUP | TX 5-557-526 |
| JET | May 20, 2002 | SE/GROUP | TX 5-557-526 |
| JET | May 27, 2002 | SE/GROUP | TX 5-557-526 |
| JET | June 3, 2002 | SE/GROUP | TX 5-557-526 |
| JET | June 10, 2002 | SE/GROUP | TX 5-557-526 |
| JET | June 17, 2002 | SE/GROUP | TX 5-557-526 |
| JET | June 24, 2002 | SE/GROUP | TX 5-557-526 |
| JET | July 1, 2002 | SE/GROUP | TX 5/683-158 |
| JET | July 8, 2002 | SE/GROUP | TX 5/683-158 |
| JET | July 15, 2002 | SE/GROUP | TX 5/683-158 |
| JET | July 22, 2002 | SE/GROUP | TX 5/683-158 |
| JET | July 29, 2002 | SE/GROUP | TX 5/683-158 |
| JET | August 5, 2002 | SE/GROUP | TX 5/683-158 |
| JET | August 12, 2002 | SE/GROUP | TX 5/683-158 |
| JET | August 19, 2002 | SE/GROUP | TX 5/683-158 |
| JET | August 26, 2002 | SE/GROUP | TX 5/683-158 |
| JET | September 2, 2002 | SE/GROUP | TX 5/683-158 |
| JET | September 9, 2002 | SE/GROUP | TX 5/683-158 |
| JET | September 16, 2002 | SE/GROUP | TX 5/683-158 |
| JET | September 23, 2002 | SE/GROUP | TX 5/683-158 |
| JET | September 30, 2002 | SE/GROUP | TX 5/683-158 |
| JET | October 7, 2002 | SE/GROUP | TX 5-683-159 |
| JET | October 14, 2002 | SE/GROUP | TX 5-683-159 |
| JET | October 21, 2002 | SE/GROUP | TX 5-683-159 |
| JET | October 28, 2002 | SE/GROUP | TX 5-683-159 |
| JET | November 4, 2002 | SE/GROUP | TX 5-683-159 |
| JET | November 11, 2002 | SE/GROUP | TX 5-683-159 |
| JET | November 18, 2002 | SE/GROUP | TX 5-683-159 |

| | | | |
|-----|---------------------|----------|------------|
| JET | November 25, 2002   | SE/GROUP | TX 5-683-159 |
| JET | December 2, 2002    | SE/GROUP | TX 5-683-159 |
| JET | December 9, 2002    | SE/GROUP | TX 5-683-159 |
| JET | December 16, 2002   | SE/GROUP | TX 5-683-159 |
| JET | Dec 23 - Dec 30, 2002 | SE/GROUP | TX 5-683-159 |
| JET | January 6, 2003     | SE/GROUP | TX 5-683-159 |

| MAGAZINE | ISSUE DATE | | REGISTRATION NUMBER |
|---|---|---|---|
| JET | January 13, 2003 | SE/GROUP | TX 5-840-712 |
| JET | January 20, 2003 | SE/GROUP | TX 5-840-712 |
| JET | January 27, 2003 | SE/GROUP | TX 5-840-712 |
| JET | February 3, 2003 | SE/GROUP | TX 5-840-712 |
| JET | February 10, 2003 | SE/GROUP | TX 5-840-712 |
| JET | February 17, 2003 | SE/GROUP | TX 5-840-712 |
| JET | February 24, 2003 | SE/GROUP | TX 5-840-712 |
| JET | March 3, 2003 | SE/GROUP | TX 5-840-712 |
| JET | March 10, 2003 | SE/GROUP | TX 5-840-712 |
| JET | March 17, 2003 | SE/GROUP | TX 5-840-712 |
| JET | March 24, 2003 | SE/GROUP | TX 5-840-712 |
| JET | March 31, 2003 | SE/GROUP | TX 5-840-712 |
| JET | April 7, 2003 | SE/GROUP | TX 5-840-711 |
| JET | April 14, 2003 | SE/GROUP | TX 5-840-711 |
| JET | April 21, 2003 | SE/GROUP | TX 5-840-711 |
| JET | April 28, 2003 | SE/GROUP | TX 5-840-711 |
| JET | May 5, 2003 | SE/GROUP | TX 5-840-711 |
| JET | May 12, 2003 | SE/GROUP | TX 5-840-711 |
| JET | May 19, 2003 | SE/GROUP | TX 5-840-711 |
| JET | May 26, 2003 | SE/GROUP | TX 5-840-711 |
| JET | June 2, 2003 | SE/GROUP | TX 5-840-711 |
| JET | June 9, 2003 | SE/GROUP | TX 5-840-711 |
| JET | June 16, 2003 | SE/GROUP | TX 5-840-711 |
| JET | June 23, 2003 | SE/GROUP | TX 5-840-711 |
| JET | June 30, 2003 | SE/GROUP | TX 5-840-711 |
| JET | July 7, 2003 | SE/GROUP | TX 5-879-577 |
| JET | July 14, 2003 | SE/GROUP | TX 5-879-577 |
| JET | July 21, 2003 | SE/GROUP | TX 5-879-577 |
| JET | July 28, 2003 | SE/GROUP | TX 5-879-577 |
| JET | August 4, 2003 | SE/GROUP | TX 5-879-577 |
| JET | August 11, 2003 | SE/GROUP | TX 5-879-577 |
| JET | August 18, 2003 | SE/GROUP | TX 5-879-577 |
| JET | August 25, 2003 | SE/GROUP | TX 5-879-577 |
| JET | September 1, 2003 | SE/GROUP | TX 5-879-577 |
| JET | September 8, 2003 | SE/GROUP | TX 5-879-577 |
| JET | September 15, 2003 | SE/GROUP | TX 5-879-577 |
| JET | September 22, 2003 | SE/GROUP | TX 5-879-577 |
| JET | September 29, 2003 | SE/GROUP | TX 5-879-577 |
| JET | October 6, 2003 | SE/GROUP | TX 5-879-496 |
| JET | October 13, 2003 | SE/GROUP | TX 5-879-496 |
| JET | October 20, 2003 | SE/GROUP | TX 5-879-496 |
| JET | October 27, 2003 | SE/GROUP | TX 5-879-496 |
| JET | November 3, 2003 | SE/GROUP | TX 5-879-496 |
| JET | November 10, 2003 | SE/GROUP | TX 5-879-496 |
| JET | November 17, 2003 | SE/GROUP | TX 5-879-496 |
| JET | November 24, 2003 | SE/GROUP | TX 5-879-496 |

| JET | December 1, 2003 | SE/GROUP | TX 5-879-496 |
| JET | December 8, 2003 | SE/GROUP | TX 5-879-496 |
| JET | December 15, 2003 | SE/GROUP | TX 5-879-496 |
| JET | Dec 22 - 29, 2003 | SE/GROUP | TX 5-879-496 |
| JET | January 5, 2004 | SE/GROUP | TX 5-879-496 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|---|---|---|---|
| JET | January 5, 2004 | SE | TX 6-012-300 |
| JET | January 12, 2004 | SE/GROUP | TX 5-999-933 |
| JET | January 19, 2004 | SE/GROUP | TX 5-999-933 |
| JET | January 26, 2004 | SE/GROUP | TX 5-999-933 |
| JET | February 2, 2004 | SE/GROUP | TX 5-999-933 |
| JET | February 9, 2004 | SE/GROUP | TX 5-999-933 |
| JET | February 16, 2004 | SE/GROUP | TX 5-999-933 |
| JET | February 23, 2004 | SE/GROUP | TX 5-999-933 |
| JET | March 1, 2004 | SE/GROUP | TX 5-999-933 |
| JET | March 8, 2004 | SE/GROUP | TX 5-999-933 |
| JET | March 15, 2004 | SE/GROUP | TX 5-999-933 |
| JET | March 22, 2004 | SE/GROUP | TX 5-999-933 |
| JET | March 29, 2004 | SE/GROUP | TX 5-999-933 |
| JET | April 5, 2004 | SE/GROUP | TX 5-999-934 |
| JET | April 12, 2004 | SE/GROUP | TX 5-999-934 |
| JET | April 19, 2004 | SE/GROUP | TX 5-999-934 |
| JET | April 26, 2004 | SE/GROUP | TX 5-999-934 |
| JET | May 3, 2004 | SE/GROUP | TX 5-999-934 |
| JET | May 10, 2004 | SE/GROUP | TX 5-999-934 |
| JET | May 17, 2004 | SE/GROUP | TX 5-999-934 |
| JET | May 24, 2004 | SE/GROUP | TX 5-999-934 |
| JET | May 31, 2004 | SE/GROUP | TX 5-999-934 |
| JET | June 7, 2004 | SE/GROUP | TX 5-999-934 |
| JET | June 14, 2004 | SE/GROUP | TX 5-999-934 |
| JET | June 21, 2004 | SE/GROUP | TX 5-999-934 |
| JET | June 28, 2004 | SE/GROUP | TX 5-999-934 |
| JET | July 5, 2004 | SE/GROUP | TX 6-099-404 |
| JET | July 12, 2004 | SE/GROUP | TX 6-099-404 |
| JET | July 19, 2004 | SE/GROUP | TX 6-099-404 |
| JET | July 26, 2004 | SE/GROUP | TX 6-099-404 |
| JET | August 2, 2004 | SE/GROUP | TX 6-099-404 |
| JET | August 9, 2004 | SE/GROUP | TX 6-099-404 |
| JET | August 16, 2004 | SE/GROUP | TX 6-099-404 |
| JET | August 23, 2004 | SE/GROUP | TX 6-099-404 |
| JET | August 30, 2004 | SE/GROUP | TX 6-099-404 |
| JET | September 6, 2004 | SE/GROUP | TX 6-099-404 |
| JET | September 13, 2004 | SE/GROUP | TX 6-099-404 |
| JET | September 20, 2004 | SE/GROUP | TX 6-099-404 |
| JET | September 27, 2004 | SE/GROUP | TX 6-099-404 |
| JET | October 4, 2004 | SE/GROUP | TX 6-099-405 |
| JET | October 11, 2004 | SE/GROUP | TX 6-099-405 |
| JET | October 18, 2004 | SE/GROUP | TX 6-099-405 |
| JET | October 25, 2004 | SE/GROUP | TX 6-099-405 |
| JET | November 1, 2004 | SE/GROUP | TX 6-099-405 |
| JET | November 8, 2004 | SE/GROUP | TX 6-099-405 |
| JET | November 15, 2004 | SE/GROUP | TX 6-099-405 |

| JET | November 22, 2004 | SE/GROUP | TX 6-099-405 |
| JET | November 29, 2004 | SE/GROUP | TX 6-099-405 |
| JET | December 6, 2004 | SE/GROUP | TX 6-099-405 |
| JET | December 13, 2004 | SE/GROUP | TX 6-099-405 |
| JET | December 20, 2004 | SE/GROUP | TX 6-099-405 |
| JET | Dec 27, 2004 - Jan 3, 3005 | SE/GROUP | TX 6-099-405 |

| MAGAZINE | ISSUE DATE | | REGISTRATION NUMBER |
|----------|------------|--|--------------------|
| JET | January 10, 2005 | SE/GROUP | TX 6-236-436 |
| JET | January 17, 2005 | SE/GROUP | TX 6-236-436 |
| JET | January 24, 2005 | SE/GROUP | TX 6-236-436 |
| JET | January 31, 2005 | SE/GROUP | TX 6-236-436 |
| JET | February 7, 2005 | SE/GROUP | TX 6-236-436 |
| JET | February 14, 2005 | SE/GROUP | TX 6-236-436 |
| JET | February 21, 2005 | SE/GROUP | TX 6-236-436 |
| JET | February 28, 2005 | SE/GROUP | TX 6-236-436 |
| JET | March 7, 2005 | SE/GROUP | TX 6-236-436 |
| JET | March 14, 2005 | SE/GROUP | TX 6-236-436 |
| JET | March 21, 2005 | SE/GROUP | TX 6-236-436 |
| JET | March 28, 2005 | SE/GROUP | TX 6-236-436 |
| JET | April 4, 2005 | SE/GROUP | TX 6-236-435 |
| JET | April 11, 2005 | SE/GROUP | TX 6-236-435 |
| JET | April 18, 2005 | SE/GROUP | TX 6-236-435 |
| JET | April 25, 2005 | SE/GROUP | TX 6-236-435 |
| JET | May 2, 2005 | SE/GROUP | TX 6-236-435 |
| JET | May 9, 2005 | SE/GROUP | TX 6-236-435 |
| JET | May 16, 2005 | SE/GROUP | TX 6-236-435 |
| JET | May 23, 2005 | SE/GROUP | TX 6-236-435 |
| JET | May 30, 2005 | SE/GROUP | TX 6-236-435 |
| JET | June 6, 2005 | SE/GROUP | TX 6-236-435 |
| JET | June 13, 2005 | SE/GROUP | TX 6-236-435 |
| JET | June 20, 2005 | SE/GROUP | TX 6-236-435 |
| JET | June 27, 2005 | SE/GROUP | TX 6-236-435 |
| JET | July 4, 2005 | SE/GROUP | TX 6-297-971 |
| JET | July 11, 2005 | SE/GROUP | TX 6-297-971 |
| JET | July 18, 2005 | SE/GROUP | TX 6-297-971 |
| JET | July 25, 2005 | SE/GROUP | TX 6-297-971 |
| JET | August 1, 2005 | SE/GROUP | TX 6-297-971 |
| JET | August 8, 2005 | SE/GROUP | TX 6-297-971 |
| JET | August 15, 2005 | SE/GROUP | TX 6-297-971 |
| JET | August 22, 2005 | SE/GROUP | TX 6-297-971 |
| JET | August 29, 2005 | SE/GROUP | TX 6-297-971 |
| JET | September 5, 2005 | SE/GROUP | TX 6-297-971 |
| JET | September 12, 2005 | SE/GROUP | TX 6-297-971 |
| JET | September 19, 2005 | SE/GROUP | TX 6-297-971 |
| JET | September 26, 2005 | SE/GROUP | TX 6-297-971 |
| JET | October 3, 2005 | SE/GROUP | TX 6-297-972 |
| JET | October 10, 2005 | SE/GROUP | TX 6-297-972 |
| JET | October 17, 2005 | SE/GROUP | TX 6-297-972 |
| JET | October 24, 2005 | SE/GROUP | TX 6-297-972 |
| JET | October 31, 2005 | SE/GROUP | TX 6-297-972 |
| JET | November 7, 2005 | SE/GROUP | TX 6-297-972 |
| JET | November 14, 2005 | SE/GROUP | TX 6-297-972 |
| JET | November 21, 2005 | SE/GROUP | TX 6-297-972 |

| JET | November 28, 2005 | SE/GROUP | TX 6-297-972 |
| JET | December 5, 2005 | SE/GROUP | TX 6-297-972 |
| JET | December 12, 2005 | SE/GROUP | TX 6-297-972 |
| JET | December 19, 2005 | SE/GROUP | TX 6-297-972 |
| JET | Dec 26, 2005 - Jan 2, 2006 | SE/GROUP | TX 6-297-972 |

| MAGAZINE | ISSUE DATE | | REGISTRATION NUMBER |
|---|---|---|---|
| JET | January 9, 2006 | SE/GROUP | TX 6-397-715 |
| JET | January 16, 2006 | SE/GROUP | TX 6-397-715 |
| JET | January 23, 2006 | SE/GROUP | TX 6-397-715 |
| JET | January 30, 2006 | SE/GROUP | TX 6-397-715 |
| JET | February 6, 2006 | SE/GROUP | TX 6-397-715 |
| JET | February 13, 2006 | SE/GROUP | TX 6-397-715 |
| JET | February 20, 2006 | SE/GROUP | TX 6-397-715 |
| JET | February 27, 2006 | SE/GROUP | TX 6-397-715 |
| JET | March 6, 2006 | SE/GROUP | TX 6-397-715 |
| JET | March 13, 2006 | SE/GROUP | TX 6-397-715 |
| JET | March 20, 2006 | SE/GROUP | TX 6-397-715 |
| JET | March 27, 2006 | SE/GROUP | TX 6-397-715 |
| JET | April 3, 2006 | SE/GROUP | TX 6-398-612 |
| JET | April 10, 2006 | SE/GROUP | TX 6-398-612 |
| JET | April 17, 2006 | SE/GROUP | TX 6-398-612 |
| JET | April 24, 2006 | SE/GROUP | TX 6-398-612 |
| JET | May 1, 2006 | SE/GROUP | TX 6-398-612 |
| JET | May 8, 2006 | SE/GROUP | TX 6-398-612 |
| JET | May 15, 2006 | SE/GROUP | TX 6-398-612 |
| JET | May 22, 2006 | SE/GROUP | TX 6-398-612 |
| JET | May 29, 2006 | SE/GROUP | TX 6-398-612 |
| JET | June 5, 2006 | SE/GROUP | TX 6-398-612 |
| JET | June 12, 2006 | SE/GROUP | TX 6-398-612 |
| JET | June 19, 2006 | SE/GROUP | TX 6-398-612 |
| JET | June 26, 2006 | SE/GROUP | TX 6-398-612 |
| JET | July 3, 2006 | SE/GROUP | TX 6-497-436 |
| JET | July 10, 2006 | SE/GROUP | TX 6-497-436 |
| JET | July 17, 2006 | SE/GROUP | TX 6-497-436 |
| JET | July 24, 2006 | SE/GROUP | TX 6-497-436 |
| JET | July 31, 2006 | SE/GROUP | TX 6-497-436 |
| JET | August 7, 2006 | SE/GROUP | TX 6-497-436 |
| JET | August 14, 2006 | SE/GROUP | TX 6-497-436 |
| JET | August 21, 2006 | SE/GROUP | TX 6-497-436 |
| JET | August 28, 2006 | SE/GROUP | TX 6-497-436 |
| JET | September 4, 2006 | SE/GROUP | TX 6-497-436 |
| JET | September 11, 2006 | SE/GROUP | TX 6-497-436 |
| JET | September 18, 2006 | SE/GROUP | TX 6-497-436 |
| JET | September 25, 2006 | SE/GROUP | TX 6-497-436 |
| JET | October 2, 2006 | SE/GROUP | TX 6-497-435 |
| JET | October 9, 2006 | SE/GROUP | TX 6-497-435 |
| JET | October 16, 2006 | SE/GROUP | TX 6-497-435 |
| JET | October 23, 2006 | SE/GROUP | TX 6-497-435 |
| JET | October 30, 2006 | SE/GROUP | TX 6-497-435 |
| JET | November 6, 2006 | SE/GROUP | TX 6-497-435 |
| JET | November 13, 2006 | SE/GROUP | TX 6-497-435 |
| JET | November 20, 2006 | SE/GROUP | TX 6-497-435 |

| JET | November 27, 2006 | SE/GROUP | TX 6-497-435 |
| JET | December 4, 2006 | SE/GROUP | TX 6-497-435 |
| JET | December 11, 2006 | SE/GROUP | TX 6-497-435 |
| JET | December 18, 2006 | SE/GROUP | TX 6-497-435 |
| JET | Dec 25, 2006 - Jan 1, 2007 | SE/GROUP | TX 6-497-435 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|---|---|---|---|
| JET | January 8, 2007 | SE/GROUP | TX 6-611-950 |
| JET | January 15, 2007 | SE/GROUP | TX 6-611-950 |
| JET | January 22, 2007 | SE/GROUP | TX 6-611-950 |
| JET | January 29, 2007 | SE/GROUP | TX 6-611-950 |
| JET | February 5, 2007 | SE/GROUP | TX 6-611-950 |
| JET | February 12, 2007 | SE/GROUP | TX 6-611-950 |
| JET | February 19, 2007 | SE/GROUP | TX 6-611-950 |
| JET | February 26, 2007 | SE/GROUP | TX 6-611-950 |
| JET | March 5, 2007 | SE/GROUP | TX 6-611-950 |
| JET | March 12, 2007 | SE/GROUP | TX 6-611-950 |
| JET | March 19, 2007 | SE/GROUP | TX 6-611-950 |
| JET | March 26, 2007 | SE/GROUP | TX 6-611-950 |
| JET | April 2, 2007 | SE/GROUP | TX 6-611-950 |
| JET | April 9, 2007 | | |
| JET | April 16, 2007 | | |
| JET | April 23, 2007 | | |
| JET | April 30, 2007 | | |
| JET | May 7, 2007 | | |
| JET | May 14, 2007 | | |
| JET | May 21, 2007 | | |
| JET | May 28, 2007 | | |
| JET | June 4, 2007 | | |
| JET | June 11, 2007 | | |
| JET | June 18, 2007 | SE/GROUP | TX 6-627-488 |
| JET | June 25, 2007 | SE/GROUP | TX 6-627-488 |
| JET | July 2, 2007 | SE/GROUP | TX 6-627-488 |
| JET | July 9, 2007 | SE/GROUP | TX 6-627-488 |
| JET | July 16, 2007 | SE/GROUP | TX 6-627-488 |
| JET | July 23, 2007 | SE/GROUP | TX 6-627-488 |
| JET | July 30, 2007 | SE/GROUP | TX 6-627-488 |
| JET | August 6, 2007 | SE/GROUP | TX 6-627-488 |
| JET | August 13, 2007 | SE/GROUP | TX 6-627-488 |
| JET | August 20, 2007 | SE/GROUP | TX 6-627-488 |
| JET | August 27, 2007 | SE/GROUP | TX 6-627-488 |
| JET | September 3, 2007 | SE/GROUP | TX 6-631-371 |
| JET | September 10, 2007 | SE/GROUP | TX 6-631-371 |
| JET | September 17, 2007 | SE/GROUP | TX 6-631-371 |
| JET | September 24, 2007 | SE/GROUP | TX 6-631-371 |
| JET | October 1, 2007 | SE/GROUP | TX 6-631-371 |
| JET | October 8, 2007 | SE/GROUP | TX 6-631-371 |
| JET | October 15, 2007 | SE/GROUP | TX 6-631-371 |
| JET | October 22, 2007 | SE/GROUP | TX 6-631-371 |
| JET | October 29, 2007 | SE/GROUP | TX 6-631-371 |
| JET | November 5, 2007 | SE/GROUP | TX 6-631-371 |
| JET | November 12, 2007 | SE/GROUP | TX 6-631-371 |
| JET | November 19, 2007 | SE/GROUP | TX 6-631-371 |

| JET | November 26, 2007 | SE/GROUP | TX 6-631-371 |
| JET | December 3, 2007 | SE/GROUP | TX 6-631-371 |
| JET | December 10, 2007 | SE/GROUP | TX 6-631-372 |
| JET | December 17, 2007 | SE/GROUP | TX 6-631-372 |
| JET | Dec 24 - 31, 2007 | SE/GROUP | TX 6-631-372 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|-----------|---------------------|---|
| JET | January 7, 2008 | | |
| JET | January 14, 2008 | SE/GROUP | 6-648-752 |
| JET | January 21, 2008 | SE/GROUP | 6-648-752 |
| JET | January 28, 2008 | SE/GROUP | 6-648-752 |
| JET | February 4, 2008 | SE/GROUP | 6-648-752 |
| JET | February 11, 2008 | SE/GROUP | 6-648-752 |
| JET | February 18, 2008 | SE/GROUP | 6-648-752 |
| JET | February 25, 2008 | SE/GROUP | 6-648-752 |
| JET | March 3, 2008 | SE/GROUP | 6-648-752 |
| JET | March 10, 2008 | SE/GROUP | 6-648-752 |
| JET | March 17, 2008 | SE/GROUP | 6-648-752 |
| JET | March 24, 2008 | SE/GROUP | 6-648-752 |
| JET | March 31, 2008 | SE/GROUP | 6-648-752 |
| JET | April 7, 2008 | SE/GROUP | 6-648-785 |
| JET | April 14, 2008 | SE/GROUP | 6-648-785 |
| JET | April 21, 2008 | SE/GROUP | 6-648-785 |
| JET | April 28, 2008 | SE/GROUP | 6-648-785 |
| JET | May 5, 2008 | SE/GROUP | 6-648-785 |
| JET | May 12, 2008 | SE/GROUP | 6-648-785 |
| JET | May 19, 2008 | SE/GROUP | 6-648-785 |
| JET | May 26, 2008 | SE/GROUP | 6-648-785 |
| JET | June 2, 2008 | SE/GROUP | 6-648-785 |
| JET | June 9, 2008 | SE/GROUP | 6-648-785 |
| JET | June 16, 2008 | SE/GROUP | 6-648-785 |
| JET | June 23, 2008 | SE/GROUP | 6-648-785 |
| JET | June 30, 2008 | SE/GROUP | 6-648-785 |
| JET | July 7, 2008 | SE/GROUP | 6-662-011 |
| JET | July 14, 2008 | SE/GROUP | 6-662-011 |
| JET | July 21, 2008 | SE/GROUP | 6-662-011 |
| JET | July 28, 2008 | SE/GROUP | 6-662-011 |
| JET | August 4, 2008 | SE/GROUP | 6-662-011 |
| JET | August 11, 2008 | SE/GROUP | 6-662-011 |
| JET | August 18, 2008 | SE/GROUP | 6-662-011 |
| JET | August 25, 2008 | SE/GROUP | 6-662-011 |
| JET | September 1, 2008 | SE/GROUP | 6-662-011 |
| JET | September 8, 2008 | SE/GROUP | 6-662-011 |
| JET | September 15, 2008 | SE/GROUP | 6-662-011 |
| JET | Sept 22 -29, 2008 | SE/GROUP | 6-662-011 |
| JET | October 6, 2008 | SE/GROUP | 6-663-949 |
| JET | October 13, 2008 | SE/GROUP | 6-663-949 |
| JET | October 20-27, 2008 | SE/GROUP | 6-663-949 |
| JET | November 3, 2008 | SE/GROUP | 6-663-949 |
| JET | November 10, 2008 | SE/GROUP | 6-663-949 |
| JET | November 17, 2008 | SE/GROUP | 6-663-949 |
| JET | Nov 24, 2008 - Dec 1, 2008 | SE/GROUP | 6-663-949 |
| JET | December 8, 2008 | SE/GROUP | 6-663-949 |

| JET | December 15, 2008 | SE/GROUP | 6-663-949 |
| JET | December 22 - 29, 2008 | SE/GROUP | 6-663-949 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|-----------|:---:|---|
| JET | January 5, 2009 | SE | TX 6-682-146 |
| JET | January 12, 2009 | SE/GROUP | TX 6-686-129 |
| JET | January 19-26, 2009 | SE/GROUP | TX 6-686-129 |
| JET | February 2, 2009 | SE/GROUP | TX 6-686-129 |
| JET | February 9, 2009 | SE/GROUP | TX 6-686-129 |
| JET | February 16, 2009 | SE/GROUP | TX 6-686-129 |
| JET | Feb 23, 2009 - Mar 2, 2009 | SE/GROUP | TX 6-686-129 |
| JET | March 9, 2009 | SE/GROUP | TX 6-686-129 |
| JET | March 16, 2009 | SE/GROUP | TX 6-686-129 |
| JET | March 23-30, 2009 | SE/GROUP | TX 6-686-129 |
| JET | April 6, 2009 | SE/GROUP | TX 6-686-095 |
| JET | April 20-27, 2009 | SE/GROUP | TX 6-686-095 |
| JET | May 4, 2009 | SE/GROUP | TX 6-686-095 |
| JET | May 11, 2009 | SE/GROUP | TX 6-686-095 |
| JET | May 18, 2009 | SE/GROUP | TX 6-686-095 |
| JET | May 25, 2009 - June 1, 2009 | SE/GROUP | TX 6-686-095 |
| JET | June 8, 2009 | SE/GROUP | TX 6-686-095 |
| JET | June 15, 2009 | SE/GROUP | TX 6-686-095 |
| JET | June 22-29, 2009 | SE/GROUP | TX 6-686-095 |
| JET | July 6-13, 2009 | SE/GROUP | TX 6-702-552 |
| JET | July 20-27, 2009 | SE/GROUP | TX 6-702-552 |
| JET | August 3, 2009 | SE/GROUP | TX 6-702-552 |
| JET | August 10-17, 2009 | SE/GROUP | TX 6-702-552 |
| JET | August 24-31, 2009 | SE/GROUP | TX 6-702-552 |
| JET | September 7-14, 2009 | SE/GROUP | TX 6-702-552 |
| JET | September 21-28, 2009 | SE/GROUP | TX 6-702-552 |
| JET | October 5-12, 2009 | SE/GROUP | TX 6-705-776 |
| JET | October 19-26, 2009 | SE/GROUP | TX 6-705-776 |
| JET | November 2-9, 2009 | SE/GROUP | TX 6-705-776 |
| JET | Novembwe 16, 2009 | SE/GROUP | TX 6-705-776 |
| JET | November 23-30, 2009 | SE/GROUP | TX 6-705-776 |
| JET | December 7, 2009 | SE/GROUP | TX 6-705-776 |
| JET | December 14-21, 2009 | SE/GROUP | TX 6-705-776 |
| JET | Dec 28, 2009 - Jan 4, 2010 | SE/GROUP | TX 6-705-776 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|---|---|---|---|
| JET | January 11, 2010 | SE/GROUP | TX 6-770-740 |
| JET | January 18, 2010 | SE/GROUP | TX 6-770-740 |
| JET | Jan 25 - Feb 1, 2010 | SE/GROUP | TX 6-770-740 |
| JET | February 8, 2010 | SE/GROUP | TX 6-770-740 |
| JET | February 15, 2010 | SE/GROUP | TX 6-770-740 |
| JET | Feb 22 - Mar 1, 2010 | SE/GROUP | TX 6-770-740 |
| JET | March 8, 2010 | SE/GROUP | TX 6-770-740 |
| JET | March 15, 2010 | SE/GROUP | TX 6-770-740 |
| JET | Mar 22-29, 2010 | SE/GROUP | TX 6-770-740 |
| JET | April 5, 2010 | SE/GROUP | TX 6-608-217 |
| JET | April 12, 2010 | SE/GROUP | TX 6-608-217 |
| JET | April 19-26, 2010 | SE/GROUP | TX 6-608-217 |
| JET | May 3, 2010 | SE/GROUP | TX 6-608-217 |
| JET | May 10, 2010 | SE/GROUP | TX 6-608-217 |
| JET | May 17-24, 2010 | SE/GROUP | TX 6-608-217 |
| JET | May 31, 2010 | SE/GROUP | TX 6-608-217 |
| JET | June 7, 2010 | SE/GROUP | TX 6-608-217 |
| JET | June 14-21, 2010 | SE/GROUP | TX 6-608-217 |
| JET | June 28, 2010 | SE/GROUP | TX 6-608-217 |
| JET | July 5, 2010 | SE/GROUP | TX 6-786-588 |
| JET | July 12-19, 2010 | SE/GROUP | TX 6-786-588 |
| JET | July 26, 2010 | SE/GROUP | TX 6-786-588 |
| JET | August 2, 2010 | SE/GROUP | TX 6-786-588 |
| JET | August 9-16, 2010 | SE/GROUP | TX 6-786-588 |
| JET | August 23, 2010 | SE/GROUP | TX 6-786-588 |
| JET | August 30, 2010 | SE/GROUP | TX 6-786-588 |
| JET | September 6-13, 2010 | SE/GROUP | TX 6-786-588 |
| JET | September 20, 2010 | SE/GROUP | TX 6-786-588 |
| JET | September 27, 2010 | SE/GROUP | TX 6-786-588 |
| JET | October 4-11, 2010 | SE/GROUP | TX 6-786-621 |
| JET | October 18, 2010 | SE/GROUP | TX 6-786-621 |
| JET | October 25, 2010 | SE/GROUP | TX 6-786-621 |
| JET | November 1, 2010 | SE/GROUP | TX 6-786-621 |
| JET | November 1-8, 2010 | SE/GROUP | TX 6-786-621 |
| JET | November 15, 2010 | SE/GROUP | TX 6-786-621 |
| JET | November 22, 2010 | SE/GROUP | TX 6-786-621 |
| JET | Nov 29, 2010 - Dec 6, 2010 | SE/GROUP | TX 6-786-621 |
| JET | December 13, 2010 | SE/GROUP | TX 6-786-621 |
| JET | December 20, 2010 | SE/GROUP | TX 6-786-621 |
| JET | Dec 27, 2010 - Jan 3, 2011 | SE/GROUP | TX 6-786-621 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|---|---|---|---|
| JET | January 11, 2011 | SE/GROUP | TX 7-661-118 |
| JET | January 17, 2011 | SE/GROUP | TX 7-661-118 |
| JET | January 24-31, 2011 | SE/GROUP | TX 7-661-109 |
| JET | February 7, 2011 | SE/GROUP | TX 7-661-109 |
| JET | February 14, 2011 | SE/GROUP | TX 7-661-109 |
| JET | February 21-28, 2011 | SE/GROUP | TX 7-661-109 |
| JET | March 7, 2011 | SE/GROUP | TX 7-661-109 |
| JET | March 14, 2011 | SE/GROUP | TX 7-661-109 |
| JET | March 21-28, 2011 | SE/GROUP | TX 7-661-109 |
| JET | April 4, 2011 | SE/GROUP | TX 7-554-616 |
| JET | April 11, 2011 | SE/GROUP | TX 7-554-616 |
| JET | April 18-25, 2011 | SE/GROUP | TX 7-554-616 |
| JET | May 2, 2011 | SE/GROUP | TX 7-554-616 |
| JET | May 9-16, 2011 | SE/GROUP | TX 7-554-616 |
| JET | May 22-30, 2011 | SE/GROUP | TX 7-554-616 |
| JET | June 6, 2011 | SE/GROUP | TX 7-554-616 |
| JET | June 13, 2011 | SE/GROUP | TX 7-554-572 |
| JET | June 20-27, 2011 | SE/GROUP | TX 7-554-572 |
| JET | July 4, 2011 | SE/GROUP | TX 7-554-572 |
| JET | July 11, 2011 | SE/GROUP | TX 7-554-572 |
| JET | July 18-25, 2011 | SE/GROUP | TX 7-554-572 |
| JET | August 1, 2011 | SE/GROUP | TX 7-554-572 |
| JET | Augusts 8-15, 2011 | SE/GROUP | TX 7-554-572 |
| JET | August 22-29, 2011 | SE/GROUP | TX 7-554-610 |
| JET | September 5, 2011 | SE/GROUP | TX 7-554-610 |
| JET | September 12, 2011 | SE/GROUP | TX 7-554-610 |
| JET | September 19-26, 2011 | SE/GROUP | TX 7-554-610 |
| JET | October 3, 2011 | SE/GROUP | TX 7-554-610 |
| JET | October 10-17, 2011 | SE/GROUP | TX 7-554-610 |
| JET | October 24-31, 2011 | SE/GROUP | TX 7-554-610 |
| JET | November 7, 2011 | SE/GROUP | TX 7-554-577 |
| JET | November 14, 2011 | SE/GROUP | TX 7-554-577 |
| JET | November 21-28, 2011 | SE/GROUP | TX 7-554-577 |
| JET | December 5, 2011 | SE/GROUP | TX 7-554-577 |
| JET | December 12-19 2011 | SE/GROUP | TX 7-554-577 |
| JET | Dec 26, 2011 - Jan 2, 2012 | SE/GROUP | TX 7-554-577 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|------------|---------------------|---|
| JET | January 23, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | February 6, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | February 20, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | March 5, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | March 19, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | April 1, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | April 16, 2012 | SE/GROUP | TX 8-148-098, TX0 8-003-478 |
| JET | April 30, 2012 | SE/GROUP | TX 7-675-721 |
| JET | May 14, 2012 | SE/GROUP | TX 7-675-721 |
| JET | May 28, 2012 | SE/GROUP | TX 7-675-721 |
| JET | June 11, 2012 | SE/GROUP | TX 7-675-721 |
| JET | June 25, 2012 | SE/GROUP | TX 7-675-721 |
| JET | July 9, 2012 | SE/GROUP | TX 7-675-657 |
| JET | July 23, 2012 | SE/GROUP | TX 7-675-657 |
| JET | August 6, 2012 | SE/GROUP | TX 7-675-657 |
| JET | August 20, 2012 | SE/GROUP | TX 7-675-657 |
| JET | September 3, 2012 | SE/GROUP | TX 7-675-657 |
| JET | September 17, 2012 | SE/GROUP | TX 7-675-708 |
| JET | October 8, 2012 | SE/GROUP | TX 7-675-708 |
| JET | October 29, 2012 | SE/GROUP | TX 7-675-708 |
| JET | November 12, 2012 | SE/GROUP | TX 7-675-708 |
| JET | November 26, 2012 | SE/GROUP | TX0 7-961-892 |
| JET | December 10, 2012 | SE/GROUP | TX0 7-961-892 |
| JET | December 24, 2012 | SE/GROUP | TX0 7-961-892 |
| JET | January 14, 2013 | SE/GROUP | TX0 7-961-892 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|------------|---------------------|---|
| JET | January 28, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | February 11, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | February 25, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | March 18, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | April 8, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | April 29, 2013 | SE/GROUP | TX0 7-961-906 |
| JET | May 20, 2013 | SE/GROUP | TX0 7-961-877 |
| JET | June 10, 2013 | SE/GROUP | TX0 7-961-877 |
| JET | July 1, 2013 | SE/GROUP | TX0 7-961-877 |
| JET | July 22, 2013 | SE/GROUP | TX0 7-961-877 |
| JET | August 12, 2013 | SE/GROUP | TX0 7-961-877 |
| JET | September 2, 2013 | SE/GROUP | TX0 7-961-941 |
| JET | September 23, 2013 | SE/GROUP | TX0 7-961-941 |
| JET | October 14, 2013 | SE/GROUP | TX0 7-961-941 |
| JET | November 4, 2013 | SE/GROUP | TX0 7-961-941 |
| JET | November 25, 2013 | SE/GROUP | TX0 7-961-941 |
| JET | December 16, 2013 | SE/GROUP | TX0 7-961-948 |
| JET | January 6, 2014 | SE/GROUP | TX0 7-961-948 |

| MAGAZINE | ISSUE DATE | REGISTRATION NUMBER | |
|----------|------------|---------|---------|
| JET | January 27, 2014 | SE/GROUP | TX0 7-961-929 |
| JET | February 17, 2014 | SE/GROUP | TX0 7-961-929 |
| JET | March 10, 2014 | SE/GROUP | TX0 7-961-929 |
| JET | March 31, 2014 | SE/GROUP | TX0 7-961-929 |
| JET | April 21, 2014 | SE/GROUP | TX0 7-961-929 |
| JET | May 12, 2014 | SE/GROUP | TX0 7-961-917 |
| JET | June 2, 2014 | SE/GROUP | TX0 7-961-917 |
| JET | June 23, 2014 | SE/GROUP | TX0 7-961-917 |

# Trademarks

**Trademarks**

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| Antigua & Barbuda | JET | (2342) | November 4, 1980/(November 19, 1980) | 39 | | Seller | Registered | |
| Argentina | EBONY | 2641749/(2097318)[11] | December 27, 2005/(July 7, 2006) | 16 | | Seller | Renewed | Renewal July 7, 2016. |
| | EBONY | 2679480/ (2142420) | June 20, 2006/ (February 15, 2007) | 3 | Bleaching preparations and other substances for laundry use; cleaning, polishing, scouring and abrasive preparations; soaps; perfumery, essential oils, cosmetics, hair lotions; dentifrices. | Seller | Registered | |
| Australia | EBONY | 452584/(452584) | September 23, 1986/(September 23, 1986) | 16 | Books, magazines, newspapers and periodical publications; albums; art pictures; prints and reproductions; cards; children's, educational, engagement, picture, recipe, scrap, song, and travel books; calendars, calendar desk pads; cartoons (excluding animated cartoons); color prints and posters; decals; diaries; dictionaries; digests; directories; drawing books; games included in this class; graphic prints and reproductions; journals; lithographs; paper and paper goods; printed materials; stamps; stationery and tickets; and all other goods in this class | Seller | Registered | |
| | EBONY/JET | 4507620/(4507620) | March 30, 1989/(March 30 1989) | 41 | Educational services, entertainment services, namely radio and television programming | Seller | Registered | Expires March 30, 2016 |
| Austria | EBONY | AM1509/83/(104660) | June 7, 1982/(January 17, 1984) | 16, 3 | magazines, books, calendars and printed publications | Seller | Registered | |
| Bahamas | EBONY | (4500) | June 25, 1965/(June 25, 1965) | 39 | | Seller | Registered | |

---

[1] Note to Draft: IP counsel has been instructed to not renew this registration as Seller intends to abandon this mark.

| Country | Mark | Application No. / (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|------|------|-------|------|------|--------|----------|
| | JET | 10038/(10038) | October 22, 1980/ (October 22, 1980) | 39 | all goods in class 16 or, if not possible, "periodicals, magazines, sections of magazines, books, calendars, greeting cards, posters, artwork, scrapbooks | Seller | Registered | |
| Barbados | EBONY | 81/29473 | April 27, 2012 | 16 | | Seller | Pending | |
| | JET | 81/29474 | April 27, 2012 | 16 | | Seller | Pending | |
| Belize | EBONY | (7446) | (July 29, 1996) | 16 | printed matter; newspapers and periodical publications; all included in class 16. | Seller | Registered | |
| Benelux | JET | 0639046/(0370668) | October 15, 1980/(October 15, 1980) | 16 | magazines, journals, periodicals, calendars & books | Seller | Renewed | |
| | EBONY | 657255/(391557) | April 14, 1983/(April 14, 1983) | 16, 3 | magazines et imprimés  Produits cosmétiques, de toilette et de parfumerie pour hommes et femmes | Seller | Renewed | |
| Botswana | EBONY | BW/M/1973/007 | (February 28, 1973) | 16 | printed matter, newspapers & periodical publications uk reg 882002 of 7/16/65, ren 7/16/72 | Seller | Registered | |
| Brazil | EBONY | 81/0666235/(81/0666235) | November 3, 1981/(August 30, 1983) | 16 | local class: 16 sub-class #1: 20: magazines, calendars, books a | Seller | Registered | |
| | JET | 901176303/(901176303) | September 11, 2008(October 4, 2011) | 16 | periodicals and magazines | Seller | Registered | |
| British Virgin Islands | EBONY | (591) | July 16, 1972/(March 26, 1976) | 16 | printed matter, newspapers & periodical publications | Seller | Registered | |
| | JET | (1838) | November 5, 1980/(November 5, 1980) | 39 | g magazines, calendars, books & printed publications | Seller | Registered | |
| Burundi | EBONY | (V038/BUR) | (April 20, 1973) | 16 | periodical publication especially pertaining to general interest articles | Seller | Automatic Renew | |
| | JET | (1738/BUR) | November 18, 1980/(November 18, 1980) | 16 | magazines, calendars, books & printed publications | Seller | Automatic Renew | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| Canada | JET | 1403188/(TMA882001) | July 14, 2008/(July 11, 2008) | 9, 16, 25, 41 | pre-recorded cd's featuring music; digital media, namely downloadable audio and video recordings and cd's, videotapes, laser disks and dvd's featuring fitness, history, biography, television programs and sports, videotapes, laser disks and dvd's featuring music and musical groups; downloadable features for mobile telephones in the form of musical ringtones, digital wallpaper screen graphics, digital animated wallpaper screen graphics; screensavers, music, music themes, musical videos and video on demand, news and entertainment, video game software, graphics and computer application software for mobile telephones for delivery and display of digital information; downloadable music via the internet and wireless devices. clothing, namely shirts, pants, suits, skirts, shorts, dresses, neckties, sweaters, coats, jackets, loungewear, pajamas, lingerie, underwear, swimwear, skiwear, tracksuits, headwear, namely hates and caps; socks; clothing for infants; t-shirts; entertainment services, namely providing access to non-downloadable pre-recorded music | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | 1403197/(TMA882003) | July 14, 2008/(July 11, 2014) | | wares: headwear, namely hats and caps; optical frames; artwork, namely art prints, pictures, posters, photos, graphic art, lithographs, paintings, and reproductions thereof; scrapbooks and scrapbooking materials, namely albums, pages and stamps; food, namely vegetarian and non-vegetarian frozen, prepared or packaged entrees consisting primarily of meat, fish, poultry or vegetables; preserved, dried and cooked fruits and vegetables; jellies; jams; fruit preserves; frozen, prepared or packaged entrees consisting primarily of pasta or rice, bread, pastry, confectionery, namely, pastilles, processed cereals; savoury marinades, dry and fresh seasonings, tea, coffee; salad dressings; figurines and dolls, mobile content, namely downloadable features for mobile telephones in the form of musical ringtones, digital wallpaper screen graphics, digital animated wallpaper screen graphics, screensavers, music, menu themes, musical videos, news and entertainment, video game software, graphics and computer application software for mobile telephones for delivery and display of digital information and music compilations for mobile phones and wireless communication devices; ornaments, namely glass and porcelain ornaments, holiday ornaments and figurines services: travel and tourism services, namely arranging of cruises, travel excursions and tours | Seller | Registered | |
| | EBONY | 1452326/(TMA847009) | September 19, 2009/(March 25, 2013) | | books, photographs, posters, greeting cards; printed matter, namely photographs, art prints, posters' | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | 289445/(TMA144259) | May 15, 1965/(May 4, 1966) | | periodical publications and extracts therfrom publishing separately | Seller | Registered | |
| | EBONY INSPIRATIONS | 1338798/(TMA873573) | March 9, 2007/(March 18, 2014) | 16 | greeting cards | Seller | Registered | |
| | TASTE OF EBONY | 1338651/ (TMA793987) | March 9, 2007/(March 28, 2011) | 16, 41 | magazines, books and cards in the culinary field | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | (TMA734064)² | (February 6, 2009) | 9, 16, 21, 28, 36 | (1) Magnetic striped credit card. (2) Books, catalogs, photographs, posters, greeting cards; cards and stationery featuring art work and art reproductions; printed matter, namely photographs, art prints, posters, cards and stationery, featuring art work and art reproductions. (3) Decorative home accessories, namely, picture frames not of metal, figurines of porcelain, glass and earthenware; ceramic vases and vessels, kitchen utensils, namely, pots, pans, baking pans, flatware, serving dishes, glass beverageware, porcelainware and earthenware, namely dishes and bowls, figurines of terracotta, porcelain or glass. (4) Bed and bath linens and accessories, namely, quilts, duvets, sheets, pillow cases, pillow shams, blankets, throws, comforters, bedspreads, bed skirts, draperies, slumber bags, decorative pillows, bath towels, beach towels, shower curtains, shower curtain rings, facial tissue holders not of fabric, toothbrush holders, bathroom cups, bathroom cup holders, waste baskets, soap dishes, soap and lotion dispenser pumps, toilet tissue holders, area rugs and bath mats. (5) Games and toys, namely, board games, card games, dolls and accessories therefor, stuffed toys, electronic learning toys and games, ride-on toys, inflatable toys, jigsaw puzzles, musical toys, playing cards; balls, namely baseballs, basketballs, footballs, golf balls, tennis balls, volleyballs, soccer balls, kick balls and play ground balls. (1) Financial services, namely, credit card services; mortgage services. | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| | EBONE | 743682/(445598) | December 16, 1993/(July 28, 1995) | | COSMETICS AND CREAMS, NAMELY FOUNDATION CREAM, FACE POWDER, BLUSHER, LIPSTICK; TOILETRIES AND LOTIONS, NAMELY SKIN PURIFYING AND CLEANSING LOTIONS, SKIN TONER, SKIN MOISTURIZER, ASTRINGENT LOTION, TOILET SOAP, FACIAL SHAMPOO AND PERFUMED MILK BATH; DEODORANTS AND ANTI-PERSPIRANTS, NAMELY, PERSONAL DEODORANTS; PERFUMES. | Seller | Registered | |
| Chile | EBONY FASHION FAIR | 764131/(797415) | February 27, 2007/(March 12, 2007) | 3, 25 | Cosmetics, toiletries, perfumes and hair care products, shampoo and all products of Class 3; Clothing in general, footwear, hats, for men, woman, children, and the rest articles of Class 25. | Seller | Registered | |
| China | EBONY FASHION FAIR | 5877655/(5877655) | January 30, 2007/(March 28, 2010) | 41 | entertainment services in the nature of fashion shows | Seller | Registered | |
| | EBONY FASHION FAIR | 5877656/(5877656) | January 30, 2007/(November 21, 2009) | 16 | printed publications namely magazines, books, booklets, calendars, newsletters | Seller | Registered | |
| Congo (DR) | EBONY | 147/EXT/73/(4533/C) | September 3, 1967/(September 21, 1973) | 16 | | Seller | Registered | |
| | JET | NP/155/INT/8/(4535/C) | September 3, 1977/(October 31, 1980) | 16 | | Seller | Registered | |
| | EBONE | NP/129/EXT/8/(4531/C) | September 3, 1967/(September 21, 1973) | 3 | | Seller | Registered | |
| | EBONY | NP/130/EXT/8/(4532/C) | September 3, 1967/(June 28, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE G PREPARATIONS FOR MEN AND WOMEN S ORIG. REG. NO. 0573/83 OF 6/20/83 | Seller | Registered | |

[2] Note to Draft: Seller no longer uses the mark in the representative classes, and has not used the mark since 2012.

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| Dominica | JET | 62/(62) | December 18, 1980/(December 18, 1980) | 39 | magazines, identification calendars, books and printed publications in class 39. | Seller | Registered | |
| Dominican Republic | JET | 2006-27657/(159112) | April 21, 2006/(March 1, 2007) | 16 | magazines, calendars, books and printed publications | Seller | Registered | |
| Egypt | EBONY | 71780/(71780) | March 22, 1988/(October 5, 1993) | 16 | | Seller | Registered | |
| Ethiopia | EBONY | FTM/5282/2014 | November 17, 2014 | 16 | books and magazines featuring topics of general interest in the fields of news and current events; fashion and beauty; health and personal care; culinary; literature, entertainment and the arts; finance, business, career opportunities; history; biographics, fiction; politics; sports; travel; education, culture, and personal relationships | Seller | Pending | |
| France | JET | 576094/(1621225) | October 12, 1980/(October 12, 1980) | 16 | newspapers, magazines and periodicals, books, with the exception of all publications relating to jets | Seller | Renewed | |
| | EBONY | 660807/(1232591) | April 8, 1983/(April 8, 1983) | 16, 28, 35, 39, 41 | paper and paper articles, cardboard and cardboard articles; printed matter, newspapers and periodicals, books; bookbinding material; photographs; stationery, adhesive materials stationery; artists' supplies; paint brushes; typewriters and office requisites except furniture; instructional and teaching material except apparatus; printers' type; printing blocks. playing cards. newspaper subscription. newspaper delivery. education. educational institutions. publication of books and magazines. book lending. animal training. entertainment, shows. radio and television entertainment. film production. theatrical agencies. rental of films, sound recordings, cinematographic projection apparatus and accessories, of stage sets. arranging of competitions in the field of education or entertainment. | Seller | Renewed | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| Gambia | JET | 393/10/80/(5444) | October 25, 1980/(Octobe r 25, 1980) | 937 | | Seller | Registered | |
| Germany | JET | J16390/(1019749) | November 7, 1980/(July 3, 1981) | 16 | g printed publications, magazines, calendars, books | Seller | Registered | |
| | EBONY | J18251/(1104431) | April 19, 1983/(April 1, 1987) | 16, 35, 41 | registration covers classes 35 & 41 for "services of preparing and performing fashion shows, television shows and entertainment events" per march 27, 2013 e-mail from Frankfurt office. pamphlets, newspapers, magazines, books, services in the preparation and execution of fashion shows, television shows and other entertainment events. dienstleistungen auf dem gebiet der vorbereitung und durchführung von modeschauen. fernseh-shows und sonstigen unterhaltungsveranstaltungen. | Seller | Registered | |
| Ghana | EBONY | (A13923) | May 22, 1965/(May 22, 1965) | 39 | g periodicals & extracts therefrom published separately | Seller | Registered | |
| | EBONE | | August 25, 1983 | 3 | | Seller | Pending | |
| Guyana | EBONE | (11938A) | (July 19, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY & HAIR CARE G PREPARATIONS FOR MEN AND WOMEN S ASSOC. W 11940A | Seller | Registered | |
| | EBONY | (11940A) | (July 19, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY & HAIR CARE G PREPARATIONS FOR MEN AND WOMEN S ASSOC. W 11940A | Seller | Registered | |
| Haiti | JET | 1477-W/(100/134) | December 13, 2001/(June 14, 2002) | 16 | magazines, calendars, books and printed publications | Seller | Registered | |
| Israel | EBONY | 68669/(68669) | March 7, 1988/(March 7, 1988) | 16 | | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| Italy | EBONY | MI1983C021173 | August 18, 1983/(Octobe r 15, 2013) | 16, 3 | carta e articoli di carta, cartone e articoli di cartone; stampati, giornali e riviste, libri; articoli per legatoria; fotografie; cartoleria, materie adesive (per la cartoleria); materiale per artisti; pennelli; macchine per scrivere e articoli per ufficio (esclusi i mobili); materiale per l'istruzione o insegnamento (esclusi gli apparecchi); carte da gioco; caratteri tipografici, cliches. | Seller | Renewed | |
| Jamaica | JET | TM16/706/(33586) | October 24, 1980/(Octobe r 24, 1980) | 16 | magazines, calendars, books & printed publications | Seller | Registered | |
| | EBONY | (10777) | July 8, 1965/(July 8, 1965) | 16 | periodical publication & extracts therefrom published separately | Seller | Registered | |
| Kenya | EBONY | (13238) | July 16, 1965/(July 16, 1965) | 16 | g periodical publications & extracts therefrom c/a rec. 9/11/86 | Seller | Registered | |
| | EBONY | (8629) | (July 14, 1979) | 3 | PERFUMES, TOILET PREPARATIONS (NOT MEDICATED), COSMETIC G PREPARATIONS, DENTRIFRICES, DEPILATORY PREPARATIONS, TOILET G ARTICLES (NOT INCLUDED IN OTHER CLASSES) SACHETS FOR USE IN G WAVING THE HAIR, SOAPS AND ESSENTIAL OILS S ASSIGNED BY L'OREAL TO JOHNSON PUBLISHING ON 7/16/86 | Seller | Registered | |
| | EBONY | 31197/(A31197) | June 20, 1983/(June 20, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE G PREPARATIONS FOR MEN AND WOMEN IN INT. CL. 3 | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| Korea (Republic of South) | EBONE | 95-45139/(369804) | November 29, 1995/(July 22, 1997) | 12 | Perfume, eye shadow, mascara, face powder, liquid face powder, skin lotion, eau de cologne, cold cream, cleansing cream, foundation cream, lip stick, rouge, pomade, hair rinse, hair tonic, hair cream, permanent solution, cold waving solution, powder perfume, manicuring enamel, hair spray, bath powder, face powder, hand cream, nourishing cream, after shave lotion, bath oil, cosmetic oil, hair dressing, hair conditioner, hair mousse, hair gels, hair moisturizer, eye makeup remover, eyeliner, skin freshener, lip skin preservation agent, lip glazing agents, lip conditioner, liquid rouge, shaving foams, compact, puff, toilet brush, toilet case, perfume sprayer, comb, hair brush. | Seller | Registered | |
| | EBONY | 95-45140/(369805) | November 29, 1995/(July 22, 1997) | 12 | Perfume, eye shadow, mascara, face powder, liquid face powder, skin lotion, eau de cologne, cold cream, cleansing cream, foundation cream, lip stick, rouge, pomade, hair rinse, hair tonic, hair cream, permanent solution, cold waving solution, powder perfume, manicuring enamel, hair spray, bath powder, face powder, hand cream, nourishing cream, after shave lotion, bath oil, cosmetic oil, hair dressing, hair conditioner, hair mousse, hair gels, hair moisturizer, eye makeup remover, eyeliner, skin freshener, lip skin preservation agent, lip glazing agents, lip conditioner, liquid rouge, shaving foams, compact, puff, toilet brush, toilet case, perfume sprayer, comb, hair brush. | Seller | Registered | |
| Lesotho | EBONY | (90/02178) | (February 26, 1973) | 16 | | Seller | Registered | |
| Liberia | JET | (00307/2011) | February 3, 1981/(October 15, 1981) | 16 | magazines, calendars, books & printed publications | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | (24683/3046) | (June 17, 1983) | 3 | | Seller | Registered | |
| Malawi | EBONY | (182/73) | June 15, 1973/(June 15, 1973) | 16 | | Seller | Registered | |
| | EBONE | 127/83/(A127/83) | July 13, 1983/(July 13, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE G PREPARATIONS S ASSOC. WITH 130/83 | Seller | Registered | |
| | EBONY | (130/83) | (July 13, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE PREPARA- G TIONS FOR MEN AND WOMEN S ASSOC. WITH 127/83 | Seller | Registered | |
| Mexico | EBONY | 249415/(322780) | May 28, 1985/(February 17, 1987) | 16 | only printings and publications. | Seller | Renewed | |
| | JET | 175162/(255401) | October 21, 1980/(January 5, 1981) | 16 | all goods –books, magazines and periodicals | Seller | Registered | |
| | EBONY | 235550/(516917) | June 23, 1995/(February 16, 1996) | 3 | Products for the care of the skin, specially: humectants and hydrate creams and lotions for the body, hands, feet and face; sun-tanning preparations (cosmetics), eye-lid shadows, blush, facial powders, translucent powders, bases, liquid make-up in powder and cream, lipsticks, eyebrow, eyes and lips delineating pencils, lips gloss, eyebrows and eyes crayons, correcting pencils and creams for ears, eyelash masks, eyebrow masks, masks for the care of the skin, essential oils, oils, etc. | Seller | Renewed | |
| Namibia | JET | 80/0980(90/0980/SWA) | October 15, 1980/(October 15, 1980) | 16 | magazines and books and calendars promoted therein | Seller | Registered | |
| | EBONY | (73/076(SWA)) | March 15, 1973/(March 15, 1973) | 16 | g paper and paper articles, printed matter, magazines, news- g papers, periodicals, books | Seller | Registered | |
| Nigeria | EBONY | 16766/(16766) | August 6, 1965/(August 6, 1965) | 16 | paper, periodical publication and extracts therefrom published separately | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONE | 44114/83/(44114) | July 5, 1983/(July 5, 1983) | 3 | cosmetics, toiletries, perfumes, body and hair care preparations for men and women | Seller | Registered | |
| | EBONY | 44116/83/5/(65948) | July 5, 1983/(July 5, 1983) | 3 | | Seller | Registered | |
| Norway | EBONY | 88/1044/(140734) | March 8, 1988/(March 22, 1990) | 3, 16, 25 | | Seller | Registered | |
| OAPI | EBONY | 54819/(20.226) | August 17, 1965/(August 17, 1965) | 16 | g all goods s original reg. #4596 of 8/17/65 | Seller | Registered | |
| | JET | 71.186/(21102) | February 28, 1981/(Februa ry 28, 1981) | 16 | magazines or books, journals, calendars, books, printed publications, newspapers | Seller | Registered | |
| | EBONY | 83175/(33648) | January 21, 1994/(Januar y 21, 1994) | 3, 16, 25 | | Seller | Registered | |
| Panama | EBONY | 039647/(039647) | September 16, 1985/(August 4, 1986) | 16 | | Seller | Registered | |
| Philippines | EBONY | 4-2011-007827/(4-2011-007827) | July 4, 2011/October 27, 2011) | 16 | periodical publications; books and magazines featuring topics of general interest in the fields of news and current events; fashion and beauty; healthcare and personal care; culinary; literature, entertainment and the arts; finance, business, career opportunities; history, biographies, fiction; politics; sports; travel; education, culture and personal relationships. | Seller | Registered | |
| | EBONY | 4-2003-0004467/(4-2003-0004467) | May 20, 2003/(Februa ry 19, 2007) | 3 | Cosmetic cleansing cremes, astringents, moisture lotion, hair spray, liquid foundation, creme foundation, rouge, face powder, eye shadow, eye liner, mascara, brow pencil, lipstick, lip gloss, nail polish, perfume and toilet water in class 3. | Seller | Registered | |
| Puerto Rico | EBONY | (6640) | October 14, 1980/(Januar y 8, 1981) | 38 | g periodical publication s based on us reg 423815 of 9/10/46 | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | JET | (6643) | November 24, 1980/(January 27, 1981) | 38 | g periodical publication s based of us reg 563152 of 8/19/52 | Seller | Registered | |
| Rwanda | EBONY | (1071) | (September 18, 1973) | 16 | periodical publications | Seller | Registered | |
| | JET | (1635/CRK) | October 20, 1980/(October 20, 1980) | 16 | magazines, calendars, books & printed publications | Seller | Registered | |
| | EBONE | (1861/DRK) | (August 4, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY & HAIR CARE PREPARATIONS FOR MEN & WOMEN | Seller | Registered | |
| | EBONY | (1860/DRK) | (August 4, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY & HAIR CARE PREPARATIONS FOR MEN AND WOMEN | Seller | Registered | |
| Sierra Leone | JET | (11420) | October 16, 1980/(October 16, 1980) | 39 | | Seller | Registered | |
| South Africa | EBONY | 83/3392/(93/3392) | June 2, 1983/(June 2, 1983) | 16 | magazines, books, calendars, printed publications; the a foregoing excluding trade catalogues. | Seller | Registered | |
| | EBONY | 95/1725/(1995/01725) | February 9, 1995/(January 16, 2001) | 35 | import, export, wholesale, retail, merchandising, distribution, marketing and mail order services | Seller | Registered | |
| | EBONY | B67/5652/(B67/5652) | December 18, 1967/(December 18, 1967) | 25 | | Seller | Registered | |
| | EBONY | (69/6207) | (December 23, 1969) | 3 | | Seller | Registered | |
| Spain | EBONY | 1039682/(1039682) | June 10, 1983/(October 22, 1984) | 16 | | Seller | Renewed | |
| Swaziland | EBONY | 285/2011/(285/11) | June 15, 2011/(November 9, 2012) | 16 | printed matter, newspapers & periodical publications | Seller | Published for Opposition | |
| Switzerland | JET | 0524171980/(P-313846) | October 13, 1980/(February 22, 1982) | 16 | paper, cardboard, magazines, calendars, books, publications, newspapers and periodicals; bookbinding articles; educational and instructional material (except apparatus). | Seller | Renewed | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| Taiwan | EBONY | 072024022/(233891) | June 14, 1983/(January 16, 1984) | 56 | magazines | Seller | Renewed | |
| | EBONY | (233891) | | | | Seller | Renewed | |
| | EBONE | 85065722/(792190) | December 24, 1996/(January 16, 1998) | 3 | All kinds of cosmetics, perfumes, hair creams, hair lotions, hair oils, hair spray, face creams, lotions, skin creams, eye creams, preparations for care of the skin and hand, suntan oils, sun lotion for sensitive skin, deodorants, perfumed soaps, medicated soaps, facial washing soaps, bath foams, hair-washing and shampoo substances, rinses, common soaps, cleaners. | Seller | Renewed | |
| | EBONY | 085065723/(792151) | December 24, 1996/(January 16, 1998) | 3 | All kinds of cosmetics, perfumes, hair creams, hair lotions, hair oils, hair spray, face creams, lotions, skin creams, eye creams, preparations for care of the skin and hand, suntan oils, sun lotion for sensitive skin, deodorants, perfumed soaps, medicated soaps, facial washing soaps, bath foams, hair-washing and shampoo substances, rinses, common soaps, cleaners. | Seller | Renewed | |
| Trinidad & Tobago | EBONY | (3302) | August 20, 1965/(August 20, 1965) | 39 | g periodicals & books | Seller | Registered | |
| | JET | 12374/(12374) | October 15, 1980/(October 14, 1980) | 39 | g magazines, calendars, books and printed publications | Seller | Registered | |
| Uganda | EBONY | (13391) | August 27, 1973/(August 27, 1973) | 16 | | Seller | Registered | |
| | EBONE | (16020) | (August 23, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE G PREPARATIONS FOR MEN AND WOMEN | Seller | Registered | |
| | EBONY | (16019) | (August 23, 1983) | 3 | COSMETICS, TOILETRIES, PERFUMES, BODY AND HAIR CARE G PREPARATIONS FOR MEN AND WOMEN | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| United Kingdom | EBONY | 1386259/(1386259) | June 2, 1989/(June 2, 1989) | 41 | fashion show services; production of radio and television programmes; all included in class 41. | Seller | Registered | |
| | EBONY | 882002/(882002) | July 16, 1965/(July 16, 1965) | 16 | printed matter; newspapers and periodical publications. | Seller | Registered | |
| | JET | 1141906/(1141906) | October 15, 1980/(October 15, 1980) | 16 | magazines (publications) calendars and books none relating to aircraft or minerals. | Seller | Registered | |
| | EBONY FASHION FAIR | (1386274) | (June 2, 1989) | 41 | Television show and fashion show services; all included in Class 41. | Seller | Registered | Registration of this mark shall give no right to the exclusive use of the words "Fashion Fair". To be associated with No. 1,386,259 (5860,1002) |
| United States of America | EBONY | 78/439967/(3345084) | June 23, 2004 | 9 | prerecorded digital video disks featuring educational and entertainment programs on health, finance, beauty, fashion, cosmetics and personal care for men and women, lifestyles, african american artists and subjects of interest to african americans | Seller | Registered | |
| | EBONY/JET | 78/439959/(3345083) | November 27, 2007 | 9 | prerecorded digital video disks featuring educational and entertainment programs on health, finance, beauty, fashion, cosmetics and personal care for men and women, lifestyles, african american artists and subjects of interest to african americans | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | AMERICAN BLACK ACHIEVEMENT AWARD | 78/627928/(3589447) | May 11, 2005/(March 10, 2009) | 41 | entertainment services, namely, organizing and arranging cultural events celebrating the success of black men and women in diverse fields | Seller | Registered | |
| | BEAUTY OF THE WEEK | 77/565508/(3675503) | September 9, 2008/(September 1, 2009) | 16 | magazine section in the field of general interest | Seller | Registered | |
| | BLACK FAMILY REUNION TOUR | 76/497555/(3982798) | December 5, 2002/(June 21, 2011) | 41 | educational and entertainment services, namely, conducting cultural programs featuring live entertainment, music, dance and audiovisual presentations, games, sweepstakes, contests, and also providing food concessions and food preparations demonstrations | Seller | Registered | |
| | EBONY | 71/493806/(0423815) | December 22, 1945/(September 10, 1946) | 16 | periodical publication | Seller | Registered | |
| | EBONY | 73/201915/(1179532) | January 29, 1979/(November 24, 1981) | 41 | entertainment services-namely, organizing and presenting talent and beauty pageants, fashion shows and television shows | Seller | Registered | |
| | EBONY | 73628121/(1536329) | November 3, 1986/(April 25, 1989) | 16 | books and magazines featuring topics of general interest in the fields of news and current events; fashion and beauty; health and personal care; culinary; literature, entertainment and the arts; finance, business, career opportunities; history, biographics, fiction; politics; sports; travel; education, culture, and personal relationships | Seller | Registered | |
| | EBONY | 74/020396/(2321999) | January 18, 1990/(February 22, 2000) | 25 | t-shirts; and women's clothes, namely, jackets, t-shirts, hats | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | 77/270798 | September 4, 2007 | 3, 9, 16, 25, 41, 44, 45 | trademark: ebony, application number: 71/493806, registration number: 0423815, file reference: 841134, classes: 38 trademark: ebony, application number: 452844, registration number: 1050396, file reference: 960892, classes: 3 trademark: ebony, application number: 74/020396, registration number: 2321999, file reference: 951675, classes: 25, digital media, namely, downloadable audio and video recordings and cds, videotapes, laser disks and dvds featuring fitness, history, biography, television programs and sports; sunglasses, eyeglasses, eyeglass and sunglass cases; downloadable features for mobile telephones, namely, pre-recorded ringtones, wallpaper, animated wallpaper, screensavers, music, menu themes; videos and video on demand featuring fitness, history, biography, television programs and sports, news and entertainment, greeting cards; musical greeting cards; greeting cards with sound; stationery incorporating music and sound for use as greetings. | Seller | Pending | Associated with: Trademark: EBONY, Application Number: 71/493806, Registratio n Number: 0423815, File Reference: 841134, Classes: 38 Trademark: EBONY, Application Number: 452844, Registratio n Number: 1050396, File Reference: 960892, Classes: 3 |
| | | | | | announcement and invitation cards; calendars; wedding planners; art pictures, art prints, graphic art reproductions; printed art reproductions, lithographic works of art and their reproductions, shirts, cosmetic body care services, providing a selection of online electronic greeting cards | | | Trademark: EBONY, Application Number: 74/020396, Registratio n Number: 2321999, File Reference: 951675, Classes: 25 |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| | EBONY | 78/756931/(3888118) | November 18, 2005/(December 7, 2010) | 16 | non-fiction books in the fields of lifestyles, and other topics of general interest; printed matter, namely, photographs, cards, featuring art work and art reproductions | Seller | Registered | |
| | EBONY | 88-076130/(5860319) | August 13, 2018/(September 24, 2019) | 38 | Streaming of audio and video tethered downloads; Video broadcasting services over the Internet or other communications network, namely, electronically transmitting video clips; Video broadcasting services via the Internet; Video-on-demand transmission; Video-on-demand transmission services; Video-on-demand transmission services via the Internet; Audio... | Seller | Registered | |
| | EBONY (Stylized) Color Device | 78/736473/(3180225) | October 19, 2005/(December 5, 2006) | 16 | printed publications, namely magazines of general interest; books in the field of history, education, photography, cooking, health and wellness, entertainment; children's books; and calendars | Seller | Registered | |
| | EBONY INSPIRATIONS | 77/004583/(3757886) | September 21, 2006/(March 9, 2010) | 16 | greeting cards | Seller | Registered | |
| | EBONYLIVE | 88-076176/(5860319) | August 16, 2018/(September 17, 2019) | 38 | Streaming of audio and video tethered downloads; Streaming of audio, visual and audiovisual material via a global computer network; Streaming of video material on the Internet; Video transmission over digital networks; Broadcasting services and provision of telecommunication access to films... | Seller | Registered | |
| | EBONYLIVE | 88-081701/(5860332) | August 16, 2018/(September 17, 2019) | 41 | Film and video film production; Production and distribution of videos in the field of African-American culture, news, and entertainment; Providing a website featuring non-downloadable videos in the field of African-American culture, news, and entertainment; Providing films, not downloadable, via video-on-demand... | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| | EBONY POWER 100 LOGO in COLOR | 85/809406/(4402829) | December 21, 2012/(September 17, 2013) | 16, 41 | annual magazine supplement in the field of listing individuals and businesses that have achieved excellence in diverse fields<br><br>entertainment services, namely, organizing and arranging cultural events celebrating the success of men and women in diverse fields; entertainment and educational services, namely, providing photographic, audio, video and text presentations on successful people of | Seller | Registered | |
| | | | | | color; electronic publishing services, namely, publication of texts and graphics featuring subjects of interest to african americans; conducting awards programs honoring individuals and companies that have demonstrated excellence in their personal or professional lives | | | |
| | EBONY JET | 77/579003/(3822578) | September 25, 2008/(July 20, 2010) | 35, 41 | on-line retail store services featuring publications, fashion, home, office, and personal care goods for men, women and children<br><br>educational and entertainment services, namely, a continuing radio program about subjects of interest to african-americans, accessible online and via global computer networks; providing a web site featuring on-line publications in the field of news articles on health, finance, beauty, fashion, cosmetics and personal care for men and women, home design, lifestyles, african-american artists and subjects of interest to african-americans | Seller | Registered | |
| | JET | 73/281567/(1206138) | October 14, 1980/(August 24, 1982) | 16 | magazines featuring news, current events, fashion, sports, cosmetics and beauty care, entertainment, photographic features and business; books featuring black history, culture and achievements; calendars; magazines for children | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| | JET | 77/518887/(4350374) | July 10, 2008/(June 11, 2013) | 9, 25 | pre-recorded cds featuring music; pre-recorded digital media featuring educational and entertainment programs on health, finance, beauty, fashion, cosmetics and personal care for men and women, lifestyles, african american artists and subjects of interest to african americans, laser disks and dvds featuring music and musical groups; downloadable features for mobile communication devices, namely, ringtones, wallpaper, animated wallpaper, screensavers, music, music themes, videos and video on demand featuring news, entertainment, and commentary; graphics and computer application software for mobile telephones; downloadable music via the internet and wireless devices. clothing, namely, shirts, t-shirts | Seller | Registered | |
| | JET (SCRIPT) | 71/620506/(0563152) | October 26, 1951/(August 19, 1952) | 16 | periodical publications | Seller | Registered | |
| | JET BEAUTY | 77/565515/(3783278) | September 9, 2008/(May 4, 2010) | 16 | magazine section in the field of general interest; calendars | Seller | Registered | |
| | JET BEAUTY OF THE WEEK | 77/565504/(3675502) | September 9, 2008/(September 1, 2009) | 16 | magazine section in the field of general interest | Seller | Registered | |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | POWER 100 | 85/668182/(4386659) | July 3, 2012/(August 20, 2013) | 16, 41 | annual magazine supplement in the field of listing individuals and businesses that have achieved excellence in diverse fields. entertainment services, namely, organizing and arranging cultural events celebrating the success of men and women in diverse fields; entertainment and educational services, namely, providing photographic, audio, video and text presentations on successful people of color; electronic publishing services, namely, publication of texts and graphics featuring subjects of interest to African Americans; conducting awards programs honoring individuals and companies that have demonstrated excellence in their personal or professional lives | Seller | Registered | |
| | TASTE OF EBONY | 77/000663/(3941008) | September 15, 2006/(April 5, 2011) | 41 | provision of instructional seminars, food preparation demonstrations and expositions in the culinary field for educational and entertainment purposes | Seller | Registered | |

| EBONY.COM PRESENTS MANIFEST: BLACK MEN TACKLE IDENTITY, STRUGGLE & POWER | 86/513034 | 16, 41, 44, 45 | INT. CL. 16 BOOKS, NEWSLETTERS, BROCHURES, AND MAGAZINES IN THE FIELD OF AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION INT. CL. 41 PROVIDING NON-DOWNLOADABLE ELECTRONIC JOURNALS AND ARTICLES FEATURING THE CURRENT STATE OF AFRICAN AMERICAN MEN AND BOYS IN AMERICA AND RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION; PROVIDING A WEBSITE FEATURING BLOGS AND NON-DOWNLOADABLE ELECTRONIC PUBLICATIONS IN THE NATURE OF ARTICLES IN THE FIELD OF AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION; ENTERTAINMENT AND EDUCATIONAL SERVICES, NAMELY, EXHIBITIONS, EDUCATIONAL CONFERENCES, WORKSHOPS AND SEMINARS IN THE FIELD OF AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION; ENTERTAINMENT SERVICES, NAMELY, PROVIDING A WEB SITE FEATURING PHOTOGRAPHIC, AUDIO AND VIDEO PRESENTATIONS FEATURING AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION; NON-DOWNLOADABLE ELECTRONIC PUBLICATIONS IN THE NATURE OF ARTICLES, NEWSLETTERS, MAGAZINE AND VIDEOS IN THE |

| Country | Mark | Application No./ (Registration No.) | Filing Date / (Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---------|------|-------------------------------------|-----------------------------------|-------|------------------|------------------------|--------|----------|
| | | | | | FIELD OF AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE, FATHERHOOD, CAREER, AND FASHION INT. CL. 44 PROVIDING NEWS AND INFORMATION IN THE FIELD OF AFRICAN AMERICAN MALE RELATED TOPICS ON LIFESTYLE WELLNESS AND FATHERHOOD AS IT RELATES TO DRUG AND ALCOHOL AWARENESS AND HEALTH OF CHILDREN INT. CL. 45 PROVIDING FASHION NEWS AND INFORMATION TO AFRICAN AMERICAN MALES | | | |
| | EBONY | 72/452844(1050396) | March 29, 1973/(Octobe r 12, 1976) | 3 | COSMETIC CLEANSING CREMES, ASTRINGENTS, MOISTURE LOTION, HAIR-SPRAY, LIQUID FOUNDATION, CREME FOUNDATION, ROUGE, FACE POWDER, EYE SHADOW, EYE LINER, MASCARA, BROW PENCIL, LIPSTICK, LIP GLOSS, NAIL POLISH, PERFUME AND TOILET WATER | Seller | Registered | |
| | EBONY FASHION FAIR | 73/105110(1106312) | November 1, 1976/(Novem ber 14, 1978) | 41 | SERVICE OF PRODUCING,ORGANIZING AND PRESENTING FASHION SHOWS | Seller | Registered | |
| | MISS EBONY | 75/177589(2196350) | October 7, 1996/(Octobe r 13, 1998) | 3 | Make-up, foundation, and facial powder. | Seller | Registered | |
| US Virgin Islands | JET (SCRIPT) | (5161) | (January 20, 1981) | 38 | g periodical publications s based on us reg 563152 of 8/19/52 | Seller | Registered | |
| | EBONY | (4742) | (April 5, 1973) | 38 | s us 423815 of 9/10/46, ren 9/10/66 | Seller | Registered | |
| | JET | (6127) | (January 20, 1981) | | | Seller | Registered | |
| Venezuela | EBONY | 5047-83/(119929) | June 20, 1983/(April 25, 1986) | 16 | paper (except wallpaper), desk articles and blank books | Seller | Registered | |
| | EBONY | 5049-83/(119931) | June 20, 1983/(April 25, 1986) | 16 | books and publications of all kinds | Seller | Registered | |

| Country | Mark | Application No./(Registration No.) | Filing Date/(Registration Date) | Class | Goods / Services | Applicant / Registrant | Status | Comments |
|---|---|---|---|---|---|---|---|---|
| | EBONY | 5050-83/(119932) | June 20, 1983/(April 25, 1986) | 36, 35 | buttons, novelties, propaganda articles except publications | Seller | Registered | |
| | EBONY | 5045-83/(119927) | June 20, 1983/(April 25, 1986) | 3 | | Seller | Registered | EBONY |
| Zambia | EBONY | (A301/73) | July 4, 1973/(July 4, 1973) | 16 | | Seller | Registered | |
| | EBONE | 128/83/(A128/83) | June 17, 1983/(June 17, 1983) | 3 | Cosmetics, Toiletries, Perfumes, Body and Hair Care preparations for men and women | Seller | Registered | |
| Zanzibar | EBONY | 113/1994/(193/95) | July 13, 1994/(July 13, 1994) | 39 | | Seller | Registered | |
| | JET | 116/1994/(196/95) | July 13, 1994/(July 13, 1994) | 39 | | Seller | Registered | |
| | JET | 18934/(184/1934) | May 6, 1982/(May 6, 1982) | 16 | g magazines, calendars, books and printed publications | Seller | Registered | |
| | EBONY | 113/1994/(193/95) | July 13, 1994/(July 13, 1994) | 39 | | Seller | Registered | |
| Zimbabwe | EBONY | (A199/73) | March 12, 1973/(March 12, 1973) | 16 | g paper & paper articles included in cl 16, printed matter g magazines (publications) newspapers, periodicals, books | Seller | Registered | |
| | JET | 1208/80/(1208/80) | October 24, 1980/(October 24, 1980) | 16 | magazines, calendars, books & printed publications but excluding writing pads, envelopes & other paper articles | Seller | Registered | |
| | EBONY | 302/83(A302/83) | June 10, 1983/(June 10, 1983) | 3 | Cosmetics, toiletries, perfumes, body and hair care preparations for women | Seller | Registered | |

**Schedule 2.1(g)**

**DOMAIN NAMES**

*ACTIVE 52067311*

| Domain Name | Expiration Date | |
|---|---|---|
| **Ebony Related Domains** | | |
| **ebony.com** | 4/28/21 | Main website domain |
| ebonyenterprise.com | 10/19/21 | |
| ebonyglobalenterprise.com | 10/19/21 | |
| ebonyglobalenterprises.com | 10/19/21 | |
| ebonyglobalentertainment.com | 10/19/21 | |
| ebonyglobalmusic.com | 10/19/21 | |
| ebonyglobalproductions.com | 10/19/21 | |
| ebonyglobalstudios.com | 10/19/21 | |
| ebonymediamusic.com | 10/19/21 | |
| ebonymediastudios.com | 10/19/21 | |
| ebonyprods.com | 10/19/21 | |
| ebonyproduction.com | 10/19/21 | |
| musicebony.com | 10/19/21 | |
| ebonyentertainmentgroup.com | 10/30/21 | |
| ebonyentllc.com | 10/30/21 | |
| ebonymediallc.com | 10/30/21 | |
| ebonymediaoperationsllc.com | 10/30/21 | |
| ebonyoperations.com | 10/30/21 | |
| ebonylife.net | 3/29/21 | |
| ebonylife.org | 3/29/21 | |
| ebonymediaevents.us | 4/18/21 | |
| ebonymediaholdings.us | 4/18/21 | |
| ebonyeffect.biz | 4/19/21 | |
| ebonyeffect.co | 4/19/21 | |
| ebonymedia.info | 4/19/21 | |
| ebonymedia.org | 4/19/21 | |
| ebonymedia.press | 4/19/21 | |
| ebonymediaevents.com | 4/19/21 | |
| ebonymediaevents.info | 4/19/21 | |
| ebonymediaevents.org | 4/19/21 | |
| ebonymediagroup.black | 4/19/21 | |
| ebonymediagroup.com | 4/19/21 | |
| ebonymediagroup.info | 4/19/21 | |
| ebonymediagroup.org | 4/19/21 | |
| ebonymediaholdings.com | 4/19/21 | |
| ebonymediaholdings.info | 4/19/21 | |
| ebonymediaholdings.org | 4/19/21 | |
| theebonyeffect.biz | 4/19/21 | |
| theebonyeffect.co | 4/19/21 | |
| ebonyeffect.com | 4/20/21 | |

| Domain Name | Expiration Date |
| --- | --- |
| ebonyeffect.info | 4/20/21 |
| ebonyeffect.net | 4/20/21 |
| ebonyeffect.org | 4/20/21 |
| theebonyeffect.com | 4/20/21 |
| theebonyeffect.info | 4/20/21 |
| theebonyeffect.net | 4/20/21 |
| theebonyeffect.org | 4/20/21 |
| atasteofebony.net | 5/26/21 |
| theebonycollection.org | 6/21/21 |
| ebonymediatv.co | 9/13/21 |
| ebonymediatv.us | 9/13/21 |
| ebonytv.biz | 9/13/21 |
| ebonytv.us | 9/13/21 |
| ebonymedia.tv | 9/14/21 |
| ebonymediaentertainment.com | 9/14/21 |
| ebonymediaentertainment.info | 9/14/21 |
| ebonymediaentertainment.net | 9/14/21 |
| ebonymediaentertainment.org | 9/14/21 |
| ebonymediatelevision.com | 9/14/21 |
| ebonymediatelevision.info | 9/14/21 |
| ebonymediatelevision.net | 9/14/21 |
| ebonymediatelevision.org | 9/14/21 |
| ebonymediatv.com | 9/14/21 |
| ebonyfair.com | 9/23/21 |
| ebonyexperts.com | 9/26/21 |
| ebonyjr.net | 10/10/21 |
| ebonyphotographs.com | 10/10/21 |
| ebonyphotographs.net | 10/10/21 |
| ebonypower100.com | 10/10/21 |
| ebonypower100.info | 10/10/21 |
| ebonypower100.net | 10/10/21 |
| ebonypower100.org | 10/10/21 |
| ebonymusicllc.com | 12/18/21 |
| ebonypublishingllc.com | 12/18/21 |
| ebonymediafoundation.com | 2/21/22 |
| ebonymediafoundation.org | 2/21/22 |
| ebonymediaproduction.com | 2/21/22 |
| ebony.company | 4/19/22 |
| ebonyholdings.company | 4/19/22 |
| ebonymedia.net | 4/19/22 |
| ebonymediaevents.company | 4/19/22 |

| Domain Name | Expiration Date | |
|---|---|---|
| ebonymediaevents.net | 4/19/22 | |
| ebonymediagroup.company | 4/19/22 | |
| ebonymediagroup.net | 4/19/22 | |
| ebonymediaholdings.net | 4/19/22 | |
| atasteofebony.com | 5/26/22 | |
| atasteofebony.info | 5/28/22 | |
| atasteofebony.org | 5/28/22 | |
| ebonymediaoperations.com | 6/2/22 | |
| ebonyfinance365.com | 6/21/22 | |
| ebonymag.com | 7/10/22 | |
| ebonymagazine.com | 7/10/22 | |
| ebonyexcellencellc.com | 12/18/22 | |
| ebonyproductionsllc.com | 12/18/22 | |
| ebonyforjustice.com | 6/30/23 | |
| ebonyforjustice.org | 6/30/23 | |
| ebonymediajustice.com | 6/30/23 | |
| ebonymediajustice.org | 6/30/23 | |
| **Jet Related Domains** | | |
| **jetmag.com** | 7/4/23 | Main website domain |
| jetmagtv.co | 11/20/20 | |
| jetmag.tv | 11/21/20 | |
| jetmagtv.net | 11/21/20 | |
| jetbeautyoftheweek.com | 4/3/21 | |
| jetbeauty.net | 5/13/21 | |
| jetlove.com | 5/13/21 | |
| getjetapp.com | 8/19/21 | |
| getjetapp.mobi | 8/19/21 | |
| getjetapp.net | 8/19/21 | |
| getjetapp.org | 8/19/21 | |
| jet-digital.com | 8/19/21 | |
| jet-digital.net | 8/19/21 | |
| jet-digital.org | 8/19/21 | |
| jetdigitalmag.com | 8/19/21 | |
| jetmediaonline.com | 9/3/21 | |
| myjet247.com | 9/3/21 | |
| jetmagtv.com | 11/21/21 | |
| jetmagazine.com | 7/4/22 | |

| Domain Name | Expiration Date |
|---|---|
| **Ebony–Jet Related Domains** | |
| ebonyjetradio.com | 3/15/21 |
| ebonyjetradio.net | 3/15/21 |
| ebonyjetvideos.com | 4/3/21 |
| theebonyeffect.biz | 4/19/21 |
| theebonyeffect.co | 4/19/21 |
| theebonyeffect.com | 4/20/21 |
| theebonyeffect.info | 4/20/21 |
| theebonyeffect.net | 4/20/21 |
| theebonyeffect.org | 4/20/21 |
| theebonycollection.org | 6/21/21 |
| ebonyjetshop.com | 9/19/21 |
| ebonyjetstore.com | 12/7/21 |
| ebonyjetmusic.com | 2/21/22 |
| ebonyjetproduction.com | 2/21/22 |
| ebonyjetshowcase.com | 5/28/22 |
| ebonyjetjustice.org | 6/30/23 |
| ebonyjetjustice.com | 6/30/25 |
| **Other Domains** | |
| geeksnsneaks.co | 3/22/21 |
| geeksnsneaks.com | 3/23/21 |
| geeksnsneaks.info | 3/23/21 |
| geeksnsneaks.net | 3/23/21 |
| geeksnsneaks.org | 3/23/21 |
| sunnyandhoney.com | 10/10/21 |
| nelsonmandelaphotos.com | 7/2/22 |

**Schedule 2.1(h)  Social Media Accounts**

Facebook -EBONY

Twitter - @EBONYMag – @getjetmag

Instagram - @ebonymagazine and @jetmag

Youtube – EBONY Magazine

Pinterest - EBONY

Schedule 2.1(i)

Ebony.com

Jetmag.com

All e-mail addresses of the Business

Any Internet domain name that is a Purchased Asset that has an email address associated with it

Pursuant to Section 2.1(i) of the Asset Purchase Agreement, the Purchased Assets shall include each Seller's right, title and interest to all e-mail messages associated with all e-mail addresses of the Business related to the creation of the magazines, events, social media, and the digital platform and including any messages related to art, photography and any other creative or artistic creation or authorship, other than any Retained Privileged Materials, Deal Communications and communications to the extent solely personal in nature and not related to the aforesaid matters; provided, however, notwithstanding the foregoing, at any time following the Closing, Purchaser shall have rights to any e-mail messages and communications that are reasonably necessary to establish ownership of the Purchased Assets or are otherwise material to the ongoing operation of the Business;

The e-mail messages described above shall include, but are not limited to, the following:

| Team Member Name | Email Address | Responsibility |
|---|---|---|
| Janine Marzett | jmarzett@ebony.com | Production Director |
| Heather Morrison | hmorrison@ebony.com | Guest Art Director |
| Geoffrey Black | gblack@ebony.com | Guest Photo Editor |
| Courtney Walter | cwalter@ebony.com | Creative Director |
| Bianca Gray | bgray@ebony.com | Assistant Creative Director |
|  |  |  |

Schedule 2.1(w) Miscellaneous Assets

Listed on Inventory schedule

**Schedule 2.2(a)**

**Cash and Cash Equivalents**

**Fill in this information to identify the case:**

Debtor name    Ebony Media Operations, LLC

United States Bankruptcy Court for the:   Southern District of Texas

Case number (If known):   20-33665

☐ Check if this is an amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:   Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**       $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | JPMorgan Chase Bank | Checking | 2 5 8 5 | $ 0.00 |
| 3.2. | See continuation sheet | | | $ 749.15 |

4. **Other cash equivalents** *(Identify all)*

4.1. _____    $_____
4.2. _____    $_____

5. **Total of Part 1**       $ 749.15

Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

### Part 2:   Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.
☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

7.1. _____    $_____
7.2. _____    $_____

Debtor 1　Ebony Media Operations, LLC

First Name　Middle Name　Last Name

Case number *(if known)*_____

20-33665

## Continuation Sheet for Official Form 206 A/B

**3) Checking, savings, money market, or financial brokerage accounts**

**JPMorgan Chase Bank**　　**Checking**　　　　**2011**

**Balance: 212.08**

**JPMorgan Chase Bank**　　**Checking**　　　　**1278**

**Balance: 0.00**

**JPMorgan Chase Bank**　　**Checking**　　　　**0809**

**Balance: 11.35**

**JPMorgan Chase Bank**　　**Checking**　　　　**0993**

**Balance: 388.78**

**JPMorgan Chase Bank**　　**Checking**　　　　**9730**

**Balance: 136.94**

DocuSign Envelope ID: AA575A9A-7531-4140-B7BE-06E71AED2959

**Fill in this information to identify the case:**

Debtor name _Ebony Media Holdings, LLC_

United States Bankruptcy Court for the: _Southern District of Texas_

Case number (If known): _20-33667_

☐ Check if this is an amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**    $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | JP Morgan Chase Bank | Checking | 2  3  8  8 | $ 1,020.24 |
| 3.2. | | | | $ |

4. **Other cash equivalents** *(Identify all)*

| 4.1. | _____ | $ _____ |
|---|---|---|
| 4.2. | _____ | $ _____ |

5. **Total of Part 1**
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.    $ 1,020.24

| Part 2: | Deposits and prepayments |
|---|---|

6. **Does the debtor have any deposits or prepayments?**

   ☑ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

| 7.1. | _____ | $ _____ |
|---|---|---|
| 7.2. | _____ | $ _____ |

Schedule 2.2(f)

None.

## 2.2(j) Excluded Claims

None

Schedule 2.3

None.

Schedule 2.4

1. Any liability or obligation of any Subsidiary.
2. Any liability or obligation of any Subsidiary related to, in connection with, involving or arising out of any note, promissory note, debt obligation or similar, including that certain Short-Term Promissory Note, dated as of December 16, 2019, by and between EBONY Entertainment, LLC and Tatiana Logan, as amended, modified or supplemented.

Schedule 2.5(b)

## Schedule 4.1

### DEBTOR SUBSIDIARIES

**Subsidiaries of Ebony Media Holdings, LLC:**

| Name | Formation Date | Inactive Date | State of Formation | Current Jurisdiction |
|------|----------------|---------------|--------------------|----------------------|
| Ebony Media Operations, LLC | 4/11/2016 | - | Texas | Texas |
| Ebony Jet Entertainment, LLC | 1/18/2017 | 1/25/2019 (tax forfeiture) | Texas | Texas |
| Ebony Events, LLC | 4/27/2017 | 8/2/2019 (tax forfeiture) | Texas | Texas |
| Ebony Entertainment, LLC | 11/11/2019 | - | Texas | Texas |
| Ebony Publishing, LLC | 4/17/2020 | - | Texas | Texas |

**Subsidiaries of Ebony Media Operations, LLC:**

None.

**Entities Controlled by Ebony Media Operations, LLC:**

| Name | Formation Date | Inactive Date | State of Formation | Current Jurisdiction |
|------|----------------|---------------|--------------------|----------------------|
| Ebony Media Foundation, Inc. | 8/29/2017 | - | Texas | Texas |

Note: Ebony Media Foundation, Inc. is a Texas non-profit corporation that has no members. It was organized as the charitable arm of Ebony Media Operations, LLC and shares common management. To date, it has not obtained a federal income tax exemption or Texas franchise tax exemption.

## 4.3(a) Conflicts, Conflicts of 3rd Parties

None

## 4.3(b) Consent, Waiver and Approval

None

# 4.5 Executory Contracts

None

## Schedule 4.7(a)

The Copyrights and Trademarks identified in Schedule 2.1(f) are hereby incorporated in their entirety by reference.

The Domain Names identified in Schedule 2.1(g) are hereby incorporated in their entirety by reference.

The Social Media Accounts identified in Schedule 2.1(h) are hereby incorporated in their entirety by reference.

The following trademark registrations and domain names need to be maintained over the 90 days following November 4, 2020:

Jetmagtv.co – 11/21/20
Jetmag.tv – 11/21/20
Jetmagtv.net – 11/21/20

## 4.7(e) IT Contracts that need Maintenance

None

**Schedule 4.8**

**ISSUED PERMITS**

**APPLIED FOR PERMITS**

**PERMITS NECESSARY FOR OPERATION OF BUSINESS**

None.

*ACTIVE 52067311*

**Schedule 4.9**

**EMPLOYEE BENEFIT PLANS**

None.

## 4.10 Labor Relations

None

## Schedule 4.12

**INSURANCE POLICIES**

None.

## 4.13 Fees and Commissions Due

None

# Schedule 4.14

## Ebony Media Operations, LLC Litigation

| Lawsuit | Nature of Case | Status |
|---|---|---|
| *Joshua David Mardice, et al. v. Ebony Media Operations, LLC, et al.*, No. 1:19-cv-08910-vsb, United States District Court, Southern District of New York | Class action suit for unpaid wages and benefits | Pending |
| *John Stewart v. Ebony Media Operations, LLC, et al.*, No. 2019L011753, Circuit Court of Cook County, Illinois | Illinois Wage Payment and Collection Act collection case | Pending |
| *Garrett Realty Development, Inc. v. Ebony Media Operations, LLC, et al.*, No. 19L008961, Circuit Court of Cook County, Illinois | Breach of contract | Concluded |
| *Benny Williams v. Ebony Media Operations, LLC, et al.*, No. 2019L011756, Circuit Court of Cook County, Illinois | Illinois Wage Payment and Collection Act; breach of contract; unjust enrichment | Pending |
| *JMR Austin Hotel, LP v. Ebony Media Operations, LLC*, No. DC-19-19519, 192nd District Court of Dallas County, Texas | Suit to confirm arbitration award | Pending |
| *Banc of America Leasing & Capital, LLC v. Ebony Media Operations, LLC, et al.*, No. 18CIV01601, Superior Court of San Mateo County, California | Breach of contract | Pending |
| *Quad/Graphics, Inc. v. Ebony Media Operations, LLC*, No. 1148024, County Civil Court at Law, No. 2, of Harris County, Texas | Breach of Contract | Pending |
| *Advantis Certified Staffing Solutions, Inc. v. Michael Gibson, et al.*, No. 2018-80884, 125th District Court of Harris County, Texas | Breach of contract; breach of fiduciary duty; fraud; money had and received; negligent misrepresentation | Pending |

## Ebony Media Holdings, LLC Litigation

None.

Schedule 4.16(i) and 4.16(ii)

None.

# 4.17 Affiliate Transactions

None

Schedule 4.18

[Redacted]

## 5.4 Consents and Approvals

None.

## Schedule 6.1(c)

None.

## Schedule 6.1(c)(xii)

None.

## Schedule 9.2(n)

**PERMITS OBTAINED BY PURCHASER**

None.

Schedule 2-1 Leased Property

None.

Permitted Encumbrance Schedule

None.